# UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

|  |  |  |
|---|---|---|
| | ) | |
| UTILITY SOLID WASTE | ) | |
| ACTIVITIES GROUP, | ) | |
| | ) | |
| Petitioner, | ) | No. _____23-1300_____ |
| | ) | |
| v. | ) | |
| | ) | |
| U.S. ENVIRONMENTAL PROTECTION | ) | |
| AGENCY, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

_____

## PETITION FOR REVIEW

Pursuant to Rule 15 of the Federal Rules of Appellate Procedure, D.C. Circuit Rule 15, and Section 19(a) of the Toxic Substances Control Act, 15 U.S.C. § 2618(a), the Utility Solid Waste Activities Group ("USWAG")[1] hereby petitions this Court to review the final rule of Respondent United States Environmental Protection Agency, entitled "Alternate PCB Extraction Methods and Amendments

_____

[1] USWAG members Tennessee Valley Authority and the Edison Electric Institute are not participating in this litigation.

to PCB Cleanup and Disposal Regulations," published at 88 Fed. Reg. 59662 (Aug. 29, 2023) (Attachment A).

Respectfully submitted,

s/ Allison D. Foley
Allison D. Foley
Waymon T. Peer
VENABLE LLP
600 Massachusetts Ave. NW
Washington, DC 20001
(202) 344-4000
adfoley@venable.com
wtpeer@venable.com

*Counsel for Petitioner, Utility Solid Waste Activities Group*

Dated: October 30, 2023

# UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

|  |  |
|---|---|
| UTILITY SOLID WASTE ACTIVITIES GROUP,   ) | |
| ) | |
| Petitioner,   ) | No. _____ |
| ) | |
| v.   ) | |
| ) | |
| U.S. ENVIRONMENTAL PROTECTION AGENCY,   ) | |
| ) | |
| Respondent.   ) | |

_____

## RULE 26.1 DISCLOSURE STATEMENT OF UTILITY SOLID WASTE ACTIVITIES GROUP

Pursuant to Circuit Rule 26.1 of the Local Rules of the United States Court of Appeals for the District of Columbia Circuit, counsel for the Utility Solid Waste Activities Group ("USWAG") hereby certifies that to the best of the knowledge and belief of counsel:

USWAG is an association of approximately one hundred and thirty utilities, utility operating companies, and trade associations representing electric companies, utilities, and cooperatives. USWAG represents its members in rulemakings and administrative proceedings before the Environmental Protection Agency under the Toxic Substances Control Act, 15 U.S.C. § 2601 et seq., and in litigation arising

from such proceedings that affect its members. USWAG members are affected by the final action of the United States Environmental Protection Agency ("EPA") that is challenged in this proceeding. USWAG has no parent company. USWAG does not have any outstanding securities in the hands of the public, and no publicly held company has a ten percent or greater ownership interest in USWAG.

These representations are made in order that judges of this court may determine the need for recusal.

Respectfully submitted,

s/ Allison D. Foley
Allison D. Foley
Waymon T. Peer
VENABLE LLP
600 Massachusetts Ave. NW
Washington, DC 20001
(202) 344-4000
adfoley@venable.com
wtpeer@venable.com

*Counsel for Petitioner, Utility Solid Waste Activities Group*

Dated: October 30, 2023

# CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of October, 2023, the foregoing Petition for Review and Rule 26.1 Disclosure Statement were served by first-class mail, postage prepaid, on each of the following:

Michael S. Regan
Administrator
U.S. Environmental Protection Agency
Office of the Administrator (1101A)
1200 Pennsylvania Avenue, NW
Mail Code 1101A
Washington, DC 20460

Merrick B. Garland
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Correspondence Control Unit
Office of the General Counsel (2311)
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, NW
Washington, DC 20460

Dated:  October 30, 2023          s/ Allison D. Foley
                                  Allison D. Foley

                                  *Counsel for Utility Solid Waste Activities Group*

ATTACHMENT A


"Alternate PCB Extraction Methods and Amendments to PCB Cleanup and
Disposal Regulations," 88 Fed. Reg. 59662 (Aug. 29, 2023)

## ENVIRONMENTAL PROTECTION AGENCY

**40 CFR Part 761**

[EPA–HQ–OLEM–2021–0556; FRL–7122–03–OLEM]

RIN 2050–AH08

**Alternate PCB Extraction Methods and Amendments to PCB Cleanup and Disposal Regulations**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** The Environmental Protection Agency (EPA or the Agency) is finalizing an expanded set of extraction and determinative methods that can be used to characterize and verify the cleanup of polychlorinated biphenyls (PCBs) waste under implementing regulations for PCB-related authority in the Federal Toxic Substances Control Act (TSCA) (also referred to as the PCB regulations). These changes are expected to greatly reduce the amount of solvent used in PCB extraction processes, thereby conserving resources and reducing waste. In addition, the changes are expected to result in quicker, more efficient, and less costly cleanups, due to greater flexibility in the cleanup and disposal of PCB waste, while still being equally protective of human health and the environment. EPA is also finalizing several other amendments to the PCB regulations, including the amendment of the performance-based disposal option for PCB remediation waste; the removal of the provision allowing PCB bulk product waste to be disposed of as roadbed material; the addition of more flexible provisions for cleanup and disposal of waste generated by spills that occur during emergency situations (*e.g.,* hurricanes or floods); harmonization of the general disposal requirements for PCB remediation waste; and other amendments to improve the implementation of the regulations, clarify ambiguity, and correct technical errors.

**DATES:** This rule is effective February 26, 2024. The incorporation by reference of certain material listed in the rule is approved by the Director of the Federal Register as of February 26, 2024. The incorporation by reference of certain other material listed in the rule was approved by the Director of the Federal Register as of January 18, 2012.

**ADDRESSES:** The docket for this action, identified by docket identification (ID) number EPA–HQ–OLEM–2021–0556, is available at *https://www.regulations.gov* or at the Office of Land and Emergency Management Docket (OLEM Docket), Environmental Protection Agency Docket Center (EPA/DC), William Jefferson Clinton West Bldg., Rm. 3334, 1301 Constitution Ave. NW, Washington, DC. The Public Reading Room is open from 8:30 a.m. to 4:30 p.m., Monday through Friday, excluding Federal holidays. The telephone number for the Public Reading Room is (202) 566–1744, and the telephone number for the OLEM Docket is (202) 566–0270. Please review the visitor instructions and additional information about the docket available at *https://www.epa.gov/dockets.*

**FOR FURTHER INFORMATION CONTACT:** For further information regarding specific aspects of this document, contact Jennifer McLeod, Program Implementation and Information Division, Office of Resource Conservation and Recovery, (202) 566–0384; email address: *mcleod.jennifer@epa.gov.*

**SUPPLEMENTARY INFORMATION:**

## Table of Contents

The information presented in this preamble is organized as follows:

I. General Information
  A. Does this action apply to me?
  B. What action is the Agency taking?
  C. What is the Agency's authority for taking this action?
  D. What are the overall economic impacts of this action?
  E. Summary of the Final Rule
II. Background
  A. General Background on Polychlorinated Biphenyls (PCBs) and This Rulemaking
  B. Assumptions and Terminology Used in Discussion of Various Methods
III. Discussion of Public Comments and the Final Rule
  A. Revise Available Extraction Methods for PCBs
  B. Update and Limit the Use of Ultrasonic Extraction
  C. Revise Available Determinative Methods for PCBs
  D. Revise Performance-Based Disposal Under § 761.61(b)
  E. Remove Regulatory Provision Allowing Disposal of PCB Bulk Product Waste as Roadbed
  F. Add Flexible Provisions for Emergency Situations
  G. Harmonize General Disposal Requirements for PCB Remediation Waste
  H. Make Changes To Improve Regulatory Implementation
IV. Economic Impacts of the Final Rulemaking
V. Statutory and Executive Order (E.O.) Reviews
  A. Executive Order 12866: Regulatory Planning and Review and Executive Order 13563: Improving Regulation and Regulatory Review
  B. Paperwork Reduction Act (PRA)
  C. Regulatory Flexibility Act (RFA)
  D. Unfunded Mandates Reform Act (UMRA)
  E. Executive Order 13132: Federalism
  F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments
  G. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks
  H. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution or Use
  I. National Technology Transfer and Advancement Act (NTTAA)
  J. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations
  K. Congressional Review Act (CRA)

## I. General Information

*A. Does this action apply to me?*

This rule potentially affects persons that manufacture, process, distribute in commerce, use, or dispose of PCBs. The following list of North American Industrial Classification System (NAICS) codes is not intended to be exhaustive, but rather provides a guide to help readers determine whether this document applies to them. Potentially affected entities may include:

• *Utilities:* Electric power and light companies, natural gas companies (NAICS code 22);

• *Manufacturers:* Chemical manufacturers, electronics manufacturers, end-users of electricity, general contractors (NAICS codes 31–33);

• *Transportation and Warehousing:* Various modes of transportation including air, rail, water, ground, and pipeline (NAICS code 48–49);

• *Real Estate:* People who rent, lease, or sell commercial property (NAICS code 53);

• *Professional, Scientific and Technical Services:* Testing laboratories, environmental consulting (NAICS code 54);

• *Public Administration:* Federal, State, and local agencies (NAICS code 92);

• *Waste Management and Remediation Services:* PCB waste handlers (*e.g.,* storage facilities, landfills, incinerators), waste treatment and disposal, remediation services, material recovery facilities, waste transporters (NAICS code 562);

• *Repair and Maintenance:* Repair and maintenance of appliances, machinery and equipment (NAICS code 811);

To determine whether your entity is affected by this action, you should

carefully examine the changes to the regulatory text. If you have questions regarding the applicability of this action to a particular entity, consult the person listed under **FOR FURTHER INFORMATION CONTACT.**

*B. What action is the Agency taking?*

EPA is revising the list of extraction and determinative methods in the PCB regulations (40 CFR part 761); amending the performance-based cleanup option for PCB remediation waste under § 761.61(b); removing the provision allowing PCB bulk product waste to be disposed of as roadbed material; adding more flexible provisions for cleaning up spills that occur during emergency situations, such as during a hurricane or flood; harmonizing the general disposal requirements for PCB remediation waste; and making several other amendments to improve the implementation of the regulations, clarify ambiguity, and correct technical errors and outdated information.

*C. What is the Agency's authority for taking this action?*

The authority for this rule is found in section 6(e)(1) of TSCA. Specifically, section 6(e)(1)(A) gives EPA the authority to promulgate rules regarding the disposal of PCBs (15 U.S.C. 2605(e)(1)(A)).

*D. What are the overall economic impacts of this action?*

EPA estimated the costs and benefits of this rule in an Economic Assessment, which is available in the docket. Overall, EPA estimates that the final rule will result in quantifiable annual cost savings of approximately $14.4 million to $16.2 million when annualized at a discount rate of seven percent. The annual cost savings range from approximately $16.3 to $18.1 million when annualized at a discount rate of three percent.

*E. Summary of the Final Rule*

The Agency published the proposed rule titled ''Alternate PCB Extraction Methods and Amendments to PCB Cleanup and Disposal Regulations'' in the **Federal Register** on October 22, 2021 (86 FR 58730). The comment period, including a 30-day extension, ended on January 20, 2022 (86 FR 71862). For information on the proposed rulemaking, including a summary of the comments received and how the proposed changes are being finalized in this rule, please see *Section III. Discussion of the Public Comments and Final Rule.* Comments that warranted changes or preamble clarification are discussed in this rulemaking; for a complete response to comments, see ''Response to Comments on the Proposed PCB Rulemaking'' in the docket.

This final rule addresses several key issues related to implementing the PCB Cleanup and Disposal Program under TSCA, including:

Revise Available Extraction Methods for PCBs

EPA is adding the following extraction methods from SW–846, Test Methods for Evaluating Solid Waste, to the PCB regulations in 40 CFR part 761 for use on solid matrices: Method 3541 (Automated Soxhlet Extraction), Method 3545A (Pressurized Fluid Extraction), and Method 3546 (Microwave Extraction). EPA is also adding the following extraction methods from SW–846, Test Methods for Evaluating Solid Waste, to the PCB regulations in 40 CFR part 761 for use on aqueous matrices: Method 3510C (Separatory Funnel Liquid-Liquid Extraction), Method 3520C (Continuous Liquid-Liquid Extraction), and Method 3535A (Solid-Phase Extraction). The Agency is also incorporating by reference Methods 3541, 3545A, 3546, 3510C, 3520C, and 3535A into § 761.19.

Update and Limit the Use of Ultrasonic Extraction

EPA is revising the PCB regulations in 40 CFR part 761 to update SW–846 Method 3550B (Ultrasonic Extraction) to the newer method 3550C (Ultrasonic Extraction) and to limit the use of Method 3550C to wipe samples only.

Revise Available Determinative Methods for PCBs

EPA is adding the determinative method SW–846 Method 8082A (Polychlorinated Biphenyls (PCBs) By Gas Chromatography) to the PCB regulations in 40 CFR part 761. EPA is also updating the inclusion of Clean Water Act (CWA) Method 608 (Organochlorine Pesticides and PCBs) to the newer version, Method 608.3 (Organochlorine Pesticides and PCBs by GC/HSD).

Revise Performance-Based Disposal Under § 761.61(b)

EPA is amending the performance-based disposal option for PCB remediation waste under § 761.61(b) to include provisions for performance-based cleanup such as applicability, cleanup levels, verification sampling, and recordkeeping and notification requirements. EPA is also adding RCRA Subtitle C permitted landfills to the list of allowed performance-based disposal options for non-liquid PCB remediation waste.

Remove Regulatory Provision Allowing Disposal of PCB Bulk Product Waste as Roadbed

EPA is removing the option in § 761.62(d)(2) that allows for disposal of PCB bulk product waste under asphalt as part of a roadbed.

Add Flexible Provisions for Emergency Situations

EPA is adding new provisions for emergency situations under § 761.66 to allow individuals to request a waiver from specific requirements of §§ 761.60, 761.61, 761.62, and 761.65, when necessitated by an emergency situation. EPA is also adding two provisions to the existing PCB Spill Cleanup Policy in 40 CFR part 761, subpart G, that allow for more flexible requirements for cleanup of spills caused by and managed during emergency situations, such as hurricane or floods.

Harmonize General Disposal Requirements for PCB Remediation Waste

EPA is amending § 761.50(b)(3)(ii) to remove a phrase that was added erroneously in 1998, which could imply that waste with <50 parts per million (ppm) PCBs that meets the definition of PCB remediation waste in § 761.3 is not regulated for cleanup and/or disposal.

Make Changes To Improve Regulatory Implementation

EPA is making several supplemental amendments to improve implementation of existing requirements, clarify regulatory ambiguity, and correct technical errors in the PCB regulations.

## II. Background

*A. General Background on Polychlorinated Biphenyls (PCBs) and This Rulemaking*

What are PCBs?

PCBs are a group of man-made organic chemicals known as chlorinated hydrocarbons, which consist of carbon, hydrogen, and chlorine atoms. PCBs were manufactured in the United States from 1929 until manufacturing was banned in 1979, with certain time-limited exemptions from the statutory prohibition that were granted by rule. Note that the PCB regulations also provide for excluded manufacturing processes, as defined in 40 CFR 761.3, which include inadvertent generation. The number of chlorine atoms and their location in a PCB molecule determine many of its physical and chemical

properties. PCBs have no known taste or smell, and range in consistency from thin, light-colored liquids to yellow or black waxy solids. Due to their non-flammability, chemical stability, high boiling point and electrical insulating properties, PCBs were previously used in hundreds of industrial and commercial applications including: electrical, heat transfer and hydraulic equipment; plasticizers in paints, plastics and rubber products; pigments, dyes and carbonless copy paper; and other industrial applications. The PCBs used in these products were chemical mixtures made up of a variety of individual chlorinated biphenyl components known as congeners. Most commercial PCB mixtures are known in the United States by their industrial trade names, the most common being Aroclor. Please visit *https://www.epa.gov/pcbs/learn-about-polychlorinated-biphenyls-pcbs* for more information.

PCB Exposures and Health Effects [1][2][3]

PCBs are persistent in the environment and can cause both acute and chronic health effects. Short-term exposure to high concentrations of PCBs can lead to skin conditions such as acne and rashes and may be associated with decreased liver function, neurological effects, and gastrointestinal effects. These high levels of exposure are generally rare in the general population. Chronic exposure to lower concentrations of PCBs may also cause health effects, as PCBs can accumulate in people over time. In animal studies, PCBs have been shown to cause effects on the immune, reproductive, nervous, hepatic, and endocrine systems. PCBs have also been shown to cause cancer in animals. Some studies in humans provide supportive evidence for some of these health effects. Studies also show that PCBs in pregnant women can affect their children's birth weight, short-term memory, and learning. Also, because of potential neurotoxic and endocrine effects, there is concern regarding children's exposures to PCBs.

PCBs are highly persistent in the environment. As such, they are still present in soils and sediments at many locations and may be found at low levels in ambient air and water, even decades after their production was banned. PCBs can be released into the environment from hazardous waste sites, illegal or improper disposal of industrial wastes and consumer products, leaks from old electrical transformers and capacitors containing PCBs and burning of some wastes in incinerators, among other sources. PCBs bioaccumulate and may be present in foods that people consume, such as fish, meat, and dairy products. Dietary consumption of contaminated foods is believed to be an important route of background exposure.

Laws and Regulations

This final rule is issued pursuant to section 6(e) of the Toxic Substances Control Act, 15 U.S.C. 2605(e). Section 6(e)(1)(A) gives EPA the authority to promulgate rules regarding the disposal of PCBs (15 U.S.C. 2605(e)(1)(A)). TSCA section 6(e)(2) and (e)(3) generally prohibit the manufacture, processing, distribution in commerce, and use (other than totally enclosed use) of PCBs (15 U.S.C. 2605(e)(2) and (e)(3)). TSCA section 6(e)(2)(B) gives EPA the authority to authorize the use of PCBs in other than a totally enclosed manner based on a finding of no unreasonable risk of injury to health or the environment (15 U.S.C. 2605(e)(2)(B)). TSCA section 6(e)(3)(B) provides that any person may petition EPA for an exemption from the prohibition on the manufacture, processing, and distribution in commerce of PCBs (15 U.S.C. 2605(e)(3)(B)). EPA may grant an exemption based on findings that an unreasonable risk of injury to health or the environment will not result, and that the petitioner has made good faith efforts to develop a substitute for PCBs.

The PCB regulations can be found in Title 40 of the Code of Federal Regulations (CFR) in Part 761. For useful interpretations of the regulations as well as answers to frequently asked questions, please visit *https://www.epa.gov/pcbs/policy-and-guidance-polychlorinated-biphenyl-pcbs.*

*B. Assumptions and Terminology Used in Discussion of Various Methods*

Sources of the Methods

There are two important sources of EPA methods related to this rulemaking. The first source is SW–846, also known as *The Test Methods for Evaluating Solid Waste: Physical/Chemical Methods Compendium,* which is EPA's collection of methods for use in complying with the Resource Conservation and Recovery Act (RCRA). SW–846 is organized into chapters providing guidance on how to use the methods and groups of methods, called "series," which are organized by topic. The methods change over time as updates are published to keep up with evolving analytical and measurement needs.[4] The second source is the Clean Water Act (CWA) Methods, which are laboratory analytical methods, or test procedures, published by EPA that are used by industries and municipalities to analyze the chemical, physical, and biological components of wastewater and other environmental samples.[5] Methods for both SW–846 and CWA go through an extensive review and validation process before they are published and made available.

Technical Summary of New Methods

*EPA Method 3540C*—This Method is a procedure for extracting nonvolatile and semivolatile organic compounds from solids such as soils, sludges, and wastes. The Soxhlet extraction process ensures intimate contact of the sample matrix with the extraction solvent. This method is applicable to the isolation and concentration of water-insoluble and slightly water-soluble organics in preparation for a variety of chromatographic procedures. The solid sample is mixed with anhydrous sodium sulfate, placed in an extraction thimble or between two plugs of glass wool, and extracted using an appropriate solvent in a Soxhlet extractor. The extract is then dried, concentrated (if necessary), and, as necessary, exchanged into a solvent compatible with the cleanup or determinative step being employed.

*EPA Method 3550C*—This method describes a procedure for extracting nonvolatile and semivolatile organic compounds from solids such as soils, sludges, and wastes. The ultrasonic process ensures intimate contact of the sample matrix with the extraction solvent. This method is divided into two procedures, based on the expected concentration of organic compounds. Low concentration procedure—The sample is mixed with anhydrous sodium sulfate to form a free-flowing powder. The mixture is extracted with solvent three times, using ultrasonic extraction. The extract is separated from the sample by vacuum filtration or centrifugation. The extract is ready for final concentration, cleanup, and/or

---

[1] Thomas, Xue, Williams, Jones, and Whitaker. "Polychlorinated Biphenyls (PCBs) in School Buildings: Sources, Environmental Levels, and Exposures"; Office of Research and Development, National Exposure Laboratory; Washington, DC September 2012.

[2] Agency for Toxic Substances and Disease Registry (ATSDR). Toxicological Profile for Polychlorinated Biphenyls (PCBs); U.S. Department of Health and Human Services, Public Health Service, Agency for Toxic Substances and Disease Registry. November 2000.

[3] ATSDR. Addendum to the Toxicological Profile for Polychlorinated Biphenyls; U.S. Department of Health and Human Services, Public Health Service, Agency for Toxic Substances and Disease Registry. April 2011.

[4] *https://www.epa.gov/hw-sw846.*

[5] *https://www.epa.gov/cwa-methods.*

analysis. Medium/high concentration procedure—The sample is mixed with anhydrous sodium sulfate to form a free-flowing powder. This is extracted with solvent once, using ultrasonic extraction. A portion of the extract is collected for cleanup and/or analysis.

*EPA Method 8082A*—This method may be used to determine the concentrations of polychlorinated biphenyls (PCBs) as Aroclors or as individual PCB congeners in extracts from solid, tissue, and aqueous matrices, using open-tubular, capillary columns with electron capture detectors (ECD) or electrolytic conductivity detectors (ELCD). The method also may be applied to other matrices such as oils and wipe samples, if appropriate sample extraction procedures are employed.

*EPA Method 3546: Microwave Extraction*—This method is known for its relatively brief extraction time and low equipment costs. In a microwave extraction, a sample is prepared for extraction by grinding it to a powder and then loading it into the extraction vessel. The appropriate solvent system is added to the vessel, which is then sealed. The extraction vessel containing the sample and solvent system is then heated to the extraction temperature and is extracted for the amount of time recommended by the instrument manufacturer. After the mixture cools, the vessel is opened and the contents are filtered. The solid material is then rinsed multiple times, and the various solvent fractions are combined. Finally, the extract may be concentrated, if necessary, and, as needed, exchanged into a solvent compatible with the cleanup or determinative procedure to be employed.

*EPA Method 3545A: Pressurized Fluid Extraction (PFE)*—When performing a pressurized fluid extraction, a sample is prepared for extraction either by air drying the sample, or by mixing the sample with anhydrous sodium sulfate or pelletized diatomaceous earth. The sample is then ground and loaded into an extraction cell. The extraction cell containing the ground sample is then heated to the extraction temperature, pressurized with the appropriate solvent system, and extracted for the period of time recommended by the instrument manufacturer. The solvent is then collected from the heated extraction vessel and allowed to cool. Finally, the extract may be concentrated, if necessary, and, as needed, exchanged into a solvent compatible with the cleanup or determinative step being employed.

*EPA Method 3541: Automated Soxhlet Extraction*—This method shares many similarities with Manual Soxhlet Extraction (EPA Method 3540C); however, it takes less time and solvent per sample. When performing an Automated Soxhlet Extraction, a moist solid sample (*e.g.*, soil/sediment samples) may be air-dried and ground prior to extraction or chemically dried with anhydrous sodium sulfate. The prepared sample is then extracted using 1:1 acetone:hexane in the automated Soxhlet system.

*EPA Method 3510C: Separatory Funnel Liquid-Liquid Extraction*—This method describes a procedure for isolating organic compounds from aqueous samples. The method also describes concentration techniques suitable for preparing the extract for the appropriate determinative methods. A measured volume of sample, usually 1 liter, at a specified pH, is serially extracted with methylene chloride using a separatory funnel. The extract is dried, concentrated (if necessary), and, as necessary, exchanged into a solvent compatible with the cleanup or determinative method to be used.

*EPA Method 3520C: Continuous Liquid-Liquid Extraction*—This method describes a procedure for isolating organic compounds from aqueous samples. The method also describes concentration techniques suitable for preparing the extract for the appropriate determinative steps. Method 3520 is designed for extraction solvents with greater density than the sample. A measured volume of sample, usually 1 liter, is placed into a continuous liquid-liquid extractor, adjusted, if necessary, to a specific pH, and extracted with organic solvent for 18–24 hours. The extract is dried, concentrated (if necessary), and, as necessary, exchanged into a solvent compatible with the cleanup or determinative method being employed.

*EPA Method 3535A: Solid-Phase Extraction (SPE)*—This is a procedure for isolating target analytes from aqueous samples using solid-phase extraction (SPE) media. It describes conditions for extracting a variety of organic compounds from aqueous matrices that include groundwater, wastewater, and Toxicity Characteristic Leaching Procedure (TCLP) leachates. The extraction procedures are specific to the analytes of interest and vary by group of analytes and type of extraction media.

*ASTM D482–13*—This test method covers the determination of ash in the range 0.010% to 0.180% by mass, from distillate and residual fuels, gas turbine fuels, crude oils, lubricating oils, waxes, and other petroleum products, in which any ash-forming materials present are normally considered to be undesirable impurities or contaminants (Note 1). The test method is limited to petroleum products which are free from added ash-forming additives, including certain phosphorus compounds

*ASTM D5373–16*—Test Method A covers the determination of carbon in the range of 54.9% to 84.7%, hydrogen in the range of 3.25% to 5.10%, and nitrogen in the range of 0.57% to 1.80% in the analysis samples (8.1) of coal and of carbon in analysis samples of coke in the range of 86.6% to 97.9%. Test Method B covers the determination of carbon in analysis samples of coal in the range of 58.0% to 84.2%, and carbon in analysis samples of coke in the range of 86.3% to 95.2%.

*ASTM D3278–96(R2011)*—These test methods cover procedures for determining whether a material does or does not flash at a specified temperature or for determining the lowest finite temperature at which a material does flash when using a small scale closed-cup apparatus.[2] The test methods are applicable to paints, enamels, lacquers, varnishes, and related products having a flash point between 0 and 110 °C (32 and 230 °F) and viscosity lower than 150 St at 25 °C (77 °F).

*ASTM E258–67(R87)*—This test method covers the determination of total nitrogen in nitrogen-containing organic compounds. This test method is not applicable for use on materials containing N–O, N–N linkages.

*ASTM D4059–00*—This test method describes a quantitative determination of the concentration of polychlorinated biphenyls (PCBs) in electrical insulating liquids by gas chromatography. It also applies to the determination of PCB present in mixtures known as askarels, used as electrical insulating liquids.

*ASTM D8174–18*—This test method covers the procedure for a flash point test, within the range of −20 to 70 °C, of liquid wastes using a small-scale closed cup tester. This standard measures the ignitability properties of liquid wastes (which may be any discarded material), which may include secondary materials, off-specification products, and materials containing free liquids recovered during emergency response actions.

*ASTM D8175–18*—This test method covers the procedure for a finite flash point test, within the range of 20 to 70 °C, of liquid wastes using a manual or automated Pensky-Martens closed cup tester. This test method contains two procedures and is applicable to liquid waste, liquid phase(s) of multi-phase waste, liquid waste with suspended solids, or liquid waste that tends to form a surface film under test conditions.

Terminology of the Methods

To avoid confusion with the variety of methods discussed, the source of each method, and the numbering of the methods, EPA is using streamlined terminology in this preamble to improve its readability. For example, rather than stating "SW–846, Test Methods for Evaluating Solid Waste, EPA Method 3540C (Soxhlet Extraction)" each time this method is discussed, the preamble may refer to "Method 3540C" or "Method 3540C (Soxhlet Extraction)" instead. See Table 1 for a list of all methods referenced in this document.

TABLE 1—TABLE OF EPA METHODS DISCUSSED IN THIS RULEMAKING

| Source | Method ID | Publication year | Method type | Method name | Final change |
|--------|-----------|------------------|-------------|-------------|--------------|
| SW–846 | Method 3510C [6] | 1996 | Extraction | Separatory Funnel Liquid-Liquid Extraction. | Added to Regulations. |
| SW–846 | Method 3520C [7] | 1996 | Extraction | Continuous Liquid-Liquid Extraction. | Added to Regulations. |
| SW–846 | Method 3535A [8] | 2007 | Extraction. | Solid-Phase Extraction (SPE). | Added to Regulations. |
| SW–846 | Method 3500B | 2007 | Extraction | Organic Extraction and Sample Preparation. | Removed from Regulations. |
| SW–846 | Method 3540C | 1996 | Extraction | Soxhlet Extraction | Remains in Regulations. |
| SW–846 | Method 3541 [9] | 1994 | Extraction | Automated Soxhlet Extraction. | Added to Regulations. |
| SW–846 | Method 3545A [10] | 2007 | Extraction | Pressurized Fluid Extraction. | Added to Regulations. |
| SW–846 | Method 3546 [11] | 2007 | Extraction | Microwave Extraction | Added to Regulations. |
| SW–846 | Method 3550B | 1996 | Extraction | Ultrasonic Extraction | Updated to Method 3550C and Limited to Wipe Samples Only. |
| SW–846 | Method 3550C | 2007 | Extraction | Ultrasonic Extraction | Replaces Method 3550B and Limited to Wipe Samples Only. |
| SW–846 | Method 8082 | 1996 | Determinative | Polychlorinated Biphenyls (PCBs) by Gas Chromatography. | Removed from Regulations. |
| SW–846 | Method 8082A | 2007 | Determinative | Polychlorinated Biphenyls (PCBs) by Gas Chromatography. | Added to Regulations. |
| SW–846 | Method 8275A | 1996 | Extraction and Determinative. | Semivolatile Organic Compounds (PAHs and PCBs) in Soils/ Sludges and Solid Wastes Using Thermal Extraction/Gas Chromatography/Mass Spectrometry (TE/GC/ MS). | Not Added to Regulations. |
| CWA | Method 1668C | 2010 | Extraction and Determinative. | Chlorinated Biphenyl Congeners in Water, Soil, Sediment, Biosolids, and Tissue by HRGC/HRMS. | Not Added to Regulations. |
| CWA | 608 | 2006 | Extraction and Determinative. | Organochlorine Pesticides and PCBs. | Updated to CWA Method 608.3. |
| CWA | 608.3 | 2016 | Extraction and Determinative. | Organochlorine Pesticides and PCBs by GC/HSD. | Replaces CWA Method 608. |

---

[6] U.S. EPA, Method 3510C Separatory Funnel Liquid-Liquid Extraction. Office of Land and Emergency Management, Office of Resource Conservation and Recovery, Materials Recovery and Waste Management Division (5303P). Washington, DC December 1996.

[7] U.S. EPA, Method 3520C Continuous Liquid-Liquid Extraction. Office of Land and Emergency Management, Office of Resource Conservation and Recovery, Materials Recovery and Waste Management Division (5303P). Washington, DC December 1996.

[8] U.S. EPA, Method 3535A Solid-Phase Extraction. Office of Land and Emergency Management, Office of Resource Conservation and Recovery, Materials Recovery and Waste Management Division (5303P). Washington, DC February 2007.

[9] U.S. EPA, Method 3541 Automated Soxhlet Extraction. Office of Land and Emergency Management, Office of Resource Conservation and Recovery, Materials Recovery and Waste Management Division (5303P). Washington, DC September 1994.

[10] U.S. EPA, Method 3545A Pressurized Fluid Extraction. Office of Land and Emergency Management, Office of Resource Conservation and Recovery, Materials Recovery and Waste Management Division (5303P). Washington, DC February 2007.

[11] U.S. EPA, Method 3546 Microwave Extraction. Office of Land and Emergency Management, Office of Resource Conservation and Recovery, Materials Recovery and Waste Management Division (5303P). Washington, DC February 2007.

## III. Discussion of Public Comments and the Final Rule

### A. Revise Available Extraction Methods for PCBs

Provisions in the Final Rule

EPA proposed to add the following extraction methods to 40 CFR part 761: Method 3541 (Automated Soxhlet Extraction), Method 3545A (Pressurized Fluid Extraction), and Method 3546 (Microwave Extraction) for extraction of PCBs from solid matrices; and Method 3510C (Separatory Funnel Liquid-Liquid Extraction), Method 3520C (Continuous Liquid-Liquid Extraction), and Method 3535A (Solid-Phase Extraction) for extraction of PCBs from aqueous matrices. EPA is finalizing these changes as proposed. EPA is allowing these methods for use, as applicable, under the following subparts of 40 CFR part 761:

- Subpart D—Storage and Disposal;
- Subpart K—PCB Waste Disposal Records and Reports;
- Subpart M—Determining a PCB Concentration for Purposes of Abandonment or Disposal of Natural Gas Pipeline: Selecting Sites, Collecting Surface Samples, and Analyzing Standard PCB Wipe Samples;
- Subpart N—Cleanup Site Characterization Sampling for PCB Remediation Waste in Accordance with § 761.61(a)(2);
- Subpart O—Sampling to Verify Completion of Self-Implementing Cleanup and On-Site Disposal of Bulk PCB Remediation Waste and Porous Surfaces in Accordance with § 761.61(a)(6);
- Subpart P—Sampling Non-Porous Surfaces for Measurement-Based Use, Reuse, and On-Site or Off-Site Disposal Under § 761.61(a)(6) and Determination Under § 761.79(b)(3);
- Subpart R—Sampling Non-Liquid, Non-Metal PCB Bulk Product Waste for Purposes of Characterization for PCB Disposal in Accordance With § 761.62, and Sampling PCB Remediation Waste Destined for Off-Site Disposal, in Accordance With § 761.61; and
- Subpart T—Comparison Study for Validating a New Performance-Based Decontamination Solvent under § 761.79(d)(4).

These modifications to 40 CFR part 761 can be found in the regulatory text section towards the end of this final rule; the specific sections of the PCB regulations affected by these changes are §§ 761.61(a)(5)(i)(B)(2)(iv), 761.253, 761.272, 761.292, 761.358, and 761.395.

EPA is adding Methods 3541, 3545A, and 3546 to the PCB regulations for extraction of PCBs from solid matrices

for several reasons, including applicability of the methods to PCBs, frequency of use in EPA and commercial laboratories, and existing data supporting the effectiveness of the methods. EPA finds, based on reasonably available information, that these methods are technically sound for the extraction of PCBs from solid matrices. In addition, EPA is adding Methods 3510C, 3520C, and 3535A to the PCB regulations for extraction of PCBs from aqueous matrices because the PCB Regulations do not specify extraction methods for aqueous matrices. EPA finds, based on reasonably available information, that these methods are technically sound for the extraction of PCBs from aqueous matrices. The technical data and rationale for adding these methods to the PCB regulations can be found in *Section III.A. Expand Available Extraction Methods for PCBs* of the proposed rule "Alternate PCB Extraction Methods and Amendments to PCB Cleanup and Disposal Regulations" (86 FR 58730), which is included in the docket for this final rulemaking.

Discussion of the Public Comments

Public comments supported the Agency's proposal to add Method 3541 (Automated Soxhlet Extraction), Method 3545A (Pressurized Fluid Extraction), and Method 3546 (Microwave Extraction) for extraction of PCBs from solid matrices; and Method 3510C (Separatory Funnel Liquid-Liquid Extraction), Method 3520C (Continuous Liquid-Liquid Extraction), and Method 3535A (Solid-Phase Extraction) for extraction of PCBs from aqueous matrices. Specifically, commenters appreciated the increased flexibility of extraction methods, higher efficiency of the methods, reduced laboratory cost, and reduced waste.

EPA agrees with the public comments and is therefore finalizing its proposal to add these methods to the regulations. EPA finds, based on reasonably available information, that expanding the options for alternative extraction methods in the PCB regulations will help the regulated community investigate, clean up and dispose of PCB waste more quickly, efficiently, and economically, and in a more environmentally sound manner.

Background on Extraction Methods for PCBs

The regulated community has long expressed interest in the availability of alternative extraction methods beyond the two previously allowed under the PCB regulations—Method 3540C (Soxhlet Extraction), which is

commonly referred to as "Manual Soxhlet Extraction", and Method 3550B (Ultrasonic Extraction).[12] In addition, because Ultrasonic Extraction methods do not use heat to speed up extraction kinetics or improve extraction efficiency, and the contact time with the solvent is relatively short, they may result in low bias measurements in some sample types, such as caulk and clay. In addition, published studies indicate that Method 3550B has the potential to produce low bias measurements in some solid matrices compared to other extraction techniques. For more information on this issue, see *Section III.B. Update and Limit the Use of Ultrasonic Extraction* of this final rule.

Manual Soxhlet Extraction was invented in the late 1800s, and the revised Method 3540C was created in 1996. It is a long-standing, effective method for PCB extraction from solid matrices; however, it has slowly been replaced by newer methods in both EPA and commercial laboratories over time.[13] This transition has caused problems with the availability of Manual Soxhlet Extraction in EPA and commercial laboratories, which could cause delays in getting samples extracted and analyzed in a timely matter. In addition, further delays could result because Manual Soxhlet Extraction takes 16–24 hours to complete the extraction of a limited number of samples, whereas other methods may take only 2–4 hours, or less. Manual Soxhlet Extraction systems also typically use heating manifolds with significant footprints that are commonly operated in fume hoods to limit operator exposure to solvent vapors, which further restricts laboratory capacity using this technique.

In addition, none of the previously allowed methods are applicable to extraction of PCBs from aqueous samples. Method 8082 was the only determinative method listed in the PCB regulations for extraction from aqueous matrices and states that "[a]queous samples may be extracted at neutral pH with methylene chloride using either Method 3510 (separatory funnel), Method 3520 (continuous liquid-liquid extraction), Method 3535A (solid-phase

---

[12] Allison D. Foley "Consolidated Petition on Behalf of USWAG Members to Use Automated Soxhlet Extraction (Method 3541) in Connection with June 10, 2014 Risk-Based Approvals to Dispose of Polychlorinated Biphenyl (PCB) Remediation Waste"; March 2015.

[13] M.D. Luque de Castro, L.E. García-Ayuso. "Soxhlet extraction of solid materials: an outdated technique with a promising innovative future." Department of Analytical Chemistry, Faculty of Sciences, University of Cordoba. Cordoba, Spain. March 1998.

extraction) or other appropriate technique or solvents.''

*B. Update and Limit the Use of Ultrasonic Extraction*

Provisions in the Final Rule

EPA proposed to remove Method 3550B (Ultrasonic Extraction) from the PCB regulations. However, after reviewing the public comments, EPA is, instead, updating references to Method 3550B in the PCB regulations to Method 3550C and limiting the use of Method 3550C to wipe samples only. Available studies on Ultrasonic Extraction collectively demonstrate concerns about the inconsistent performance of the method and the robustness of extractions for certain matrices of interest to the TSCA PCB Cleanup and Disposal Program for compliance testing. However, EPA does not have such concerns about use of Ultrasonic Extraction for wipe samples based on reasonably available information.

The sections of the PCB regulations affected by these changes are §§ 761.61(a)(5)(i)(B)(2)(iv), 761.253, 761.272, 761.292, 761.358, and 761.395.

Discussion of the Public Comments

EPA proposed to remove Method 3550B (Ultrasonic Extraction) from the PCB regulations because the extraction efficiency may be more variable than other methods and thus it has a higher potential than other methods to be conducted improperly. However, several commenters opposed removing Method 3550B from the PCB regulations. These commenters all considered this method to be appropriate for at least some matrix types, such as sand and surface wipe samples. Some comments suggested that EPA restrict the use of the method for problematic matrices only, such as clay and caulk. Some comments stated that method quality controls, such as performance testing, visual observation of the extraction, or ability to meet the acceptance criteria for the method, were sufficient to identify whether the method is appropriate for a given sample. The commenters also voiced concern that removal of the method from the PCB regulations could lead to logistical problems and increased costs. Several of these commenters proposed updating the reference from Method 3550B to Method 3550C, which is an updated version of Method 3550B.

The Agency disagrees with comments that suggest EPA restrict the use of Method 3550B or 3550C for problematic matrices only, as it would be inefficient and complicated to make such a decision on a case-by-case basis—for

example, by prohibiting the method to be used on certain types of soils, or by specifying the maximum silt or clay content of soil samples for which the method is permissible to use. The Agency also disagrees with comments that the method quality controls provide all the information needed to distinguish acceptable and poor extraction efficiency since PCBs may be more deeply integrated into soils or other solid samples and may be more difficult to efficiently extract. Based on the available studies, use of Ultrasonic Extraction in some solid matrices is likely to produce low bias measurements that are not otherwise identified with the method quality controls. This low bias may lead to decision errors that could otherwise be avoided by using the alternative extraction methods EPA is adding in this rulemaking, all of which use heat and a longer solvent contact time to speed up extraction kinetics and improve extraction efficiency.

However, the Agency agrees with comments indicating the method is appropriate for wipe samples, because PCBs do not have the same extraction kinetics or extraction efficiency limitations from wipe samples containing relatively small amounts of particulates as they may have in some types of bulk solid samples (*e.g.,* wet clay or caulk). The Agency also agrees with comments proposing that EPA update Method 3550B to Method 3550C, which is the updated version of Method 3550B. The Agency is therefore allowing use of Method 3550C for wipe samples only. Allowing use of this extraction method on wipe samples, which are a very commonly extracted item, addresses both commenters' concerns about cost and logistical problems that completely removing this extraction method from the PCB regulations could cause and the Agency's concerns regarding use of this method on other matrices.

Background on This Issue

Method 3550C (Ultrasonic Extraction) is an updated version of Method 3550B. Use of Method 3550B was previously allowed in the PCB regulations. The text in Method 3550B and Method 3550C includes caveats that ultrasonic extraction may not be as rigorous as other extraction methods for soils/solids and highlights the importance of following the method explicitly. By comparison, this issue is generally not mentioned or highlighted in other SW–846 methods. Method 3550C further emphasizes, beyond what is stated in Method 3550B, the crucial importance of conducting the method properly, in

line with the manufacturer's instructions regarding operational settings.[14] For more information on the technical aspects of ultrasonic extraction, see *Section III.A.2. Technical Summary of Relevant Extraction Methods* of the proposed rule ''Alternate PCB Extraction Methods and Amendments to PCB Cleanup and Disposal Regulations'' (86 FR 58730), which is included in the docket for this final rulemaking.

*C. Revise Available Determinative Methods for PCBs*

Provisions in the Final Rule

EPA proposed to add three determinative methods to the PCB regulations: Method 8082A (Polychlorinated Biphenyls (PCBs) By Gas Chromatography), Method 8275A (Semivolatile Organic Compounds (PAHs and PCBs) In Soils/Sludges and Solid Wastes Using Thermal Extraction/ Gas Chromatography/Mass Spectrometry (TE/GC/MS)), and Method 1668C (Chlorinated Biphenyl Congeners in Water, Soil, Sediment, Biosolids and Tissue by HRGC/HRMS).

EPA also proposed to update the outdated referenced methods in § 761.60(g)(1)(iii) from Method 608 to Method 608.3, and Method 8082 to Method 8082A.

The Agency is adding Method 8082A to the PCB regulations and updating Method 608 to Method 608.3 in § 761.60(g)(1)(iii), as proposed. The Agency is not adding Method 8275A or Method 1668C to the PCB regulations, due to the public comments summarized below. The main deciding factor is that the regulated community expressed satisfaction with using Method 8082 and/or Method 8082A for analysis and indicated that there is not a need to use other methods on a broad scale. Although EPA is not adding Method 8275A and Method 1668C as determinative methods to the regulations, the Agency notes that these methods, as well as other methods that have been published since the proposed rule, such as CWA Method 1628, may be appropriate and useful in certain situations. For example, a PCB congener analysis method (such as Method 1668C) may be preferred based on the

---

[14] Section 1.4 of Method 3550C states, ''Because of the limited contact time between the solvent and the sample, ultrasonic extraction may not be as rigorous as other extraction methods for soils/ solids. Therefore, it is critical that the method (including the manufacturer's instructions) be followed explicitly, in order to achieve the maximum extraction efficiency. See Sec. 11.0 for a discussion of the critical aspects of the extraction procedure. Consult the manufacturer's instructions regarding specific operational settings.''

formulation of PCBs present in the material being analyzed per § 761.1(b)(2) and may be acceptable under a §§ 761.60(e), 761.61(c), 761.62(c), or 761.79(h) approval. EPA notes that a person may either conduct a Subpart Q comparison study or submit an appropriate application (*i.e.*, under §§ 761.60(e), 761.61(c), 761.62(c) or 761.79(h)) requesting to use an alternative determinative method for their project.

The sections of the PCB regulations affected by these changes are §§ 761.60(g)(1)(iii), 761.61(a)(5)(i)(B)(2)(iv), 761.253, 761.272, 761.292, 761.358, and 761.395.

Discussion of the Public Comments

Commenters generally opposed adding Method 8275A and Method 1668C to the PCB regulations but did not object to adding Method 8082A or updating Method 608 to Method 608.3.

Commenters pointed out that Method 8275A has a very small sample size (0.003–0.25 grams), which could lead to problems obtaining sufficient sensitivity. Comments also noted that testing such a small sample mass may lead to greater concerns about whether sample measurements are representative. Other solid sample preparation methods included in this rule specify a sample size of 10–30 grams, which is less likely to be subject to subsampling bias. In addition, comments noted that Method 8275A is not specific to quantitative analysis of PCBs as it was validated for simultaneous analysis of select PCB congeners and polycyclic aromatic hydrocarbons (PAHs). The comments also indicated that there is a lack of commercial laboratory capacity to perform this method, and that the method is not available at any National Environmental Laboratory Accreditation Program (NELAP) accredited laboratories. The comments also expressed concern that the drying and sieving process for the method could result in volatile loss of mono- and di-chlorobiphenyls, which is a common problem for any method which uses air drying. The comments identified that EPA Method 8275A has a limited scope of target analytes, and the method only specifically includes 19 out of 209 PCB congeners. Lastly, the comments expressed concern about the use of isotopically labeled PAHs in Method 8275A as internal standards for PCBs, which may lead to measurement bias if they do not perform similarly in a given sample. Considering these comments, EPA has decided not to finalize changes related to Method 8275A.

Regarding Method 1668C, commenters were primarily concerned about the availability and cost of using this method. Comments indicated that the high-resolution mass spectrometer used for this method is not widely available, and that the analytical costs are high with long turnaround times. The commenters were concerned about the parts-per-quadrillion detection limits, which are orders of magnitude more sensitive than typically needed to demonstrate compliance with the PCB regulations. The comments also noted that, due to these very low detection limits, this method is more likely to experience laboratory background contamination which could lead to problems with data interpretation. The commenters were also concerned with the fact that the method validation study for Method 1668C did not include soil or sediment matrices, and the method does not identify how to report total PCBs. Lastly, the comments noted that the regulated community never expressed concerns regarding availability of determinative methods beyond EPA Method 8082 and/or EPA Method 8082A. In light of these comments, EPA has decided not to finalize changes related to Method 1668C.

EPA did not receive any substantive comments on its proposal to update Method 608 to Method 608.3 and Method 8082 to Method 8082A in § 761.60(g)(1)(iii), and thus is finalizing those changes largely as proposed.

Background on This Issue

Previously, the PCB regulations listed Method 8082 (Polychlorinated Biphenyls (PCBs) by Gas Chromatography) as the only determinative method for PCB samples.[15] The only exception in the PCB regulations was at § 761.60(g)(1)(iii), which stated that "[a]ny gas chromatographic method that is appropriate for the material being analyzed may be used" and then listed several available determinative methods.[16] However, this section in the

[15] U.S. EPA, Method 8082 Polychlorinated Biphenyls (PCBs) by Gas Chromatography. Office of Land and Emergency Management, Office of Resource Conservation and Recovery, Materials Recovery and Waste Management Division (5303P). Washington, DC. December 1996.

[16] The regulatory text at § 761.60(g)(1)(iii) previously listed the following methods: ". . . EPA Method 608, "Organochlorine Pesticides and PCBs" at 40 CFR part 136, Appendix A;" EPA Method 8082, "Polychlorinated Biphenyls (PCBs) by Capillary Column Gas Chromatography" of SW–846, "OSW Test Methods for Evaluating Solid Waste," which is available from NTIS; and ASTM Standard D–4059, "Standard Test Method for Analysis of Polychlorinated Biphenyls in Insulating

PCB regulations is restricted to samples of mineral oil dielectric fluid (MODEF) and waste oil (see §§ 761.60(g)(1) and 761.60(g)(2)). Previously, all other samples were required to be analyzed using Method 8082, and any alternative determinative method would require EPA approval. EPA had not received any significant concerns from the regulated community regarding the availability of determinative methods; however, EPA investigated additional determinative methods to include in the proposed rulemaking to provide a greater number of technically sound options for the regulated community.

Additionally, the methods previously referenced in § 761.60(g)(1)(iii) were outdated and did not reflect the most current versions. By updating these references, EPA is not requiring that only the new specifically referenced methods be used, as § 761.60(g)(1)(iii) provides that "[a]ny gas chromatographic method that is appropriate for the material being analyzed may be used." EPA believes this update will avoid confusion by referencing the most up-to-date methods while still allowing flexibility in this regulatory provision.

*D. Revise Performance-Based Disposal Under § 761.61(b)*

Provisions in the Final Rule

EPA proposed to amend § 761.61(b) to add performance-based cleanup standards, while maintaining this option as one which does not require prior EPA approval and thus remains an expedient option for those entities removing PCB remediation waste from the site. Specifically, EPA proposed to amend § 761.61(b) to include explicit conditions for on-site remediation and cleanup of PCB remediation waste.

The Agency is finalizing the provisions in § 761.61(b) largely as proposed, with some minor changes and clarifications. The final rule includes provisions that: (1) establish cleanup levels; (2) prohibit use of § 761.61(b) where cleanup sites are near sensitive populations or environments; (3) establish verification sampling requirements; (4) establish recordkeeping requirements; (5) establish a 30-day post-cleanup notification requirement; and (6) allow disposal of non-liquid PCB remediation waste in RCRA Subtitle C landfills.

First, EPA is establishing cleanup levels for sites remediated under a § 761.61(b) performance-based cleanup. The regulations previously did not reference a specific cleanup level. The

Liquids by Gas Chromatography," which is available from ASTM."

preamble to the proposed PCB Megarule (59 FR 62788, 62796; Dec. 6, 1994) explained that § 761.61(b) "could be used where all PCB remediation waste would be removed from the environment, or where remediation levels were established elsewhere in these rules." In guidance, EPA has interpreted "all PCB remediation waste" to mean PCB remediation waste at >1 ppm PCBs.[17] Identifying a numerical cleanup level in the regulations will help responsible parties understand the circumstances under which they could expect to have no further cleanup responsibility at the site under § 761.61(b). EPA is therefore establishing the following cleanup levels directly in § 761.61(b): ≤1 ppm for bulk PCB remediation waste and porous surfaces; the concentrations specified in § 761.79(b)(1) and (2) for liquids; and the concentrations specified in § 761.79(b)(3) for nonporous surfaces. See § 761.61(b)(1)(ii).

Second, EPA is adding an applicability provision in § 761.61(b) to exclude the use of § 761.61(b) at sites with specific characteristics that merit additional consideration by EPA. In the PCB Megarule (63 FR 35384; June 29, 1998), EPA established that certain types of sensitive environments and populations would not be well-served by the cleanup levels prescribed in § 761.61(a)(4) and excluded those sites from the applicability of § 761.61(a). EPA also identified certain types of sites that, while subject to § 761.61(a), may call for more stringent cleanup levels. See § 761.61(a)(1) and (a)(4)(vi). The PCB Spill Cleanup Policy includes similar provisions. See § 761.120(a)(2) and (d)(2). Because performance-based cleanup under § 761.61(b) will not require consultation with EPA, the Agency is establishing a list of objective characteristics that excludes a site for cleanup using performance-based cleanup standards. This list largely mirrors the applicability section in § 761.61(a)(1) and the characteristics in §§ 761.61(a)(4)(vi), 761.120(a)(2), and 761.120(d)(2) of sites that may require more stringent cleanup levels or site-specific determinations. It also excludes sites where PCB remediation waste is found within the 100-year floodplain, which allows EPA to give additional consideration to the protection of waterways through cleanup under § 761.61(a) and/or § 761.61(c), and to the impacts of climate change on the spread of PCB contamination through flooding. See § 761.61(b)(1)(i).

Third, EPA is requiring verification sampling in accordance with the PCB regulations to ensure that the cleanup levels established in § 761.61(b) have been met. Verification sampling must be conducted in accordance with Subpart O for bulk PCB remediation waste and porous surfaces, Subpart P for nonporous surfaces, and § 761.269 for liquid PCB remediation waste. The concentration in every required sample analysis result must be below the specified cleanup levels for the cleanup to be complete. See § 761.61(b)(1)(iii).

Fourth, EPA is incorporating explicit recordkeeping requirements into performance-based cleanup. Previously, responsible parties using § 761.61(b) were only subject to the applicable recordkeeping requirements in § 761.180(a) for PCB remediation waste shipped off-site. Under the new provisions for performance-based cleanup, responsible parties must follow the recordkeeping requirements in the PCB Spill Cleanup Policy at § 761.125(c)(5) in addition to the requirements in § 761.180(a). See § 761.61(b)(1)(iv).

Fifth, EPA is incorporating a 30-day post-cleanup notification requirement into the performance-based cleanup provisions. Under performance-based cleanup and disposal, sites may be remediated without EPA involvement. Post-cleanup notification allows regulators to evaluate performance to ensure that conditions, such as cleanup levels, are met. The notification must include information about the site and point of contact, the disposal facility and waste shipments, a summary of the required records, and a certification, as defined in § 761.3, from the responsible party. While EPA proposed to require responsible parties to send a notification to EPA within 14 days of the final shipment of waste offsite for disposal from a site cleaned up under § 761.61(b), based on the public comments summarized below, this final rule revises the notification period to 30 days. See § 761.61(b)(1)(v).

Sixth, EPA is adding a RCRA Subtitle C landfill disposal option for non-liquid PCB remediation waste under § 761.61(b). RCRA Subtitle C landfills are already allowed to be used for the disposal of bulk PCB remediation waste under § 761.61(a)(5)(i)(B)(2)(iii) and for PCB bulk product waste under § 761.62(a)(3). EPA has previously stated in the preamble to the PCB Megarule that "EPA added RCRA Subtitle C landfills as a disposal option for PCB bulk product waste because they are designed and operated in the

same manner as TSCA chemical waste landfills."[18] As discussed further below, RCRA Subtitle C and TSCA chemical waste landfill regulations authorize the imposition of comparable protective conditions, and EPA believes that allowing this waste to go to RCRA Subtitle C landfills is protective and presents no unreasonable risk to human health or the environment. Moreover, since EPA has already determined that RCRA Subtitle C landfills are protective for PCB bulk product waste, which typically contains very high concentrations of PCBs, the Agency finds that disposal of non-liquid PCB remediation waste in RCRA Subtitle C landfills would also be protective, as non-liquid PCB remediation waste typically contains concentrations of PCBs similar to or lower than PCB bulk product waste. By adding these landfills to the list of allowable disposal options for certain PCB remediation wastes, EPA anticipates that transportation costs will decrease as the distance to the closest allowable disposal option diminishes. Furthermore, the disposal cost per ton of non-liquid, nonhazardous PCB waste is generally lower at RCRA Subtitle C landfills than it is at TSCA chemical waste landfills. More information on the estimated costs is available in the Economic Assessment. See § 761.61(b)(2)(ii)(A).

Finally, EPA is revising the language in § 761.125(a)(2) of the PCB Spill Cleanup Policy to ensure that the addition of RCRA Subtitle C landfills to § 761.61(b) does not affect the Spill Cleanup Policy. Expanding the disposal options available under the Spill Cleanup Policy is not an objective of this rulemaking and is outside the scope of this rulemaking. While EPA proposed to revise the language in the Spill Cleanup Policy to specify that only disposal facilities with TSCA approvals issued under Subpart D of the PCB regulations could be used for disposal of cleanup debris and other materials resulting from cleanup under the Policy, based on the public comment summarized below, EPA has modified the revision to ensure that Subpart D storage and disposal options other than disposal in RCRA Subtitle C landfills remain. See § 761.125(a)(2).

EPA notes that the above changes to § 761.61(b) will not impact a responsible party's ability to pair performance-based disposal under § 761.61(b)(2) with on-site cleanup under § 761.61(a), § 761.61(c), or § 761.77 (e.g., state-authorized cleanup under a coordinated approval). The regulatory text explicitly preserves the ability to use

---

[17] Managing Remediation Waste From Polychlorinated Biphenyls (PCBs) Cleanups, *https://www.epa.gov/pcbs/managing-remediation-waste-polychlorinated-biphenyls-pcbs-cleanups.*

[18] 63 FR 35384, 35410–35411; June 29, 1998.

§ 761.61(b)(2) solely as a disposal provision. See introductory paragraph in § 761.61(b).

For more information on the changes to § 761.61(b), see *Section III.D. Revise Performance-Based Disposal Under § 761.61(b)* of the proposed rule ''Alternate PCB Extraction Methods and Amendments to PCB Cleanup and Disposal Regulations'' (86 FR 58730), which is included in the docket for this final rulemaking.

*Discussion of the Public Comments*

Comments were supportive of EPA's proposal to establish cleanup levels for sites remediated under a § 761.61(b) performance-based cleanup, and EPA is finalizing this change as proposed.

EPA proposed to limit applicability of § 761.61(b) at sites with characteristics that may warrant more stringent cleanup levels or site-specific determinations. Several commenters expressed concern that prohibiting use of § 761.61(b) at sites that are adjacent to, contain, or are proposed to be redeveloped to contain the sensitive populations or environments listed in § 761.61(b)(1)(i)(A)(7) unnecessarily limits the applicability of the § 761.61(b) performance-based cleanup option and that the § 761.61(b) cleanup levels will ensure no unreasonable risk at these sites. EPA disagrees with these comments. In EPA's experience addressing these types of sites under § 761.61(c), EPA frequently sees complex risks and exposure pathways that require extensive collaboration between EPA and responsible parties. Based on this experience, the Agency does not have confidence that these sites could be protectively managed under the performance-based cleanup option without EPA involvement and believes that the § 761.61(b) applicability provisions, which largely mirror existing provisions in §§ 761.61(a)(1), 761.61(a)(4)(vi), 761.120(a)(2), and 761.120(d)(2), are appropriately limited. EPA does, however, recognize the need for clarification in § 761.61(b)(1)(i)(A)(*7*) based on comments that questioned whether the term ''adjacent to'' in that provision referred to adjacency to a cleanup site or an entire property or facility containing a cleanup site. EPA has revised § 761.61(b)(1)(i)(A)(7) to clarify that the provision refers to a cleanup site, as defined in § 761.3.

EPA proposed to add verification sampling requirements to § 761.61(b). Some commenters sought flexibility in verification sampling to account for site-specific circumstances and for other reasons. While EPA recognizes the desire for flexibility, because § 761.61(b)

is a self-implementing cleanup option without EPA involvement, the Agency believes that prescriptive verification sampling requirements are appropriate, and EPA is finalizing this change as proposed.

EPA proposed to add recordkeeping requirements from § 761.125(c)(5) of the PCB Spill Cleanup Policy to § 761.61(b). EPA received no comments regarding these recordkeeping requirements and thus is finalizing this change as proposed.

EPA proposed to add a post-cleanup notification requirement to § 761.61(b) that would require notification within 14 days of the final shipment of waste offsite for disposal from a site cleaned up under § 761.61(b). Commenters considered the 14-day notification period to be too short and sought either 30 or 60 days. EPA agrees with commenters on the need for more time to obtain all necessary information to include in the notification, including processing verification samples and confirming the manifests. EPA is therefore finalizing a post-cleanup notification requirement that requires notification within 30 days of final shipment of waste offsite for disposal from a site cleaned up under § 761.61(b). EPA finds 30 days will allow sufficient time to obtain all necessary information while providing EPA timely notification of cleanups completed under § 761.61(b).

EPA proposed to allow for disposal of non-liquid PCB remediation waste in RCRA Subtitle C permitted landfills under § 761.61(b). Most of the commenters supported the addition of RCRA Subtitle C landfills to the list of allowable disposal options for non-liquid PCB remediation waste. One commenter noted potential differences in monitoring, recordkeeping, and reporting requirements for PCBs between RCRA Subtitle C landfills and TSCA chemical waste landfills. In particular, the commenter noted that environmental monitoring requirements for RCRA Subtitle C landfills are based on RCRA hazardous waste program requirements, which are not the same as the monitoring requirements for TSCA chemical waste landfills under § 761.75 (*i.e.,* surface water, groundwater, leachate, and secondary leachate monitoring of PCBs, pH, specific conductance, and chlorinated organics). The commenter noted that additional monitoring parameters for TSCA chemical waste landfills may include soil, sediment, and ambient air monitoring, where necessary, to ensure protection of the environment from PCBs. The commenter also noted that in some States, PCBs are not a hazardous

waste, which could leave State programs with a limited ability to implement environmental monitoring of PCBs at RCRA Subtitle C landfills.

PCBs are hazardous constituents under 40 CFR part 261, appendix VIII and groundwater monitoring constituents under 40 CFR part 264, appendix IX; therefore, they are regulated under the RCRA regulations and under facility permits. Specifically, they are subject to the comprehensive scheme for detecting and responding to releases to groundwater from hazardous waste management units at facilities permitted under RCRA Subtitle C. See 40 CFR part 264, subpart F. Among other things, the facility must promptly report to the Regional Administrator any detected releases (see, *e.g.,* §§ 264.98(g)(1), 264.99(h)) and maintain records of groundwater monitoring data (§ 264.97(j)). In addition, the RCRA regulations contain requirements for a liner system (under § 264.301(a)(1)), leachate collection system (under § 264.301(a)(2)), recordkeeping (under § 264.73), and reporting (under §§ 264.75, 264.76, and 264.77). Subtitle C landfills must also be permitted under RCRA § 3005 and 40 CFR part 270. The permit would flesh out these regulatory provisions to specify as appropriate, among other things, requirements to analyze groundwater samples for PCBs identified as constituents to be monitored and monitor amounts of leachate in the leachate collection and removal system. In addition to implementing the specific regulatory requirements, each permit is required to contain additional terms and conditions that EPA or the authorized State determines to be necessary to protect human health and the environment. See RCRA § 3005(c)(3); 40 CFR 270.32(b)(2). This authority is comparable to 40 CFR 761.75(c)(3)(ii), under which EPA may include in a TSCA chemical waste landfill approval any other requirements or provisions that the Agency finds are necessary to ensure that operation of the chemical waste landfill does not present an unreasonable risk of injury to health or the environment from PCBs. It is under this authority that EPA could require, for example, air monitoring at a chemical waste landfill, a measure identified by the commenter but not specifically required in § 761.75. Thus, EPA disagrees that States in which PCBs are not a hazardous waste could have limited ability to implement environmental monitoring of PCBs at RCRA Subtitle C landfills. Despite a few minor variations in monitoring, recordkeeping, and reporting requirements specified in the RCRA

Subtitle C and TSCA chemical waste landfill regulations, the regulations authorize the imposition of comparable protective conditions, and EPA believes that allowing this waste to go to RCRA Subtitle C landfills is protective and presents no unreasonable risk to human health or the environment.

EPA proposed to revise the language in § 761.125(a)(2) of the PCB Spill Cleanup Policy to ensure that the addition of RCRA Subtitle C landfills to § 761.61(b) would not affect the Spill Cleanup Policy. Specifically, EPA proposed to revise the language in the Spill Cleanup Policy to specify that only disposal facilities with TSCA approvals issued under Subpart D of the PCB regulations could be used for disposal of cleanup debris and other materials resulting from cleanup under the Policy. One commenter warned that the revision, as proposed, would inadvertently curtail the storage and disposal options for cleanup debris and other materials under the Policy. EPA agrees with the comment and has modified the revision to specifically exclude disposal of cleanup debris and other materials in RCRA Subtitle C landfills but allow all other storage and disposal conducted in accordance with the provisions of 40 CFR part 761, subpart D. See § 761.125(a)(2).

Finally, EPA's request for comments on requiring a § 761.61(b) pre-cleanup notification yielded overwhelmingly opposing comments. Commenters raised concerns that a pre-cleanup notification would cause unnecessary delay and negate one of the primary benefits of carrying out performance-based cleanups, which is the ability to perform the cleanup without EPA involvement. EPA agrees these concerns have merit and has decided to take no further action on this issue.

Background on the Issue

There are three options for addressing PCB remediation waste, listed in § 761.61 under paragraphs (a), (b) and (c). Previously, § 761.61(b) prescribed disposal methods for liquid and non-liquid PCB remediation waste but did not explicitly require or refer to cleanup requirements or cleanup levels in the regulations. In contrast, the PCB remediation waste option in § 761.61(a) for ''self-implementing on-site cleanup and disposal of PCB remediation waste'' describes in detail the requirements for notification, site characterization, cleanup levels, cleanup verification, disposal options, and more. The option in § 761.61(c) for ''risk-based disposal approval'' allows a person to apply for a risk-based approval to sample, cleanup, or dispose of PCB remediation

waste in a manner other than prescribed in paragraphs (a) or (b). The language of § 761.61(b) thus did not conform to the other two options in that the provision did not state the removal requirements of PCB remediation waste at any specified concentration nor did it provide for procedures to demonstrate that on-site cleanup is complete.

Before this rulemaking, EPA had stated in guidance related to § 761.61(b) that to be completely unregulated for disposal off-site without an approval from EPA, PCB remediation waste must contain <1 ppm PCBs, and that the concentration must not be the result of dilution during remediation (e.g., by mixing contaminated soil with clean soil during excavation).[19] Similarly, if someone were to use § 761.61(b) for disposal of waste but leave PCB remediation waste on-site >1 ppm, they would still have TSCA obligations for those remaining materials.[20]

While EPA's regulatory text and preamble statements refer to §§ 761.61(a), (b), and (c) as three alternatives for PCB cleanup and disposal, the previous absence of cleanup provisions, such as cleanup levels and sampling requirements, in § 761.61(b) made it challenging to determine that on-site cleanup is complete and the site is authorized for use under § 761.30(u).[21] [22] Clear regulatory requirements are warranted as EPA estimates that 50 to 60 million kilograms of PCB remediation waste are generated at 430 to 460 sites cleaned up under § 761.61(b) each year.[23]

While the new conditions for performance-based cleanup will require additional effort on the part of responsible parties, the conditions will also provide them confidence that they are satisfying the regulatory requirements. As always, failure to properly characterize PCBs on site is not a defense for noncompliant cleanup and disposal. Liability for ensuring compliance with § 761.61(b), performance-based cleanup and disposal, lies with the responsible party. In addition, while the revisions to § 761.61(b) are designed to be fully self-implementing, if the remediating party has questions as to whether a site qualifies to be cleaned up under

§ 761.61(b)(1)(i) of this provision, it would be in the remediating party's best interest, from a compliance assurance perspective, to contact the appropriate EPA Regional PCB Coordinator prior to commencing the cleanup and disposal activities. See EPA's PCB website for a list of the EPA Regional PCB Coordinators: *www.epa.gov/pcbs/program-contacts.*

*E. Remove Regulatory Provision Allowing Disposal of PCB Bulk Product Waste as Roadbed*

Provisions in the Final Rule

The Agency is removing the option provided for in § 761.62(d)(2) to dispose of PCB bulk product waste under asphalt as roadbed material, as proposed. The Agency cannot determine that the practice presents no unreasonable risk of injury to health or the environment.

Summary of the Public Comments

The public comments were supportive of removing the regulatory provision allowing the disposal of PCB bulk product waste as roadbed material. One commenter sought confirmation that this change will not impact PCB bulk product waste that was previously and lawfully disposed of as roadbed material under this option. EPA confirms that while the PCB regulations no longer allow disposal of PCB bulk product waste under asphalt as roadbed as of the effective date of this final rulemaking, this change does not have retroactive effect.

Background on the Issue

EPA established a provision allowing for disposal of PCB bulk product waste as roadbed material in the 1998 PCB Megarule. In the preamble for that rule, EPA stated that ''[b]ecause these disposal options have been restricted to materials that do not leach and because other potential routes of exposure have been controlled, EPA has concluded that the risk from these disposal options is the practical equivalent of disposal in a landfill as required in § 761.62(b)(1), and therefore that this risk is not unreasonable.''[24] Since 1998, the assumption that PCBs do not migrate from PCB bulk product waste has been proven incorrect in many scenarios.[25] For example, studies show that caulk containing PCBs degrades, releasing PCBs to the air, stormwater, and

---

[19] PCB Q&A Manual. June 2014. Pg. 91. *https://www.epa.gov/sites/production/files/2015-08/documents/qacombined.pdf.*

[20] *https://www.epa.gov/pcbs/managing-remediation-waste-polychlorinated-biphenyls-pcbs-cleanups.*

[21] 59 FR 62788, 62796; Dec. 6, 1994.

[22] 40 CFR 761.61, introductory paragraph.

[23] Manifest data from 2018 and 2019 were analyzed to estimate the volume of waste and number of sites cleaned up under § 761.61(b).

[24] 63 FR 35384, 35412; June 29, 1998.

[25] Eero Priha, Sannamari Hellman, Jaana Sorvari, PCB contamination from polysulphide sealants in residential areas—exposure and risk assessment, Chemosphere, Volume 59, Issue 4, 2005, Pages 537–543. *https://www.sciencedirect.com/science/article/pii/S0045653505001074.*

adjacent soil.[26] Considering these studies, EPA questions whether potential leaching of PCBs from PCB bulk product waste used as roadbed material could lead to environmental releases of PCBs and potential exposures to humans and wildlife. As a result, EPA no longer has a basis to support the determination of no unreasonable risk of injury to health or the environment that the Agency made in 1998. EPA further believes that this disposal option is not widely used.

*F. Add Flexible Provisions for Emergency Situations*

Provisions in the Final Rule

EPA is adding new provisions for emergency situations under § 761.66 to allow individuals to request a waiver from specific requirements of §§ 761.60, 761.61, 761.62, and 761.65, when necessitated by an emergency situation. EPA is also adding two provisions to the existing PCB Spill Cleanup Policy in 40 CFR part 761, subpart G, that allow for more flexible requirements for cleanup of spills caused by and managed in emergency situations. Additionally, EPA is establishing a definition for "emergency situation" to clarify the applicability of these changes.

The Agency is also adding a provision to remind the regulated community that they must abide by all other applicable Federal, State, and local laws and regulations when conducting activities under these emergency provisions.

a. Definition of "Emergency Situation"

EPA is adding a definition for "emergency situation" to §§ 761.3 and 761.123. Specifically, EPA is defining "emergency situation" as "adverse conditions caused by manmade or natural incidents that threaten lives, property, or public health and safety; require prompt responsive action from the local, State, Tribal, territorial, or Federal government; and result in or are reasonably expected to result in: (1) A declaration by either the President of the United States or Governor of the affected State of a natural disaster or emergency; or (2) an incident funded under the Federal Emergency Management Agency (FEMA) via a Stafford Act disaster declaration or emergency declaration. Examples of emergency situations may include civil emergencies or adverse natural

conditions, such as hurricanes, earthquakes, or tornados." EPA is establishing this definition because it is sufficiently broad to capture a wide range of emergencies that would be likely to significantly impact the cleanup and disposal of PCB waste. At the same time, the definition is contingent upon a declaration of disaster or emergency from an established authority, which are generally made in an objective manner. In response to a public comment indicating that such declarations are sometimes made well after incidents occur, which could create uncertainty as to whether adverse conditions caused by the incident would qualify as an emergency situation, EPA has revised the proposed definition to include situations that both result in or are reasonably expected to result in a declaration.

b. Additional Flexibilities Under the PCB Spill Cleanup Policy for Spills Caused by Emergency Situations

In this rulemaking, EPA is expanding the existing flexibilities in the PCB Spill Cleanup Policy in 40 CFR part 761, subpart G to be available in all emergency situations, rather than on a case-by-case basis. First, EPA is allowing the responsible party to clean up a spill caused by an emergency situation based on the as-found PCB concentration when the source concentration cannot readily be determined, as is common in emergency situations. See § 761.120(c)(2)(i) and the definition of "spill" in § 761.123.

Second, EPA is adding flexibility to the timeframe for completing notification under the PCB Spill Cleanup Policy. Generally, the PCB Spill Cleanup Policy specifies that notification be made within 24 hours after the responsible party was notified or became aware of the spill. See § 761.125(a)(1). When the Policy is used for cleanup activities undertaken directly in response to spills caused by emergency situations, EPA is extending the timeframe for reporting. EPA proposed to extend the timeframe for reporting to seven days after the adverse conditions that prevented communication have ended. However, in response to a comment summarized below, EPA is shortening the window to 48 hours after the adverse conditions that prevented communication have ended (*e.g.*, internet and phone lines are down due to an emergency situation; once one or the other is back up, notification to EPA is required within 48 hours). See § 761.120(c)(2)(ii).

These flexibilities are being finalized largely as proposed. EPA expects that

these flexibilities will result in a net benefit in protection of health and the environment, given that they allow those conducting responses to spills caused by emergency situations to assess and dispose of waste more quickly and to prioritize time-sensitive remedial actions.

c. Waiver From Various Sampling, Extraction, Analysis, Cleanup, Storage, and Disposal Requirements in Emergency Situations

EPA is creating an option to apply for a waiver from various PCB waste management requirements when necessitated by emergency situations. Responsible parties will be able to request a waiver from the provisions of §§ 761.60, 761.61, 761.62, and 761.65, which provide requirements for sampling, extraction, analysis, cleanup, storage, and disposal of all types of regulated PCB wastes.

Cleanup and disposal activities often cannot be initiated promptly in emergency situations, such as hurricanes or wildfires, due to necessary emergency response actions taking place. EPA recognizes that spills caused by an emergency situation may not be discovered or be able to be cleaned up until after the emergency ends or until after the initial emergency response. EPA regularly negotiates and implements special arrangements during emergency situations on a case-by-case basis, which can delay implementation of remedial actions. EPA is therefore modifying the PCB regulations to allow the person managing the cleanup and/or disposal of PCB waste caused by an emergency situation to request waivers from applicable PCB sampling, extraction, analysis, cleanup, storage, disposal and other regulatory requirements when there is an emergency situation and the existing regulatory requirements (*e.g.*, timeframes, sampling protocols) are impracticable due to the nature of the emergency situation. This waiver option is being finalized as proposed, except as described in the response to comments below.

Discussion of the Public Comments

The public comments pertaining to emergency situations were generally supportive of most of the provisions and additional flexibilities put forward by the Agency in the proposed rulemaking. There were three main issues raised by the commenters.

First, some commenters expressed that the proposed definition of "emergency situation" was too limiting and may leave individuals unsure if they would be able to use the flexible

---

[26] Luca Rossi, Luiz de Alencastro, Thomas Kupper, Joseph Tarradellas, Urban stormwater contamination by polychlorinated biphenyls (PCBs) and its importance for urban water systems in Switzerland, Science of The Total Environment, Volume 322, Issues 1–3, 2004, Pages 179–189. *https://www.sciencedirect.com/science/article/pii/S0048969703003619.*

provisions for emergency situations in § 761.66 and in the PCB Spill Cleanup Policy. One commenter stated that emergency and disaster declarations may be delayed, even for several weeks, after adverse conditions occur and provided several examples where delay has occurred in the past. The commenter opposed tying the definition of emergency situation to the issuance of a declaration because delays could create uncertainty as to whether regulated parties could use the flexible provisions for emergency situations when they are most needed. EPA recognizes that delays in issuance of declarations could create uncertainty and has therefore revised the proposed definition to include not only situations that result in declarations, but also situations where an individual could reasonably expect a declaration will be made. Other commenters requested that EPA broaden the definition of ''emergency situation'' to include activities such as power restoration and emergency utility repairs. EPA notes that the flexible provisions for emergency situations may be used for activities involving power restoration and utility repair that are caused by emergency situations. However, those activities by themselves do not constitute emergency situations that warrant flexibility. EPA does not expect there to be barriers to compliance with the regular requirements in the normal course of power restoration or utility repairs, such as communications lines being fully inaccessible or utilities conducting other competing emergency response actions.

Second, a commenter stated the proposed seven-day timeframe for completing notification under the PCB Spill Cleanup Policy would give individuals too much time to notify the Agency in an emergency situation. The Agency agrees with this commenter and is shortening the timeframe to 48 hours, which is now closer in length to the 24-hour timeframe for notification under the PCB Spill Cleanup Policy for spills not related to emergency situations. See § 761.125(a)(1).

Third, some commenters were confused by the waiver option and did not see how it differed from a formal PCB approval. While the waiver request is submitted to and approved by the Regional Administrator, it is not a formal PCB approval. The waiver is only for temporary measures in emergency situations. Examples of such situations might include excavating visibly contaminated soil near storm drains or removing and storing leaking electrical equipment that contains PCB oil before the remaining oil is released to the environment. As emergency situations may be complex and often time-sensitive, the waiver option allows one path for entities to request changes to multiple standards at once, rather than seeking individual regulatory approvals under several regulatory standards.

A comment was received requesting that a copy of the waiver request be sent to the Director of the State or Tribal environmental agency. The Agency agrees with this change and has incorporated the language into the final rule. Therefore, the Agency is finalizing the waiver request option generally as proposed with the additional language that a copy of the waiver request must be sent to the Director of the State or Tribal environmental agency.

Other comments were either supportive of the proposed changes or requested minor changes. One commenter requested that the Agency include language to remind the regulated community that they must abide by all other Federal, State, and local laws and regulations; the Agency agrees with this change and has incorporated the language in the final rule.

Background on the Issue

The TSCA PCB Spill Cleanup Policy was first published on April 2, 1987 (52 FR 10688), and is codified at 40 CFR part 761, subpart G. The Policy establishes criteria to determine the adequacy of the cleanup of spills resulting from the release of materials containing PCBs at concentrations of 50 ppm or greater which occur after May 4, 1987. The PCB Spill Cleanup Policy requires cleanup of PCBs to different levels depending upon spill location, the potential for exposure to residual PCBs remaining after cleanup, the concentration of PCBs initially spilled (high or low concentration), and the nature and size of the population potentially at risk of exposure to residual PCBs. The Policy applies the most stringent requirements for PCB spill cleanup to non-restricted access areas where there is a greater potential for human exposures to spilled PCBs and less stringent requirements to restricted access areas where there is little potential for human exposures.[27]

When the spilled material contains 50 to less than 500 ppm PCBs and the total quantity of material spilled involves less than 1 pound of PCBs, the Policy allows for cleanup in accordance with procedural performance requirements (*i.e.,* double wash/rinse for solid surfaces and removal of visible traces plus a 1-foot lateral boundary for soil and other ground media provided that the minimum depth of excavation is 10 inches) rather than requiring sampling to verify that numerical cleanup standards have been met. When the spilled material contains PCBs equal to or greater than 500 ppm PCBs, or the total quantity of material spilled containing PCBs at or below 500 ppm involves 1 pound or more of PCBs by weight, the Policy provides numerical cleanup standards based on the accessibility of the area and the potential for human exposure. Post-cleanup sampling is required to verify that the cleanup standards have been met.

EPA may allow flexibility such as less stringent or alternative requirements based upon site-specific considerations. See § 761.120(a)(4). EPA has used this provision to issue storm-specific guidance in Regions 4 and 6 for Hurricanes Katrina (2005),[28] Harvey (2017),[29] Irma (2017),[30] Florence (2018),[31] Michael (2018),[32] Dorian (2019),[33 34] and Tropical Storm Barry (2019).[35 36] Generally, EPA extended the time frame for notification and allowed spills to be managed based on the as-found concentration for spills directly caused by the emergency situation.

EPA recognizes that issuing guidance on a case-by-case basis can create some inefficiencies. First, since disasters can develop without forewarning, they can put pressure upon EPA to develop the guidance quickly so that it may be distributed to the regulated community in time for facilities to use it. Also, the fast-paced nature of the response to such events means that entities that could use the guidance may not become aware that it was issued in time to use

---

[27] 59 FR 62788, 62793; Dec. 6, 1994.

[28] Letter from Jesse Baskerville to Mary Davis, Nov 9, 2005. Guidance for Addressing Spills from Electrical Equipment [damaged by Hurricane Rita or Katrina].

[29] Correspondence from James Sales, EPA to Mary Davis. Aug 29, 2017. PCB Disaster Debris Cleanup Guidance.

[30] Memo from Alan Farmer to Barnes Johnson, Sept 8, 2017. EPA Region 4 Issuance of Disaster Waste Guidance.

[31] Memo from Susan Hansen to Barnes Johnson. Sept 13, 2018. EPA Region 4 Issuance of Disaster Waste Guidance.

[32] Memo from Susan Hansen to Barnes Johnson. Oct 10, 2018. EPA Region 4 Issuance of Disaster Waste Guidance.

[33] Memo from John Armstead to Barnes Johnson. Sept 4, 2019. EPA Region 3 Issuance of Disaster Waste Guidance.

[34] Memo from Carol J. Monell to Barnes Johnson. Sept 3, 2019. EPA Region 4 Issuance of Disaster Waste Guidance.

[35] Memo from Ronnie Crossland to Barnes Johnson. July 11, 2019. EPA Region 6 Issuance of Disaster Waste Guidance.

[36] Memo from Carol J. Monell to Barnes Johnson. July 18, 2019. EPA Region 4 Issuance of Disaster Waste Guidance.

it. Finally, due to uncertainty regarding whether a guidance document will be issued, it is often challenging for regulated facilities to include the flexibilities offered in the EPA guidance into their disaster preparation protocols. EPA received requests from industry requesting a more standardized set of flexibilities, citing several of these reasons.

Independent of EPA's additions above, EPA notes that § 761.61 currently "does not prohibit any person from implementing temporary emergency measures to prevent, treat, or contain further releases or mitigate migration to the environment of PCBs or PCB remediation waste." This means that immediate measures may be taken to contain PCBs during an emergency situation prior to receiving approval from the EPA Regional Administrator as described in § 761.66(b).

### G. Harmonize General Disposal Requirements for PCB Remediation Waste

#### Provisions in the Final Rule

The Agency is finalizing the proposed change to the language in § 761.50(b)(3)(ii) by removing the phrase "at as found concentrations ≥50 ppm." The language now reads: "(ii) Any person responsible for PCB waste that was either placed in a land disposal facility, spilled, or otherwise released into the environment on or after April 18, 1978, but prior to July 2, 1979, where the concentration of the spill or release was ≥500 ppm; or placed in a land disposal facility, spilled, or otherwise released into the environment on or after July 2, 1979, where the concentration of the spill or release was ≥50 ppm, must dispose of it in accordance with either of the following".

#### Discussion of the Public Comments

All of the public comments were either supportive or did not object to EPA's proposal to modify the language in § 761.50(b)(3)(ii). EPA is thus finalizing this change as proposed.

#### Background on This Issue

In the 1998 PCB Megarule, EPA promulgated both the definition of PCB remediation waste in § 761.3 and a guide to the cleanup and disposal obligations for PCB remediation waste in § 761.50(b)(3). At the time of the 1998 PCB Megarule, § 761.50(b)(3) failed to account for the fact that disposal of PCBs <500 ppm was not regulated between April 18, 1978, (the effective date of the Disposal and Marking Rule, which set the 500 ppm threshold) and

July 2, 1979 (the effective date of the PCB Ban Rule, which replaced the 500 ppm level with 50 ppm). EPA issued a technical amendment to correct this discrepancy in 1999 (64 FR 33755; June 24, 1999). The preamble text addressed changes made to § 761.50(b)(3)(i), which was amended accordingly. Section 761.50(b)(3)(ii) was also amended, presumably to correct the same discrepancy for the time between April 18, 1978, and July 2, 1979. However, the phrase "at as-found concentrations ≥50 ppm" was added to § 761.50(b)(3)(ii) unnecessarily. This addition was apparently an error; there is no justification in the preamble for the change, and it could be read to cut against the apparent intent to better align § 761.50(b)(3) with the definition of PCB remediation waste and the general direction in § 761.50(b)(3) that PCB remediation waste "is regulated for cleanup and disposal in accordance with § 761.61."

In keeping with the regulatory text overall, preamble and guidance statements, and interactions with the regulated community, EPA has not interpreted the "as found" language in § 761.50(b)(3)(ii) as limiting the cleanup and disposal obligations for PCB remediation waste created by releases that occurred on or after the dates referenced in that clause, where the as-found PCB concentration is <50 ppm. Rather, EPA maintains that all materials that fit the definition of PCB remediation waste in § 761.3—including materials which are currently at any volume or concentration where the original source was ≥500 ppm PCBs beginning on April 18, 1978, or ≥50 ppm PCBs beginning on July 2, 1979—are regulated for cleanup and disposal under § 761.61. The introductory language to § 761.50(b)(3) provides, without exception, that "PCB remediation waste [. . .] is regulated for cleanup and disposal in accordance with § 761.61." EPA has published guidance affirming that PCB remediation waste, even if <50 ppm, is regulated under § 761.61.[37] EPA has also issued numerous risk-based disposal approvals in the past five years that apply only to <50 ppm PCB remediation waste.[38]

In EPA's view, the function of § 761.50(b)(3)(ii) is to clarify that PCB remediation waste created by releases that occurred on or after the dates

referenced in that clause can be managed either in accordance with the PCB Spill Cleanup Policy if it meets the criteria established in the Policy, as provided in § 761.50(b)(3)(ii)(A); or in accordance with § 761.61, as provided in § 761.50(b)(3)(ii)(B) and the introductory text to § 761.50(b)(3). This intention is reflected in the 1998 PCB Megarule preamble, which states: "With regard to sites containing PCB remediation wastes generated on or after April 18, 1978, owners or operators of those sites now have two choices: they may clean up the wastes in accordance with the new § 761.61, or, if applicable, they may clean up the wastes in accordance with EPA's Spill Cleanup Policy, part 761, subpart G." [39] In contrast, the older PCB remediation waste addressed under § 761.50(b)(3)(i) is not eligible for management under the PCB Spill Cleanup Policy. Thus, as EPA interprets § 761.50(b)(3)(ii), the effect of adding the "as-found" limitation to the provision was to suggest that PCB remediation waste created by releases that occurred on or after the dates referenced in that clause, where the as-found PCB concentration is <50 ppm, is not eligible for management under the PCB Spill Cleanup Policy, but only under § 761.61 as provided in the introductory text. EPA did not intend to so limit the Policy, which applies to the cleanup of certain spills resulting from the release of materials containing PCBs ≥50 ppm but is not dependent on the as-found concentrations of the materials contaminated by such spills.

### H. Make Changes To Improve Regulatory Implementation

EPA proposed several supplemental amendments to improve implementation of existing requirements, clarify regulatory ambiguity, and correct technical errors in the PCB regulations. EPA requested comment and is finalizing changes for each item listed below. For more information on the proposed changes, see *Section III.H. Make Changes to Improve Regulatory Implementation* of the proposed rule, "Alternate PCB Extraction Methods and Amendments to PCB Cleanup and Disposal Regulations" (86 FR 58730), which is included in the docket for this final rulemaking.

#### 1. Medium Density Plastics as Non-Porous Surfaces

##### Provisions in the Final Rule

The definition of "non-porous surface" in § 761.3 includes several examples, including high-density

---

[37] PCB Q&A Manual. June 2014. Pg. 49 Q.3 *https://www.epa.gov/sites/production/files/2015-08/documents/qacombined.pdf.*

[38] Nationwide Risk-based PCB Remediation Waste Disposal Approvals. *https://www.epa.gov/pcbs/nationwide-risk-based-pcb-remediation-waste-disposal-approvals.*

[39] 63 FR 35384, 35402; June 29, 1998.

plastics. The Agency is modifying the definition of ''non-porous surface'' in § 761.3 to include medium-density plastics as an example of a non-porous surface.

Discussion of the Public Comments

The public comments were supportive of adding medium density plastics to the definition of a non-porous surface, and thus EPA is finalizing this change as proposed.

Background on the Issue

In December 2018, EPA issued an interpretive letter to the American Gas Association which found that medium- and high-density polyethylene used in natural gas distribution piping meet the definition of a ''non-porous surface'' under § 761.3.[40] EPA found that the study titled *Assessment of Polychlorinated Biphenyls (PCBs) in Polyethylene (PE) Gas Distribution Piping,* conducted by NYSEARCH and National Grid, demonstrated that the amount of PCB absorption into medium- and high-density polyethylene pipe was minimal, and penetration of PCBs beyond the immediate surface was limited.[41] EPA is therefore including medium-density plastics in the definition of non-porous surface. See § 761.3.

2. Temporary Storage in Containers at the Site of Generation

Provisions in the Final Rule

The PCB regulations permit the storage of bulk PCB remediation waste in piles at the site of generation for up to 180 days under § 761.65(c)(9). In response to requests from generators, EPA is allowing, under the same provision, the use of non-leaking, covered containers to be used at the site of generation for up to 180 days. Waste stored in containers must meet the same criteria as waste stored in piles, and thus do not incur additional risk.

Discussion of the Public Comments

The public comments were all supportive or did not object to allowing temporary storage in containers at the site of generation, and thus EPA is finalizing this change as proposed. Several comments did request clarification on what qualifies as a container, including whether a container encompasses drums or roll-off

boxes. Drums and roll-off boxes which meet the definition of a container under § 761.65(c)(9) (*e.g.,* constructed of appropriate materials, non-leaking, covered) would qualify as a container. EPA is clarifying that under this provision a liner is required only for piles, to prevent soil contamination, and is not required for containers. Please see ''Response to Comments on the Proposed PCB Rulemaking'' in the docket for further clarification.

3. Language Modifications for Financial Assurance Instruments

Provisions in the Final Rule

The Agency is finalizing the change to allow the Regional Administrator (RA) the flexibility to modify the language required in financial assurance instruments for the purposes of implementation under TSCA. These changes allow the RA to request modification to the terms of those instruments to account for the fact that they are being used to fulfill a financial assurance obligation under TSCA; for example, modifications may include changes to the instrument wording so that references to RCRA are replaced with references to TSCA, or changes to the instruments to better comport with the legal authorities under, and applicable to, TSCA. The changes are made throughout § 761.65(g), once for each of the financial instruments. See §§ 761.65(g)(1), 761.65(g)(1)(iv), 761.65(g)(2), 761.65(g)(3)(i), 761.65(g)(4)(i), 761.65(g)(5), 761.65(g)(6), and 761.65(g)(7).

Discussion of the Public Comments

EPA received one public comment in support and one public comment in opposition to the proposed revision to allow Regional Administrators discretion to modify the required language in financial assurance instruments. The latter commenter was concerned with the possibility of different standards applying in different Regions. However, this is not the intention of the change. The wording of the change, ''except when the Regional Administrator specifies modifications for the purposes of implementation under TSCA,'' that applies to each of the allowed financial assurance instruments limits changes to those that are necessary for implementation under and in alignment with TSCA. Any necessary changes to financial assurance instruments should therefore be narrow. Further, the TSCA PCB program is implemented by EPA Headquarters and Regions with a high level of coordination; therefore, EPA expects any necessary modifications to be

broadly and consistently applied across the program. EPA is finalizing this change as proposed.

Background on This Issue

The PCB regulations at § 761.65(g) require commercial storers of PCB waste to establish financial assurance for closure of PCB storage facilities by choosing from financial assurance mechanisms in the RCRA regulations under 40 CFR part 264. Part 264 includes prescribed language that must be included in each type of financial instrument. Some variation from the RCRA instrument wording may be necessary for the purposes of effectuating the financial assurance requirements under TSCA. EPA is therefore revising § 761.65(g) to allow the RA the flexibility to modify the language required in financial assurance instruments for the purposes of implementation under TSCA.

5. Remove Manifest Tracking Numbers From Annual Reports

Provisions in the Final Rule

EPA is removing the provision at § 761.180(b)(3)(ii) requiring owners or operators of PCB disposal facilities or commercial storage facilities to include in their annual reports lists of manifest tracking numbers of signed PCB manifests either received by or generated at the facility during that year. The Agency is finalizing this change as proposed to reduce the burden on reporting facilities and to simplify the annual reporting process. In place of the aforementioned requirement, EPA is marking § 761.180(b)(3)(ii) as ''[Reserved].''

Discussion of the Public Comments

No commenters were opposed to the removal of manifest tracking numbers from the Annual Reports and thus EPA is finalizing this change as proposed. Commenters did encourage EPA to look for additional ways to coordinate the PCB manifest requirements with EPA's RCRA hazardous waste electronic manifest (e-Manifest) system to avoid duplication and unnecessary burdens. EPA notes that the Agency recently proposed, in a separate rulemaking, further regulatory changes to more closely align PCB manifest regulations with the RCRA manifest regulations with respect to e-Manifest (87 FR 19290; April 1, 2022). Commenters also requested that the owner or operator of a facility should be allowed to exclude manifest tracking numbers from their annual document log since that information is also uploaded to the e-Manifest system. EPA did not propose changes to remove the requirement to

---

[40] Letter from Barnes Johnson to Pamela Lacey. Dec 14, 2018. *https://www.epa.gov/pcbs/epas-response-letter-aga-regarding-mdpe-and-hdpe-non-porous-surface.*

[41] JANA on behalf of NYSEARCH NGA. Oct 19, 2018. Assessment of Polychlorinated Biphenyls (PCBs) in Polyethylene (PE) Gas Distribution Piping. Revision 2.

maintain manifest tracking numbers in the annual document log and thus is not making any changes at this time.

Background on This Issue

As of June 30, 2018, receiving facilities must submit final, signed manifests to EPA's e-Manifest system. Since PCB manifests can now be obtained from the e-Manifest system, EPA no longer needs this information to be submitted as part of the annual reporting requirement.

6. Mandatory Form for Annual Reports

Provisions in the Final Rule

The Agency is finalizing a requirement to use a standard form for the submission of annual reports under § 761.180(b)(3). Use of a standard form will create a consistent reporting format that will reduce burden for EPA and regulated entities.

Discussion of the Public Comments

Most commenters supported use of a standard form for submission of annual reports, and thus EPA is finalizing this change as proposed. EPA notes that, one commenter opposed the standard form, asserting that it would be a burden to the facilities that had adopted their own format and methods for compiling the annual report. While EPA acknowledges that facilities will have to adjust their current practices to adopt the new form, the Agency finds that a standard form will reduce burden overall and result in more complete and higher quality data submitted. Another commenter was amenable to the addition of the form but did not agree that use of the form should be mandatory; specifically, the commenter noted that if annual reports contain all required information, failure to use the standard form should not result in a TSCA violation. The Agency disagrees with this comment and believes that mandatory use of the form for submission of annual reports is appropriate. This is consistent with how EPA requires use of other forms, such as the Uniform Hazardous Waste Manifest form (EPA form 8700–22) and the RCRA Subtitle C Site Identification Form (EPA form 8700–12). Moreover, allowing use of the standard form on a voluntary basis would likely diminish the impacts of the form on burden reduction and submission of more complete and higher quality data. Some commenters also requested a two-year transition period before use of the form becomes mandatory. EPA finds that an additional transition period is not necessary given that use of the form will not be required until the first July 15 (*i.e.*, the due date for the annual report) following the effective date of the rulemaking.

Another commenter asked if EPA could develop a standardized online reporting portal; EPA acknowledges this comment and may consider it for future implementation efforts.

Background on This Issue

While § 761.180(b)(3) describes the information EPA requires in the annual report, it does not specify a format. This lack of clarity could lead to confusion for regulated entities. Use of the form will standardize the format and improve data quality, allowing EPA to process the reports in less time. The form will also reduce the reporting burden on members of the regulated community who submit more than the required information, such as facilities that send copies of every manifest instead of every manifest tracking number. Furthermore, the instructions for the form clarify EPA's expectations; for example, facilities should report "zero" in all categories for which they did not manage PCB waste in that calendar year. At present, many facilities omit categories in annual reports, making it unclear as to whether this is an oversight or an indication that the categories do not pertain to them.

7. PCB Waste Categories on the Manifest and Annual Reports

Provisions in the Final Rule

The Agency is finalizing changes to the categories of PCB waste specified by the generator on the manifest to align with the categories of PCB waste specified by the commercial storer or disposer in the annual report. Specifically, EPA is modifying the categories of PCB waste in § 761.207(a) to list the five categories from § 761.180(b)(3)(iii)–(vi): "bulk PCBs," "PCB Transformers," "PCB Large High or Low Voltage Capacitors," "PCB Article Containers," and "PCB Containers." In response to comments summarized below, the Agency is also adding a sixth category of PCB waste in § 761.207(a) and § 761.180(b)(3)(iii)–(vi): "Other." Additional required data elements (*e.g.*, unique identification number, weight in kilograms, date removed from service) remain the same. EPA notes that the additional category of PCB waste on the manifest, "Other," does not impact the categories of PCB waste submitted in the annual document log under § 761.180(a)(2). EPA is also removing references to instructions in the appendix of 40 CFR part 262 because these instructions were

removed from the regulations and are instead available on EPA's website.[42]

Discussion of the Public Comments

The commenters were divided on this change. One commenter fully supported this change. Another commenter did not object to the revision of PCB waste categories on the manifest but requested that stakeholders be given enough time to prepare for the changes and that the changes only be applicable to manifests prepared after the effective date of the rule. EPA confirms that the revised categories of PCB waste are only applicable to manifests prepared after the effective date of the rule. The Agency also notes that the effective date of this rule is 180 days after the date of publication in the **Federal Register**, which should provide sufficient time for stakeholders to prepare. One commenter was concerned that none of the proposed categories covered PCB-Contaminated transformers with concentrations ≥50 to <500 ppm, which previously were classified under the category "PCB Article not in a PCB Container or PCB Article Container," which EPA is eliminating. Another commenter requested clarification from the Agency on whether PCB-Contaminated transformers and other electrical equipment would be required to be identified on the manifest, as it is not included in the five proposed categories. To address these aforementioned comments, the Agency is adding an additional category of PCB waste to the manifest (and the annual report), "Other." EPA also notes that PCB-Contaminated transformers and other electrical equipment will be required to be marked on the manifest under this new category. Another commenter opposed the requirements in § 761.207(a)(4) and (a)(5) to specify the type of PCB waste for each PCB Article Container or PCB Container, asserting that such information takes up already limited space on the manifest form and is unnecessary because it can be found in waste characterization forms on-site at generator and treatment or disposal facilities. EPA disagrees with the comment, noting that previous requirements for the now-eliminated "PCB Article Container or PCB Container" category of PCB waste also required specification on the manifest of the type of PCB waste for each PCB Article Container or PCB Container. EPA believes that such information on the manifest is valuable because this allows EPA to track the type of waste in

---

[42] *https://www.epa.gov/hwgenerators/uniform-hazardous-waste-manifest-instructions-sample-form-and-continuation-sheet.*

e-Manifest without having to obtain waste characterization forms, which are not easily available.

Background on This Issue

Previously, § 761.207(a) required PCB waste to be listed on the manifest as either ''bulk PCBs,'' ''PCB Article Container or PCB Container,'' or ''PCB Article not in a PCB Container or PCB Article Container.'' These categories, however, did not match the categories of PCB waste specified by the commercial storer or disposer in the annual report under § 761.180(b)(3). Harmonizing these PCB waste categories streamlines recordkeeping for commercial storers and disposers, while imposing negligible burden on the generators.

8. Define ''As-Found Concentration''

Provisions in the Final Rule

The Agency is adding a definition of ''as-found concentration'' to § 761.3, as proposed. The final definition reads: ''As-found concentration means the concentration measured in samples of environmental media or material collected in-situ (*i.e.,* prior to being moved or disturbed for cleanup and/or disposal), unless otherwise specifically provided. For example, media must not be disturbed, nor may they be diluted (*e.g.,* excavated, placed on a pile, and sampled after such placement), before characterization sampling is conducted. Sampling media in piles and existing accumulations would be considered ''as-found'' if the media were already in piles when the site was first visited by the responsible party, such as during the redevelopment of abandoned properties with historic PCB contamination. The as-found concentration is distinct from the source concentration, which is the concentration of the PCBs in the material that was originally spilled, released, or otherwise disposed of at the site.''

The definition clarifies that the as-found concentration must be measured from samples collected in-situ, unless otherwise specifically provided. Existing accumulations, as described in § 761.340(a) would be one such exception. Ex-situ sampling often reduces the concentration of PCBs in environmental media through dilution.

Discussion of the Public Comments

Commenters expressed concerns that the proposed definition of as-found concentration would be unworkable for situations where soils are excavated and generated during emergency underground utility repairs, routine maintenance activities, replacement of utility poles damaged by weather events, or otherwise generated and

tested ex-situ for the purposes of characterization for disposal. EPA acknowledges that there are scenarios where in-situ sampling to characterize potential PCB remediation waste for disposal may not be feasible such as certain emergency repair situations. It is EPA's intent to encourage PCB sampling of in-situ environmental media prior to making emergency repairs if it is feasible to do. If PCBs are discovered after ex-situ sampling in an emergency repair scenario, or from materials excavated from an area where there was no known PCB use or release, they may be disposed of under the performance based disposal requirements of § 761.61(b)(2), or a person may take additional steps to determine if the PCBs are regulated under TSCA (*i.e.,* originated from a regulated source or were otherwise potentially diluted from in-situ levels exceeding 50 mg/kg). If you are uncertain about whether such materials are regulated under the TSCA PCB regulations, you are encouraged to consult with your Regional PCB Coordinator. EPA believes that routine maintenance activities or general utility repairs would not rise to the level of an emergency and would provide for the opportunity to perform in-situ sampling to check for the presence of PCB contamination prior to soil excavation. For scenarios such as downed utility poles which cause releases of PCBs or suspected PCBs to the environment, the PCB Spill Cleanup Policy in 40 CFR part 761, subpart G offers an approach for such scenarios.

In addition, commenters stated that the definition of as-found concentration should not be restricted to in-situ sampling due to the heterogeneous nature of PCB contamination at cleanup sites. EPA acknowledges that PCB remediation waste such as soils can be heterogeneous; however, the regulations require adequate site characterization to determine the concentration and extent of PCB contamination at a cleanup site. The Subpart N cleanup site characterization sampling procedures were included in the 1998 PCB Megarule as an optional method for collecting new data at a cleanup site under 40 CFR 761.61. The regulations do not preclude a person from using a characterization sampling procedure designed to reduce the deleterious effects that soil heterogeneity has on environmental data prior to soil excavation.

EPA finds that no changes are necessary based on public comments, as addressed above. Therefore, EPA is finalizing the definition of ''as-found concentration'' as proposed.

Background on This Issue

In the 1998 PCB Megarule, EPA allowed for a variance from the anti-dilution provision for certain PCB remediation waste.[43] Such remediation waste is managed for disposal based on the concentration of the PCBs found in the affected media at the time the waste is discovered as opposed to the concentration of PCBs in the material that was originally spilled, released, or otherwise disposed of at the site. TSCA does not allow further iterative stages of successive dilution such as by intentionally or fortuitously excavating soils affected by a release from a regulated source into stockpiles with subsequent characterization for disposal testing. The Agency clarified this position by developing specific questions and answers related to as-found concentrations in EPA's PCB Q&A Manual available on the EPA PCB website at *https://www.epa.gov/pcbs/ polychlorinated-biphenyl-pcb-question-and-answer-manual-and-response-comment-documents.* ''As-found concentration'' is used in the PCB regulations particularly in reference to PCB remediation waste. See §§ 761.50(b) and 761.61.

9. Clarify § 761.61(a) Cleanups Must Comply With All Applicable Requirements

Provisions in the Final Rule

EPA is finalizing the changes to § 761.61(a)(3)(ii) as proposed. EPA is removing the phrase ''assume that it is complete and acceptable'' from § 761.61(a)(3)(ii) and adding text to that provision clarifying that the subsequent cleanup and disposal must comply with all applicable requirements in § 761.61(a)(4) through (9). See § 761.61(a)(3)(ii). EPA is not making any other changes to § 761.61(a)(3)(ii). EPA is finalizing the changes to § 761.61(a)(3)(ii) to ensure the notification that responsible parties submit under § 761.61(a) complies with all requirements of § 761.61(a)(3)(i) and the subsequent cleanup and disposal complies with all applicable requirements in § 761.61(a)(4) through (9). The person submitting the notification is responsible for verifying its completeness and accuracy.

The changes to 761.61(a)(3)(ii) do not impact the responsible party's ability to proceed with the cleanup if the Agency does not respond within 30 days. However, if upon review of the notification, EPA determines that the notification does not contain all information required by

---

[43] 63 FR 35384, 35388; June 29, 1998.

§ 761.61(a)(3)(i), sufficient to ensure compliance with § 761.61(a)(4) through (a)(9) at the site, the Agency may require the submission of additional information. Furthermore, regardless of the content of the notification, the cleanup and disposal must meet all requirements of § 761.61(a)(4) through (9). If the responsible party has reason to believe their implementation of § 761.61(a) may not satisfy the regulatory requirements, it would be in their best interest, from a compliance assurance perspective, to contact the appropriate EPA Regional PCB Coordinator before the end of the 30-day period, or at least before commencing the cleanup and disposal activities. EPA also encourages responsible parties to contact the appropriate EPA Regional PCB Coordinator to discuss the notification and cleanup plan before submitting it to EPA. See the EPA PCB website for a list of the EPA Regional PCB Coordinators at *www.epa.gov/pcbs/program-contacts*. In addition, PCB cleanup guidance (*e.g.,* PCB Facility Approval Streamlining Toolbox) is available on the EPA PCB website at *https://www.epa.gov/pcbs.*

Discussion of the Public Comments

EPA proposed to remove the phrase "assume that it is complete and acceptable" from 761.61(a)(3)(ii) and to add language clarifying that the subsequent cleanup and disposal must comply with all applicable requirements in § 761.61(a)(4) through (9). Two commenters supported the proposed clarification that responsible parties must ensure that notifications submitted to EPA under § 761.61(a) and the subsequent cleanup and disposal of PCB remediation waste under § 761.61(a) comply with all applicable requirements. Several commenters opposed the proposed deletion of the phrase "assume that it is complete and acceptable" from § 761.61(a)(3)(ii). Commenters proposed that EPA extend the 30-day timeframe for EPA to respond to a notification to 60 days, expressed concerns with EPA identifying issues after the responsible party begins the cleanup, and voiced concerns with delayed cleanup implementation and increased cleanup costs. The 30-day timeframe for EPA to respond to a notification is intended to prevent compromising the expeditious nature of § 761.61(a) self-implementing cleanups. The responsible party has the option to contact EPA before submitting the notification to ensure they are preparing a notification that meets all the requirements of § 761.61(a). In addition, the responsible party may contact EPA during the 30-day period to

go over the submitted notification with EPA. If EPA needs additional information, EPA expects to request it within those 30 days.

EPA finds that no changes are necessary based on public comments, as addressed above. Therefore, EPA is finalizing changes to § 761.61(a)(3)(ii) as proposed.

10. Harmonize PCB Concentration Language Regarding Cap Material

The Agency is finalizing the proposal to correct a PCB remediation waste cap requirement to provide consistency with the rest of the PCB regulations. EPA received one public comment in support of this provision.

Previously, § 761.61(a)(7) required that "a cap shall not be contaminated at a level ≥1 ppm PCB per Aroclor[TM] (or equivalent) or per congener." EPA is deleting "per Aroclor[TM] (or equivalent) or per congener" to make this requirement consistent with the rest of the PCB regulations. A PCB congener is a single PCB molecular structure, with (a) chlorine atom(s) attached to the benzene rings in different configurations. Aroclors are mixtures of these PCB congeners that were manufactured between 1929 and 1979. There are 209 congeners and sixteen known Aroclors.[44][45]

The rest of the PCB regulations only specify requirements or restrictions based on PCB concentrations, rather than PCB congener concentrations or PCB Aroclor concentrations. The PCB regulations at § 761.1(b)(2) state "Unless otherwise provided, PCBs are quantified based on the formulation of PCBs present in the material analyzed," which means that when PCBs are present as Aroclors (*e.g.,* in PCB transformer oil), they may be measured and reported as Aroclors. When PCBs are present as congeners that do not match an Aroclor pattern (*e.g.,* in weathered environmental samples), they should be measured as congeners and reported as a sum of those congeners. Furthermore, there is no technical or risk-based reason why PCB remediation waste cap requirements should differ from other sections of the PCB regulations. As a result, the new language simply requires that "a cap shall not be contaminated at a level ≥1 ppm PCBs." This change is consistent with how PCB concentrations are described in the rest of the TSCA PCB regulations. See § 761.61(a)(7).

11. Clarify Applicability of Deed Restrictions

The Agency is finalizing the proposed clarifications to the requirements for deed restrictions associated with PCB remediation waste being left on-site under a self-implementing cleanup and disposal activity under § 761.61(a). EPA received one public comment in support of this provision.

The self-implementing cleanup and disposal option for PCB remediation waste provides for varying cleanup levels based on the occupancy level and the presence of a fence or cap. When cleanup levels are based upon low occupancy of the cleanup area or the existence of a fence or cap (either in high or low occupancy areas), deed restrictions are required. See § 761.61(a)(8). EPA's 2005 PCB Site Revitalization Guidance confirms that § 761.61(a)(8) requires a deed restriction for all cleanups requiring caps or fences, and all cleanups based on low-occupancy uses.[46] However, portions of the regulatory text previously suggested that the deed restriction must reference low-occupancy status *and* the existence of a cap or fence in every case, even though some sites with low occupancy cleanups will not have caps or fences and some sites with caps or fences will not be low-occupancy. To remedy any potential for confusion, EPA is finalizing several minor edits to § 761.61(a)(8) to clarify that deed restrictions apply to any area with a cap, a fence, or a low occupancy designation.

In addition, EPA is clarifying in § 761.61(a)(8)(i)(A) that the deed restriction should designate the portion of a property that is subject to the deed restriction, when applicable. The deed restriction should reference the location of the cap, fence, or low occupancy portion in a format that makes sense for the site, for example, latitude/longitude coordinates, street address, or annotated areal image. EPA intends for the December 2012 Institutional Controls document to provide guidance on how to effectively plan, implement, maintain, and enforce deed restrictions required under § 761.61(a)(8).[47]

---

[44] *https://www.epa.gov/pcbs/table-polychlorinated-biphenyl-pcb-congeners.*

[45] *https://www.epa.gov/pcbs/table-aroclors.*

[46] Polychlorinated Biphenyl (PCB) Site Revitalization Guidance Under the Toxic Substances Control Act (TSCA). November 2005. Page 13. *https://www.epa.gov/sites/production/files/2015-08/documents/pcb-guid3-06.pdf.*

[47] Institutional Controls: A Guide to Planning, Implementing, Maintaining, and Enforcing Institutional Controls at Contaminated Sites. December 2012. *https://www.epa.gov/sites/production/files/documents/final_pime_guidance_december_2012.pdf.*

12. Include Alternate Extraction and Analysis Under § 761.61(c)—PCB Remediation Waste

The Agency is finalizing its proposal to clarify that, under a § 761.61(c) risk-based approval, a responsible party can be permitted to perform extraction or analysis of PCB remediation waste in a manner other than prescribed in § 761.61(a) or (b), including in lieu of a Subpart Q comparison study. Prior to this change, EPA's practice has been to allow responsible parties to request the use of a different extraction or analysis method for PCB remediation waste under § 761.61(c), as they are considered part of sampling requirements. This change clarifies that responsible parties have this option, by adding extraction and analysis to the list of modifiable requirements under a § 761.61(c) risk-based approval. EPA received two public comments in support of this provision.

13. Include Alternate Extraction and Analysis Under § 761.62(c)—PCB Bulk Product Waste

The Agency is finalizing its proposal to clarify that, under a § 761.62(c) risk-based approval, a responsible party can be permitted to perform extraction or analysis of PCB bulk product waste in a manner other than prescribed in § 761.62(a) or (b). Prior to this change, EPA's practice has been to allow responsible parties to request the use of a different extraction or analysis method for PCB bulk product waste under § 761.62(c), as they are considered part of sampling requirements. This change clarifies that responsible parties have this option, by adding extraction and analysis to the list of modifiable requirements under a § 761.62(c) risk-based approval. EPA received no public comments on this provision.

14. Include Alternate Extraction and Analysis Under § 761.79(h)—Decontaminated Material

The Agency is clarifying that, under a § 761.79(h) approval, a responsible party can be permitted to perform extraction or analysis of decontaminated material in a manner other than prescribed in § 761.79(f). Prior to this change, EPA's practice has been to allow responsible parties to request to modify or replace the use of an extraction or analysis method for decontaminated material under § 761.79(h), as they are considered part of sampling procedure. This change clarifies that responsible parties have this option, by adding extraction and analysis to the list of modifiable requirements under a

§ 761.79(h) approval. EPA received no public comments on this provision.

15. Clarify Sampling Procedure for Non-Porous Surfaces

The Agency is finalizing its proposal to correct an inconsistency with respect to non-porous surfaces in the site characterization requirements for self-implementing cleanups of PCB remediation waste under § 761.61(a). The site characterization requirements in § 761.61(a)(2) provide that site characterization may be conducted using procedures included in 40 CFR part 761, subpart N. The method found in Subpart N for sampling non-porous surfaces specifies that the sampling area shall be divided into "square portions approximately 2 meters on each side" and to "[f]ollow the procedures in § 761.302(a)." See § 761.267(a). However, § 761.302(a), which is the section of the PCB regulations pertaining to post-cleanup sampling of non-porous surfaces, specifies dividing the surface into 1-meter square portions instead of 2-meter square portions. EPA is amending § 761.267 by adding the following italicized language to this provision, "Follow the procedures in § 761.302(a), *with the exception of the sampling grid size*," to correct the inconsistency. This change reflects the way in which EPA has already been addressing the inconsistency. EPA received two public comments in support of this provision.

16. Add Unit to Concentration in § 761.1(b)(3)

The Agency is finalizing its proposal to modify text in § 761.1(b)(3) to read "PCB concentrations of >10 μg/100 cm². " Previously, § 761.1(b)(3) listed a concentration with only partial units of reference, "PCB concentrations of >10/100 cm²," which was meaningless as written. It is clear from context that the text should have read "PCB concentrations of >10 μg/100 cm²," which is how surface concentrations otherwise appear throughout the PCB regulations, including, for example in § 761.79(b). EPA received one public comment in support of this revision. EPA also proposed to harmonize the "greater/less than" and "greater/less than or equal to" symbols in this section but is not finalizing that change, as doing so might create some inconsistency with the definitions section of the PCB regulations.

17. Update References to ASTM Methods

The regulations at § 761.19 incorporate by reference several ASTM test method standards that have since

been updated. EPA is adding three updated methods, removing a withdrawn method, updating a method which was withdrawn and replaced with a newer method, and updating references to two methods which are currently unavailable on ASTM's website. These ASTM standards reflect the current consensus of ASTM members. EPA is making the following changes:

ASTM D93–09, Standard Test Methods for Flash Point by Pensky-Martens Closed Tester, was approved by ASTM in 2009 and added to the PCB regulations in 2012 at §§ 761.71(b)(2)(vi) and 761.75(b)(8)(iii).[48] EPA is adding as an alternative ASTM D8175–18, Test Method for Finite Flash Point Determination of Liquid Wastes by Pensky-Martens Closed Cup Tester.

ASTM D3278–89, Standard Test Methods for Flash Point of Liquids by Setaflash Closed-Cup Apparatus, was approved by ASTM in 1989 and added to the PCB regulations in 1992 at § 761.75(b)(8)(iii).[49] EPA is replacing the updated version, ASTM D3278–96 (Reapproved 2011), Standard Test Methods for Flash Point of Liquids by Small Scale Closed-Cup Apparatus, and adding ASTM D8174–18, Test Method for Finite Flash Point Determination of Liquid Wastes by Small Scale Closed Cup Tester.

EPA is removing ASTM D2784–89, Standard Test Method for Sulfur in Liquified Petroleum Gases (Oxy-hydrogen Burner or Lamp) from § 761.19 and § 761.71(a)(2)(vi). This test method was withdrawn in June 2016 because it is archaic and not used in the industry.[50]

EPA is removing ASTM D3178–84, Standard Test Methods for Carbon and Hydrogen in the Analysis Sample of Coke and Coal, replacing it with D5373–16, Standard Test Methods for Determination of Carbon, Hydrogen and Nitrogen in Analysis Samples of Coal and Coke and Carbon in Analysis Samples of Coal and Coke, in §§ 761.19 and 761.71(b)(2)(vi). ASTM D3178–84 was replaced in June 2007 because there was no reproducibility statement for D3178.[51]

EPA is replacing ASTM D482–87, Standard Test Method for Ash from Petroleum Products, with ASTM D482–13, Standard Test Method for Ash from Petroleum Products, in § 761.71(a)(2)(vi). EPA is also replacing

---

[48] 77 FR 2463, Jan. 18, 2012.
[49] 57 FR 13323, Apr. 16, 1992.
[50] *https://compass.astm.org/Standards/WITHDRAWN/D2784.htm.*
[51] *https://compass.astm.org/Standards/WITHDRAWN/D3178.htm.*

ASTM D3278–89, Standard Test Methods for Flash Point of Liquids by Setaflash Closed-Cup Apparatus, with ASTM D3278–96(R2011), Standard Test Methods for Flash Point of Liquids by Small Scale Closed-Cup Apparatus, in § 761.75(b)(8)(iii) (see above). ASTM began building its electronic library of standards in the 1990s, so the 1987 version of ASTM D482 and the 1989 version of ASTM D3278 are no longer available from the ASTM website. Therefore, the Agency is updating ASTM D482–87 and ASTM D3278–89 to list the most recent versions of the methods.

EPA has found that most of the entities that would have to comply with these standards are already familiar with them, since it would be difficult to be in the business of testing for PCBs without being familiar with these industry consensus standards. The standards are all readily available electronically or in print and are relatively inexpensive. See § 761.19. EPA received one public comment in support of this provision.

18. Require a Wipe Sample Under § 761.30(i)(4)

Section 761.30(i)(4), which governs characterization of PCB contamination in natural gas pipe or natural gas pipeline systems, previously read, in part, "if no liquids are present, they must use standard wipe samples in accordance with Subpart M of this part." This language might be read to mean that all natural gas pipe or natural gas pipeline systems must be characterized using standard wipe samples if no liquids are present. However, this text was meant to convey that if any person *chooses* to characterize natural gas pipe or natural gas pipeline systems that do not contain liquids, then they must do so using wipe samples.[52] Therefore, EPA is finalizing its proposal to replace the text with: "if no liquids are present and they decide, in their discretion, to characterize PCB contamination, the person must use standard wipe samples in accordance with Subpart M of this part." See § 761.30(i)(4). EPA received

52 See PCB Q&A Manual. June 2014. Pg. 23 ("Under the use authorization provisions at § 761.30(i), if a pipeline system once contained liquids at 50 ppm or greater but is now relatively dry (*i.e.,* there are no liquids available to test at existing condensate collection points), then the owner/operator of the pipeline system has no further sampling and analysis to do until such time as liquids appear. EPA did not intend to require wipe sampling for characterizing natural gas pipeline systems in use. . . ."). *https:// www.epa.gov/sites/production/files/2015-08/ documents/qacombined.pdf.*

three public comments in support of this provision.

19. High Efficiency Boilers Approval Application Requirements

EPA is finalizing its proposal to correct an editorial error in § 761.71. This section describes the required operating parameters for high efficiency boilers that dispose of PCB waste. The requirements for high efficiency boilers are divided into two sections, a section for burning PCB-contaminated mineral oil dielectric fluid at § 761.71(a) and a section for burning any other PCB-contaminated fluids at § 761.71(b). Mineral oil dielectric fluid is an insulating fluid used in electrical equipment such as transformers. Other PCB-contaminated fluids might include used oil, contaminated water, and hydraulic fluid. Section 761.71(b) regulates high efficiency boilers that burn PCB liquids *other* than mineral oil dielectric fluid, so EPA is amending § 761.71(b)(2)(iv) to correct an error by replacing the phrase "mineral oil dielectric fluid" with "PCB liquids." See § 761.71(b)(2)(iv). EPA received one public comment in support of this provision.

20. Mailing Address for Annual Reports

The owner or operator of any PCB disposal facility or commercial storage facility submits an annual report to the EPA Regional Administrator for the region in which the facility is located, pursuant to § 761.180(b)(3). EPA is finalizing its proposal to change the recipient of the annual reports from the Regional Administrator to the Director of the Office of Resource Conservation and Recovery, which is the office in EPA Headquarters that manages the PCB cleanup and disposal program. An analogous change is also being made in § 761.3 under the definition of *annual report.* This change will reduce the administrative burden on the Agency of compiling the data in the annual reports, which is used to inform Agency actions. The address for submission will be displayed prominently on the mandatory form. See §§ 761.3 and 761.180(b)(3). EPA received one public comment in support of this provision.

21. Update Address for Submission of EPA Form 7710–53

EPA is finalizing its proposal to remove the address for submission of EPA form 7710–53, "Notification of PCB Activity," from the regulations. This change will allow EPA to more easily update the mailing address in the future without undertaking a regulatory change. The mailing address will continue to appear on the form itself

and can be updated through the Information Collection Request (ICR) process. This change will expedite future address changes and thus streamline the distribution of mail and reduce the processing time for these forms. See §§ 761.205(a)(3) and 761.205(d). EPA received one public comment in support of this provision.

22. Add Field for Facility Email Address and EPA PCB Email Address to EPA Form 7710–53

EPA is finalizing its proposal to require that an email address must be submitted on the EPA form 7710–53, "Notification of PCB Activity." Additionally, EPA is adding the EPA PCB email address (*ORCRPCBs@ epa.gov*) to the notification form to facilitate any questions from members of the public. These changes will improve communication and reduce the processing time for these forms. Any Notification of PCB Activity form submitted prior to the effective date of this rulemaking will not be required to be resubmitted, unless the facility would like to add or update information (including the email address). See §§ 761.205(a)(3) and 761.205(d).

EPA received one public comment in support of this provision and one public comment which questioned if EPA form 7710–53 will need to be resubmitted to provide an email address. The form will not be required to be resubmitted to provide an email address, and only needs to be resubmitted if something changes at the site. While not mandating resubmission, the Agency does encourage sites to resubmit the form to supply an email address.

23. Sample Site Selection Instructions for Pipelines

Subpart M provides a number of steps that must be followed when selecting the locations for sampling to characterize natural gas pipeline. EPA found that, due to rounding errors, the instructions for a length of pipe greater than seven segments but shorter than three miles in length were incorrect. EPA is finalizing its proposal to modify the instructions and the example given in § 761.247(b)(2)(ii)(B) to clarify where each sample must be taken along pipes of this length. This change is a technical correction and does not influence the number of samples taken or the burden on the owner or operator of the pipe. See § 761.247(b)(2)(ii)(B). EPA received one public comment in support of this provision.

24. Remove Reference to Method 3500B

SW–846 is organized such that several similar methods are grouped together in

a series. The 3500 series contains extraction procedures used for the preparation of samples for analysis of organic parameters. These techniques include Liquid-Liquid Extraction, Solid-Phase Extraction, Soxhlet Extraction, and Supercritical Fluid Extraction, among others. Method 3500B (recently updated to Method 3500C) is not a detailed method where step-by-step instructions are discussed.[53][54] Rather, Method 3500B simply provides general guidance for all the methods within its series (*i.e.,* the 3500 series), including the extraction methods being added as part of this rulemaking. Also, Method 3500B or 3500C is already referenced in every 3500 series method EPA is adding to the PCB regulations. Therefore, EPA feels that it is unnecessary to reference Method 3500B in the PCB regulations directly and is removing the reference from the PCB regulations. The removal of Method 3500B from the regulations does not influence any of the 3500 series methods currently in or being added to the PCB regulations. The PCB regulatory sections affected are §§ 761.61(a)(5)(i)(B)(*2*)(*iv*), 761.253, 761.272, 761.292, 761.358, and 761.395. EPA received one public comment in support of this provision.

### 25. Correct References to SW–846

The official title of the EPA publication known as SW–846 was updated from "Test Methods for Evaluating Solid Waste" to "Test Methods for Evaluating Solid Waste: Physical/Chemical Methods." There are several references to this publication throughout the PCB regulations. EPA is finalizing its proposal to update the definition of SW–846 in § 761.3 with the current official title and to refer to it as "SW–846" throughout the PCB regulations, for readability. See §§ 761.3, 761.60(g)(1)(iii), 761.61(a)(5)(i)(B)(2)(iv), 761.253(a), 761.272, 761.292, 761.358, 761.395(b)(1). EPA received one public comment in support of this provision.

### 26. Correct References to EPA's PCB Website

Throughout the PCB regulations, there are several references to EPA's PCB website. In 2015, as part of a redesign, the URL for the EPA PCB web page

---

[53] U.S. EPA, Method 3500B Organic Extraction and Sample Preparation. Office of Land and Emergency Management, Office of Resource Conservation and Recovery, Materials Recovery and Waste Management Division (5303P). Washington, DC December 1996.

[54] U.S. EPA, Method 3500C Organic Extraction and Sample Preparation. Office of Land and Emergency Management, Office of Resource Conservation and Recovery, Materials Recovery and Waste Management Division (5303P). Washington, DC February 2007.

changed from *https://www.epa.gov/pcb* to *https://www.epa.gov/pcbs.* EPA is finalizing its proposal to update those references throughout the PCB regulations. See §§ 761.130(e), 761.205(a)(3), 761.243(a), 761.386(e). EPA received one public comment in support of this provision, and one comment that suggested removing weblinks completely from the PCB regulations to avoid the need for future updates. EPA finds, however, that periodic maintenance of web links in the regulations is outweighed by the benefits of providing a direct link in the PCB regulations to applicable information for the regulated community.

### 27. Change "He" to "They"

The PCB regulations previously referred to generic individuals such as the Regional Administrator or facility owners as "he," "his," "he/she," or "he or she." EPA is finalizing its proposal to replace all such references with the gender neutral "they" and "their." See §§ 761.3, 761.20(e)(3)(ii)(B), 761.20(e)(4)(i), 761.20(e)(4)(ii), 761.50(b)(3)(i)(A), 761.60(b)(2)(v)(C), 761.61(a)(8)(i)(B), 761.65(g), 761.65(h), 761.70(d)(4)(i), 761.75(c)(3)(i), 761.75(c)(4), 761.77(a)(1)(ii)(B), 761.77(a)(2), 761.77(b), 761.120(b)(2), 761.125(c)(3)(iii), 761.125(c)(4)(iv), 761.180(b)(4), 761.207(c), 761.212(a), 761.213(a)(4), 761.213(b), 761.214(a), 761.216(a), 761.217(a)(2)(ii). EPA received one public comment in support of this provision.

### 28. Change "On Site" to "On-Site"

The term "on site" is included in the definitions at § 761.3, but the PCB regulations previously used the term "on-site" throughout. EPA is finalizing its proposal to modify § 761.3 to read "on-site" to improve the readability of the PCB regulations. See § 761.3. EPA received no public comments on this provision.

### 29. Correct Reference to Methods for Standard Wipe Test Samples

Section 761.314 "Chemical analysis of standard wipe test samples" previously instructed the reader to "perform the chemical analysis of standard wipe test samples in accordance with § 761.272." While § 761.272 does contain the allowable methods for wipe test samples, it also lists several other methods that would not be appropriate for wipe test samples. This reference has been corrected to § 761.253, which is specific to wipe samples. EPA received one public comment in support of this provision.

### 30. Incorporation by Reference

The Agency is incorporating by reference SW–846 Test Methods 3541, 3545A, 3546, 3510C, 3520C, 3535A, 3550C, and 8082A into 40 CFR part 761 under §§ 761.60, 761.61, 761.253, 761.272, 761.292, 761.358, and 761.395. Finally, the Agency is incorporating by reference ASTM standards D482–13, D3278–96(R2011), D4059–00, D5373–16, D8174–18, and D8175–18 into 40 CFR part 761 under §§ 761.60, 761.71, and 761.75. (See section II.B of this preamble for summaries of the IBR material.)

The following standards appear in the amendatory text of this document and have already been approved for the locations in which they appear: ASTM D93–09, D129–64(R1968), D240–87, D524–88, D808–87, D923–86, D923–89, D1266–87, D1796–83, D2158–89, D2709–88, and E258–67.

The SW–846 Test Methods being incorporated by reference are published in the test methods compendium known as, "Test Methods for Evaluating Solid Waste, Physical/Chemical Methods," EPA Publication SW–846, Third Edition, available at *https://www.epa.gov/hw-sw846.* ASTM materials may be obtained from ASTM International, 100 Barr Harbor Dr., P.O. Box C700, West Conshohocken, PA 19428–2959, or by calling (877) 909–ASTM, or at *www.astm.org.* EPA methods being incorporated by reference are also included in the docket. EPA received one public comment in support of this provision.

## IV. Economic Impacts of the Final Rulemaking

One focus of the final rule is expanding the allowable PCB extraction methods, which impacts testing laboratories (NAICS code 541380) that currently perform PCB extractions under TSCA. Based on method-specific certifications and communication with laboratory personnel, EPA estimates that approximately 19 laboratories are impacted by the rule. Further, EPA estimates that these 19 laboratories perform approximately 65,000 relevant extractions each year. Some laboratories may experience a one-time cost of purchasing equipment used to perform one of the extraction methods. However, the decreases in solvent and labor hours required to perform the extraction methods are expected to result in net annual cost savings of approximately $4.7 million, annualized at a discount rate of seven percent. The cost savings at a discount rate of three percent is $6.6 million.

The revisions to § 761.61(b) may impact any facility performing a PCB site remediation under § 761.61(b). No data are available on the exact number of § 761.61(b) remediations performed annually, but EPA estimates that there will be between 430 and 460 relevant remediations per year, based on an analysis of 2018 and 2019 hazardous waste manifests. Certain aspects of this provision increase burden on the regulated community through certain requirements (*e.g.,* recordkeeping, notification, sampling). However, EPA is also allowing for disposal of relevant waste at RCRA Subtitle C landfills under § 761.61(b), in addition to the existing disposal options (*e.g.,* TSCA landfills, TSCA incinerators), which will decrease transportation and disposal costs related to non-hazardous, non-liquid PCB remediation waste for the regulated community. Overall, the revisions to § 761.61(b) are expected to result in net annual cost savings between $9.8 million and $11.5 million, annualized at a discount rate of seven percent and three percent, respectively.

Disallowing PCB bulk product waste to be used as roadbed material has the potential to create a slight increase in costs for the regulated community. Facilities that would have used PCB bulk product waste on-site as roadbed material under asphalt now have to pay to transport the waste to a municipal solid waste landfill and pay the associated tipping fee for disposal. EPA believes that the practice of using PCB bulk product waste as roadbed is exceedingly rare. However, in an effort to incorporate all potential impacts of the final rule, the Economic Assessment modeled a single party using PCB bulk product waste as roadbed per year. EPA estimates that the cost increase for the regulated community will be between $740 and $6,630 per year.

EPA anticipates that the added flexibilities for emergency situations will result in cost savings for the regulated community. EPA estimates that there will be between 12 and 60 emergencies each year where the regulated community may use the flexibilities. A lack of data prevents an overall quantitative estimate of the cost savings from this provision. However, impacted parties are expected to save money and time by avoiding delays associated with searches for the source of the spill during an emergency situation where the search is likely to be time-consuming and unsuccessful, and by being able to manage waste under the less burdensome procedures of § 761.125(b), rather than § 761.125(c). The regulated community is also

expected to see a decrease in sampling and testing expenditures.

The change to harmonize the general disposal requirements for PCB remediation waste is in line with current EPA policy, guidance and practice. Therefore, EPA estimates that this change will not have any economic impact.

The Economic Assessment for the final rule is constrained by the lack of relevant data, largely because the final rule makes changes to provisions that are self-implementing and/or require no EPA notification. EPA has quantified costs and cost savings when possible. When quantification has not been possible, EPA has analyzed the costs and cost savings qualitatively. The Economic Assessment associated with the final rule can be referenced for a greater level of detail related to the costs and benefits of the revisions.

## V. Statutory and Executive Order Reviews

Additional information about these statutes and Executive Orders can be found at *https://www.epa.gov/laws-regulations/laws-and-executive-orders.*

### A. Executive Order 12866: Regulatory Planning and Review and Executive Order 13563: Improving Regulation and Regulatory Review

This action is a significant regulatory action that was submitted to the Office of Management and Budget (OMB) for review under Executive Order 12866 (58 FR 51735, October 4, 1993) and Executive Order 13563 (76 FR 3821, January 21, 2011). Any changes made in response to OMB recommendations have been documented in the docket. The Economic Assessment is available in the docket and is summarized in *Section I.D What are the projected economic impacts of this action?* of the preamble.

### B. Paperwork Reduction Act (PRA)

The information collection activities in this final rule have been submitted for approval to the Office of Management and Budget (OMB) under the PRA, 44 U.S.C. 3501 *et seq.* The Information Collection Request (ICR) document that the EPA prepared has been assigned EPA ICR number 2688.02 (2050–NEW). You can find a copy of the ICR in the docket for this rule, and it is briefly summarized here.

*Respondents/affected entities:* The information collection requirements of the final rule affect facilities that will read the final rule, responsible parties using § 761.61(b)(1) performance-based cleanup, responsible parties using § 761.66 waivers in emergency

situations, commercial storers and disposers submitting annual reports, and entities submitting Notification of PCB Activity forms.

*Respondent's obligation to respond:* The recordkeeping and notification requirements are required for parties performing relevant activities (*e.g.,* using § 761.66 waivers in emergency situations). These requirements are described in detail in the ICR Supporting Statement.

*Estimated number of respondents:* 1,085.

*Frequency of response:* On occasion/as necessary.

*Total estimated burden:* 8,276 hours.
*Total estimated cost:* $1,051,643.

### C. Regulatory Flexibility Act (RFA)

I certify that this action will not have a significant economic impact on a substantial number of small entities under RFA, 5 U.S.C. 601 *et seq.* In making this determination, the impact of concern is any significant adverse economic impact on small entities. An agency may certify that a rule will not have a significant economic impact on a substantial number of small entities if the rule relieves burden or has no net burden on the small entities subject to the rule. These changes would reduce the impacts on all small entities subject to the rule, so there are no significant impacts to any small entities. We have therefore concluded that this action will relieve regulatory burden for all directly regulated small entities. Details of this analysis are presented in the Economic Assessment, which is in the public docket for this action.

### D. Unfunded Mandates Reform Act (UMRA)

This action does not contain an unfunded mandate of $100 million or more as described in UMRA, 2 U.S.C. 1531–1538, and does not significantly or uniquely affect small governments. EPA estimates that the final rule would result in net annual cost savings of between $14.4 and $16.2 million, assuming a seven percent discount rate ($16.3 to $18.1 at a three percent discount rate). As a result, EPA expects that the rule would not result in annual expenditures exceeding $100 million annually and therefore would not be subject to requirements of section 202 of UMRA as listed above.

### E. Executive Order 13132: Federalism

This action does not have federalism implications. It will not have substantial direct effects on the states, on the relationship between the national government and the states, or on the distribution of power and

responsibilities among the various levels of government.

*F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments*

This action does not have Tribal implications as specified in Executive Order 13175 (65 FR 67249, November 9, 2000) because the action is not expected to result in any adverse environmental or human health impacts on Tribal entities. In addition, the action is expected to result in a cost savings and is not expected to result in any adverse financial impacts on Tribal entities. Thus, Executive Order 13175 does not apply to this rule. Consistent with the EPA Policy on Consultation and Coordination with Indian Tribes, the EPA prepared a Tribal consultation and coordination plan and sent a letter to the tribes on July 13, 2021, inviting consultation. EPA did not receive any comments from tribes.

*G. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks*

This action is not subject to Executive Order 13045 (62 FR. 19885, April 23, 1997) because it is not an economically significant regulatory action as defined by Executive Order 12866. In addition, because the rule would not increase risk related to exposure to hazardous materials, the Agency does not believe the environmental health or safety risks addressed by this action present a disproportionate risk to children.

*H. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution or Use*

This action is not a ''significant energy action'' under Executive Order 13211, ''Actions Concerning Regulations that Affect Energy Supply, Distribution, or Use'' (May 18, 2001) because it is not likely to have a significant adverse effect on the supply, distribution or use of energy. The proposed rule would not directly regulate energy production or consumption and is expected to result in net cost savings.

*I. National Technology Transfer and Advancement Act (NTTAA)*

This action involves technical standards. In this rulemaking, the EPA incorporates voluntary consensus standards (VCSs) developed by both ASTM and the Agency into the rulemaking, consistent with the National Technology Transfer and Advancement Act (NTTAA). These VCSs support PCB cleanups as well sampling activities including the extraction and analysis of PCBs. For more details on the technical standards that EPA is using in this rulemaking, please see *Section III.G.—Incorporation by Reference.*

*J. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations*

Executive Order 12898 (59 FR 7629, February 16, 1994) directs Federal agencies, to the greatest extent practicable and permitted by law, to make environmental justice part of their mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of their programs, policies, and activities on minority populations (people of color and/or indigenous peoples) and low-income populations.

The EPA believes that the human health or environmental conditions that exist prior to this action result in or have the potential to result in disproportionate and adverse human health or environmental effects on people of color, low-income populations and/or indigenous peoples. Examples of these potential disproportionate effects include PCB contamination occuring more frequently in these communities, as well as disproportionate effects from emergency situations and climate change.

The EPA believes that this action is likely to reduce existing disproportionate and adverse effects on people of color, low-income populations and/or indigenous peoples. Generally, the final rule will modernize the PCB regulations, making it easier and more affordable to clean up contaminated sites, while continuing to ensure that the requirements remain protective of health and the environment. Underserved, disadvantaged, and overburdened communities are expected to benefit from quicker, more cost-effective, compliant cleanups under the final rule. For example, adding explicit cleanup provisions under § 761.61(b), including the requirements to notify EPA and follow specific sampling protocols, will provide additional assurance that sites are properly remediated and enhance compliance and enforcement. Furthermore, the increased flexibility for emergency situations provided under § 761.66 will allow the Agency to work collaboratively with responsible parties to more quickly respond to releases of PCBs caused by natural disasters and other emergency situations, which can disproportionately impact such communities.

*K. Congressional Review Act (CRA)*

This action is subject to the CRA, and the EPA will submit a rule report to each House of the Congress and to the Comptroller General of the United States. This action is not a ''major rule'' as defined by 5 U.S.C. 804(2).

**List of Subjects in 40 CFR Part 761**

Environmental protection, Hazardous substances, Incorporation by reference, Labeling, Polychlorinated biphenyls (PCBs), Reporting and recordkeeping requirements.

**Barry N. Breen,**

*Principal Deputy Assistant Administrator, Office of Land and Emergency Management.*

For the reasons set out in the preamble, title 40, chapter I of the Code of Federal Regulations, part 761 is amended as follows:

## PART 761—POLYCHLORINATED BIPHENYLS (PCBs) MANUFACTURING, PROCESSING, DISTRIBUTION IN COMMERCE, AND USE PROHIBITIONS

■ 1. The authority citation for part 761 continues to read as follows:

**Authority:** 15 U.S.C. 2605, 2607, 2611, 2614, and 2616.

### Subpart A—General

■ 2. Amend § 761.1 by revising paragraph (b)(3) to read as follows:

**§ 761.1 Applicability.**

\*    \*    \*    \*    \*

(b) \* \* \*

(3) Most provisions in this part apply only if PCBs are present in concentrations above a specified level. Provisions that apply to PCBs at concentrations of <50 ppm apply also to contaminated surfaces at PCB concentrations of ≤10 µg/100 cm². Provisions that apply to PCBs at concentrations of ≥50 to <500 ppm apply also to contaminated surfaces at PCB concentrations of >10 µg/100 cm² to <100 µg/100 cm². Provisions that apply to PCBs at concentrations of ≥500 ppm apply also to contaminated surfaces at PCB concentrations of ≥100 µg/100 cm².

\*    \*    \*    \*    \*

■ 3. Amend § 761.3 by:
■ a. Revising definitions for ''Administrator'' and ''Annual report'';
■ b. Adding in alphabetical order the definition for ''As-found concentration'';
■ c. Revising the definition for ''ASTM'';
■ d. Adding in alphabetical order definitions for ''CWA'', ''Director, Office

of Resource Conservation and Recovery'', and ''Emergency situation'';
■ e. Revising definitions for ''Non-porous surface'' and ''NTIS'';
■ f. Removing the definition for ''On site'' and adding in its place the definition for ''On-site''; and
■ g. Revising definition for ''SW–846''.

The revisions and additions read as follows:

### § 761.3 Definitions.

\* \* \* \* \*

*Administrator* means the Administrator of the Environmental Protection Agency, or any employee of the Agency to whom the Administrator may either herein or by order delegate their authority to carry out their functions, or any person who shall by operation of law be authorized to carry out such functions.

\* \* \* \* \*

*Annual report* means the completed EPA Form 6200–025 submitted each year by each disposer and commercial storer of PCB waste to the Director, Office of Resource Conservation and Recovery. The annual report is a brief summary of the information included in the annual document log.

\* \* \* \* \*

*As-found concentration* means the concentration measured in samples collected in-situ (*i.e.,* prior to being moved or disturbed for cleanup and/or disposal) from environmental media or material, unless otherwise specifically provided. For example, media must not be disturbed, nor may they be diluted (*e.g.,* excavated, placed on a pile, and sampled after such placement), before characterization sampling is conducted. Sampling media in piles and existing accumulations would be considered ''as-found'' if the media were already in piles when the site was first visited by the responsible party, such as during the redevelopment of abandoned properties with historic PCB contamination. The as-found concentration is distinct from the source concentration, which is the concentration of the PCBs in the material that was originally spilled, released, or otherwise disposed of at the site.

*ASTM* means ASTM International, 100 Barr Harbor Drive, West Conshohocken, PA 19428–2959.

\* \* \* \* \*

*CWA* means Clean Water Act, also known as the Federal Water Pollution Control Act (33 U.S.C. 12–51 *et seq.*).

\* \* \* \* \*

*Director, Office of Resource Conservation and Recovery* means the Director of the Office of Resource Conservation and Recovery of the Office

of Land and Emergency Management of the United States Environmental Protection Agency. Submissions to the Director shall be sent to 1200 Pennsylvania Ave. NW, MC5303T, Washington, DC 20460 or through an electronic method of submission, as applicable.

\* \* \* \* \*

*Emergency situation* means adverse conditions caused by manmade or natural incidents that threaten lives, property, or public health and safety; require prompt responsive action from the local, State, Tribal, territorial, or Federal government; and result in or are reasonably expected to result in: (1) A declaration by either the President of the United States or Governor of the affected State of a natural disaster or emergency; or, (2) an incident funded under FEMA via a Stafford Act disaster declaration or emergency declaration. Examples of emergency situations may include civil emergencies or adverse natural conditions, such as hurricanes, earthquakes, or tornados.

\* \* \* \* \*

*Non-porous surface* means a smooth, unpainted solid surface that limits penetration of liquid containing PCBs beyond the immediate surface. Examples are: smooth uncorroded metal; natural gas pipe with a thin porous coating originally applied to inhibit corrosion; smooth glass; smooth glazed ceramics; impermeable polished building stone such as marble or granite; and medium- and high-density plastics, such as polycarbonates and melamines, that do not absorb solvents.

*NTIS* means the National Technical Information Service, 5301 Shawnee Road, Alexandria, VA 22312, telephone: (703) 605–6000.

*On-site* means within the boundaries of a contiguous property unit.

\* \* \* \* \*

*SW–846* means the document having the title ''SW–846, Test Methods for Evaluating Solid Waste: Physical/Chemical Methods,'' also known as the SW–846 Compendium, which is available online at *https://www.epa.gov/hw-sw846.*

\* \* \* \* \*

■ 4. Section 761.19 is revised to read as follows:

### § 761.19 Incorporation by reference.

Certain material is incorporated by reference into this part with the approval of the Director of the **Federal Register** under 5 U.S.C. 552(a) and 1 CFR part 51. All approved incorporation by reference (IBR) material is available for inspection at the Environmental Protection Agency (EPA) and at the

National Archives and Records Administration (NARA). Contact EPA at EPA Docket Center (EPA/DC), Rm. 3334, EPA West Bldg., 1301 Constitution Ave. NW, Washington, DC 20460–0001; (202) 566–0270; *www.epa.gov/dockets.* For information on the availability of this material at NARA, visit *www.archives.gov/federal-register/cfr/ibr-locations.html* or email *fr.inspection@nara.gov.* The material may be obtained from the following sources:

(a) ASTM International, 100 Barr Harbor Dr., P.O. Box C700, West Conshohocken, PA 19428–2959; (877) 909–ASTM *www.astm.org.*

(1) ASTM D93–09, Standard Test Methods for Flash Point by Pensky-Martens Closed Tester, approved December 15, 2009; IBR approved for §§ 761.71; 761.75.

(2) ASTM D129–64 (Reapproved 1968), Standard Test Method for Sulfur in Petroleum Products (General Bomb Method), approved 1968; IBR approved for § 761.71.

(3) ASTM D240–87, Standard Test Method for Heat of Combustion of Liquid Hydrocarbon Fuel by Bomb Calorimeter, approved March 27, 1987; IBR approved for § 761.71.

(4) ASTM D482–13, Standard Test Method for Ash from Petroleum Products, approved June 15, 2013; IBR approved for § 761.71.

(5) ASTM D524–88, Standard Test Method for Ramsbottom Carbon Residue of Petroleum Products, approved 1988; IBR approved for § 761.71.

(6) ASTM D808–87, Standard Test Method for Chlorine in New and Used Petroleum Products (Bomb Method), approved 1987; IBR approved for § 761.71.

(7) ASTM D923–86, Standard Test Method for Sampling Electrical Insulating Liquids, Approved 1986, IBR approved for § 761.60.

(8) ASTM D923–89, Standard Methods of Sampling Electrical Insulating Liquids, approved 1989; IBR approved for § 761.60.

(9) ASTM D1266–87, Standard Test Method for Sulfur in Petroleum Products (Lamp Method), approved 1987; IBR approved for § 761.71.

(10) ASTM D1796–83 (Reapproved 1990), Standard Test Method for Water and Sediment in Fuel Oils by the Centrifuge Method (Laboratory Procedure), approved 1990; IBR approved for § 761.71.

(11) ASTM D2158–89, Standard Test Method for Residues in Liquified Petroleum (LP) Gases, approved 1989; IBR approved for § 761.71.

(12) ASTM D2709–88, Standard Test Method for Water and Sediment in

Distillate Fuels by Centrifuge, approved 1988; IBR approved for § 761.71.

(13) ASTM D3278–96 (Reapproved 2011), Standard Test Methods for Flash Point of Liquids by Small Scale Closed-Cup Apparatus, approved June 1, 2011; IBR approved for § 761.75.

(14) ASTM D4059–00, Standard Test Method for Analysis of Polychlorinated Biphenyls in Insulating Liquids by Gas Chromatography, approved October 10, 2000; IBR approved for § 761.60.

(15) ASTM D5373–16, Standard Test Methods for Determination of Carbon, Hydrogen and Nitrogen in Analysis Samples of Coal and Carbon in Analysis Samples of Coal and Coke, approved September 1, 2016; IBR approved for § 761.71.

(16) ASTM D8174–18, Test Method for Finite Flash Point Determination of Liquid Wastes by Small Scale Closed Cup Tester, approved March 15, 2018; IBR approved for §§ 761.71; 761.75.

(17) ASTM D8175–18, Test Method for Finite Flash Point Determination of Liquid Wastes by Pensky-Martens Closed Cup Tester, approved March 15, 2018; IBR approved for §§ 761.71; 761.75.

(18) ASTM E258–67 (Reapproved 1987), Standard Test Method for Total Nitrogen Inorganic Material by Modified KJELDAHL Method approved 1987; IBR approved for § 761.71.

(b) *EPA, Office of Resource Conservation and Recovery, 1200 Pennsylvania Ave. NW (5304T), Washington, DC 20460; www.epa.gov/ hw-sw846.*

(1) SW–846 Method 3510C, Separatory Funnel Liquid-Liquid Extraction, Revision 3, Approved December 1996; IBR approved for §§ 761.61, 761.272, and 761.292.

(2) SW–846 Method 3520C, Continuous Liquid-Liquid Extraction, Revision 3, Approved December 1996; IBR approved for §§ 761.61, 761.272, and 761.292.

(3) SW–846 Method 3535A, Solid-Phase Extraction (SPE), Revision 1, Approved February 2007; IBR approved for §§ 761.61, 761.272, and 761.292.

(4) SW–846 Method 3540C, Soxhlet Extraction, Revision 3, Approved December 1996; IBR approved for §§ 761.61, 761.253, 761.272, 761.292, 761.358, and 761.395.

(5) SW–846 Method 3541, Automated Soxhlet Extraction, Approved September 1994; IBR approved for §§ 761.61, 761.253, 761.272, 761.292, 761.358, and 761.395.

(6) SW–846 Method 3545A, Pressurized Fluid Extraction (PFE), Revision 1, Approved February 2007; IBR approved for §§ 761.61, 761.253, 761.272, 761.292, 761.358, and 761.395.

(7) SW–846 Method 3546, Microwave Extraction, Approved February 2007; IBR approved for §§ 761.61, 761.253, 761.272, 761.292, 761.358, and 761.395.

(8) SW–846 Method 3550C, Ultrasonic Soxhlet Extraction, Revision 3, Approved February 2007; IBR approved for §§ 761.253, and 761.395.

(9) SW–846 Method 8082A, Polychlorinated Biphenyls (PCBs) By Gas Chromatography, Revision 1, Approved February 2007; IBR approved for §§ 761.60, 761.61, 761.253, 761.272, 761.292, 761.358, and 761.395.

**Note 1 to paragraph (b):** Hard copies of these materials may be obtained from the National Technical Information Service, 5301 Shawnee Road, Alexandria, VA 22312, or by calling (800) 553–6847 or (703) 605–6000.

## Subpart B—Manufacturing, Processing, Distribution in Commerce, and Use of PCBs and PCB Items

■ 5. Amend § 761.20 by revising paragraphs (e)(3)(ii)(B), (e)(4)(i), and (ii) to read as follows:

### § 761.20  Prohibitions and exceptions.

\*    \*    \*    \*    \*

(e) \*    \*    \*

(3) \*    \*    \*

(ii) \*    \*    \*

(B) The burner will burn the used oil only in a combustion facility identified in paragraph (e)(1) of this section and identify the class of burner they qualify under.

(4) \*    \*    \*

(i) *Marketers.* Marketers who first claim that the used oil fuel contains no detectable PCBs must include among the records required by 40 CFR 279.72(b) and 279.74(b) and (c), copies of the analysis or other information documenting their claim, and they must include among the records required by 40 CFR 279.74(a) and (c) and 279.75, a copy of each certification notice received or prepared relating to transactions involving PCB-containing used oil.

(ii) *Burners.* Burners must include among the records required by 40 CFR 279.65 and 279.66, a copy of each certification notice required by paragraph (e)(3)(ii) of this section that they send to a marketer.

\*    \*    \*    \*    \*

■ 6. Amend § 761.30 by revising paragraph (i)(4) to read as follows:

### § 761.30  Authorizations.

\*    \*    \*    \*    \*

(i) \*    \*    \*

(4) Any person characterizing PCB contamination in natural gas pipe or natural gas pipeline systems must do so by analyzing organic liquids collected at existing condensate collection points in the pipe or pipeline system. The level of PCB contamination found at a collection point is assumed to extend to the next collection point downstream. Any person characterizing multi-phasic liquids must do so in accordance with § 761.1(b)(4); if no liquids are present and they choose, in their discretion, to characterize PCB contamination, the person must use standard wipe samples in accordance with subpart M of this part.

\*    \*    \*    \*    \*

## Subpart D—Storage and Disposal

■ 7. Amend § 761.50 by revising paragraphs (b)(3)(i)(A) and (b)(3)(ii) introductory text to read as follows:

### § 761.50  Applicability.

\*    \*    \*    \*    \*

(b) \*    \*    \*

(3) \*    \*    \*

(i) \*    \*    \*

(A) Sites containing these wastes are presumed not to present an unreasonable risk of injury to health or the environment from exposure to PCBs at the site. However, the EPA Regional Administrator may inform the owner or operator of the site that there is reason to believe that spills, leaks, or other uncontrolled releases or discharges, such as leaching, from the site constitute ongoing disposal that may present an unreasonable risk of injury to health or the environment from exposure to PCBs at the site, and may require the owner or operator to generate data necessary to characterize the risk. If after reviewing any such data, the EPA Regional Administrator makes a finding, that an unreasonable risk exists, then they may direct the owner or operator of the site to dispose of the PCB remediation waste in accordance with § 761.61 such that an unreasonable risk of injury no longer exists.

\*    \*    \*    \*    \*

(ii) Any person responsible for PCB waste that was either placed in a land disposal facility, spilled, or otherwise released into the environment on or after April 18, 1978, but prior to July 2, 1979, where the concentration of the spill or release was ≥500 ppm; or placed in a land disposal facility, spilled, or otherwise released into the environment on or after July 2, 1979, where the concentration of the spill or release was ≥50 ppm, must dispose of it in accordance with either of the following:

\*    \*    \*    \*    \*

■ 8. Amend § 761.60 by revising paragraphs (b)(2)(v)(C), (g)(1)(iii), and (g)(2)(ii) to read as follows:

## § 761.60  Disposal requirements.

* * * * *

(b) * * *

(2) * * *

(v) * * *

(C) There is other good cause shown. As part of this evaluation, the Assistant Administrator will consider the impact of their action on the incentives to construct or expand PCB incinerators.

* * * * *

(g) * * *

(1) * * *

(iii) Unless otherwise specified in this part, any person conducting the chemical analysis of PCBs shall do so using gas chromatography. Any gas chromatographic method that is appropriate for the material being analyzed may be used, including EPA Method 608.3, ''Organochlorine Pesticides and PCBs'' (see 40 CFR part 136, Appendix A), or SW–846 Method 8082A (incorporated by reference in § 761.19); and ASTM D4059–00 (incorporated by reference, see § 761.19).

(2) * * *

(ii) For purposes of complying with the marking and disposal requirements, representative samples may be taken from either the common containers or the individual electrical equipment to determine the PCB concentration. Except, that if any PCBs at a concentration of 500 ppm or greater have been added to the container or equipment then the total container contents must be considered as having a PCB concentration of 500 ppm or greater for purposes of complying with the disposal requirements of this subpart. For purposes of this paragraph, representative samples of mineral oil dielectric fluid are either samples taken in accordance with ASTM D923–86 or ASTM D923–89 (both incorporated by reference, see § 761.19) or samples taken from a container that has been thoroughly mixed in a manner such that any PCBs in the container are uniformly distributed throughout the liquid in the container.

* * * * *

■ 9. Amend § 761.61 by revising paragraphs (a)(3)(ii), (a)(5)(i)(B)(2)(iv), (a)(7), (a)(8) introductory text, (a)(8)(i)(A) and (B), (a)(8)(ii) introductory text, (b), (c) paragraph heading, and (c)(1) to read as follows:

## § 761.61  PCB remediation waste.

* * * * *

(a) * * *

(3) * * *

(ii) Within 30 calendar days of receiving the notification, the EPA Regional Administrator will respond in writing approving of the self-implementing cleanup, disapproving of the self-implementing cleanup, or requiring additional information. If the EPA Regional Administrator does not respond within 30 calendar days of receiving the notice, the person submitting the notification may proceed with the cleanup according to the information the person provided to the EPA Regional Administrator. If, upon review of the notification, the EPA Regional Administrator determines that the notification does not contain all of the information required by paragraph (a)(3)(i) of this section, sufficient to ensure compliance with paragraphs (a)(4) through (9) of this section at the site, they may require the submission of additional information. The cleanup and disposal must comply with all applicable requirements of paragraphs (a)(4) through (9) of this section. Once cleanup is underway, the person conducting the cleanup must provide any proposed changes from the notification to the EPA Regional Administrator in writing no less than 14 calendar days prior to the proposed implementation of the change. The EPA Regional Administrator will determine in their discretion whether to accept the change and will respond to the change notification verbally within 7 calendar days and in writing within 14 calendar days of receiving it. If the EPA Regional Administrator does not respond verbally within 7 calendar days and in writing within 14 calendar days of receiving the change notice, the person who submitted it may proceed with the cleanup according to the information in the change notice provided to the EPA Regional Administrator, subject to the submission of additional information if the Regional Administrator determines it is needed to address the elements of paragraph (a)(3)(i), of this section and in compliance with all applicable requirements of paragraphs (a)(4) through (9) of this section and other applicable requirements of this part.

* * * * *

(5) * * *

(i) * * *

(B) * * *

(2) * * *

(iv) The generator must provide written notice, including the quantity to be shipped and highest concentration of PCBs at least 15 days before the first shipment of bulk PCB remediation waste from each cleanup site by the generator, to each off-site facility where the waste is destined for an area not subject to a TSCA PCB Disposal Approval. The generator must select applicable method(s) from the following list to extract PCBs and determine the PCB concentration from individual and composite samples of PCB remediation waste: SW–846 Method 3510C, SW–846 Method 3520C, SW–846 Method 3535A, SW–846 Method 3540C, SW–846 Method 3541, SW–846 Method 3545A, SW–846 Method 3546, or SW–846 Method 8082A (all incorporated by reference, see § 761.19). Modifications to the methods listed in this paragraph or alternative methods not listed may be used if validated under Subpart Q of this part or authorized in a § 761.61(c) approval.

* * * * *

(7) *Cap requirements.* A cap means, when referring to on-site cleanup and disposal of PCB remediation waste, a uniform placement of concrete, asphalt, or similar material of minimum thickness spread over the area where remediation waste was removed or left in place in order to prevent or minimize human exposure, infiltration of water, and erosion. Any person designing and constructing a cap must do so in accordance with § 264.310(a) of this chapter, and ensure that it complies with the permeability, sieve, liquid limit, and plasticity index parameters in §§ 761.75(b)(1)(ii) through (v). A cap of compacted soil shall have a minimum thickness of 25 cm (10 inches). A concrete or asphalt cap shall have a minimum thickness of 15 cm (6 inches). A cap must be of sufficient strength to maintain its effectiveness and integrity during the use of the cap surface which is exposed to the environment. A cap shall not be contaminated at a level ≥1 ppm PCB. Repairs shall begin within 72 hours of discovery for any breaches which would impair the integrity of the cap.

(8) *Deed restrictions for caps, fences and low occupancy areas.* When a cleanup activity conducted under this section includes the use of a fence or a cap, the owner of the site must maintain the fence or cap, in perpetuity. In addition, whenever a fence, a cap, or the procedures and requirements for a low occupancy area, is used, the owner of the site must meet the following conditions:

(i) * * *

(A) Record, in accordance with State law, a notation on the deed to the property, or on some other instrument which is normally examined during a title search, that will in perpetuity notify any potential purchaser of the property:

(1) That the land, or the specific portion thereof identified in the instrument when only a portion is subject to the instrument, has been used

for PCB remediation waste disposal and, when applicable, that the area is restricted to use as a low occupancy area as defined in § 761.3;

(*2*) Of the existence of the fence or cap and the requirement to maintain the fence or cap, when applicable; and

(*3*) The applicable cleanup levels left at the site, including inside any fence, under any cap, and/or in a low occupancy area.

(B) Submit a certification, signed by the owner, that they have recorded the notation specified in paragraph (a)(8)(i)(A) of this section to the EPA Regional Administrator.

(ii) The owner of a site being cleaned up under this section may remove a fence, cap, or low occupancy designation after conducting additional cleanup activities and achieving cleanup levels, specified in paragraph (a)(4) of this section, which do not require a fence, cap, or low occupancy designation. The owner may remove the notice on the deed no earlier than 30 days after achieving the cleanup levels specified in this section which do not require a fence, cap, or low occupancy designation.

\* \* \* \* \*

(b) *Performance-based cleanup and disposal.* Any person may clean up and dispose of PCB remediation waste at a site in full compliance with the performance-based cleanup provisions of paragraph (b)(1) of this section and disposal provisions of paragraph (b)(2) of this section.

Alternatively, any person may dispose of PCB remediation waste in accordance with paragraph (b)(2) of this section, but such disposal does not relieve them of cleanup and disposal obligations for any PCBs that remain on-site if the provisions of paragraph (b)(1) of this section are not complied with.

(1) *Performance-based cleanup of PCB remediation waste*—(i) *Applicability.* (A) The performance-based cleanup option may not be used to clean up:

(*1*) Surface or ground waters.

(*2*) Sediments in marine and freshwater ecosystems.

(*3*) Sewers or sewage treatment systems.

(*4*) Any private or public drinking water sources or distribution systems.

(*5*) Grazing or agricultural lands.

(*6*) Vegetable gardens.

(*7*) Sites where the cleanup site, as defined in § 761.3, is adjacent to, contains, or is proposed to be redeveloped to contain: residential dwellings, hospitals, schools, nursing homes, playgrounds, parks, day care centers, endangered species habitats, estuaries, wetlands, national parks, national wildlife refuges, commercial fisheries, sport fisheries, or surface waters.

(*8*) Sites where the PCB contamination is in the 100-year floodplain.

(B) The performance-based cleanup provisions shall not be binding upon cleanups conducted under other authorities, including but not limited to, actions conducted under section 104 or section 106 of CERCLA, or section 3004(u) and (v) or section 3008(h) of RCRA.

(ii) *Cleanup level.* All on-site PCB remediation waste above the following cleanup levels must be disposed of or decontaminated in accordance with paragraph (2).

(A) The cleanup level for bulk PCB remediation waste and porous surfaces is ≤1 ppm PCBs.

(B) The cleanup levels for liquids are the concentrations specified in §§ 761.79(b)(1) and (b)(2).

(C) The cleanup levels for non-porous surfaces are the concentrations specified in § 761.79(b)(3).

(iii) *Verification sampling.* Verification sampling for bulk PCB remediation waste and porous surfaces must be conducted in accordance with Subpart O. Verification sampling for non-porous surfaces must be conducted in accordance with Subpart P. Verification sampling for liquid PCB remediation waste must be conducted in accordance with § 761.269. When analysis of each sample results in a measurement of PCBs less than or equal to the levels specified in paragraph (ii) of this section, on-site performance-based cleanup is complete.

(iv) *Recordkeeping.* Recordkeeping is required in accordance with § 761.125(c)(5).

(v) *Cleanup Completion Notification.* Within 30 days of sending the final shipment of waste offsite for disposal from a site cleaned up under this paragraph, the person in charge of the cleanup or the owner of the property where the PCB remediation waste was located shall notify, in writing, the EPA Regional Administrator, the Director of the State or Tribal environmental protection agency, and the Director of the county or local environmental protection agency where the cleanup was conducted. EPA may require additional on-site cleanup upon finding that the cleanup level(s) in (b)(1)(ii) of this section have not been met. Upon review of the cleanup completion notification, EPA may request that the responsible party submit additional information related to the records required under (b)(1)(iv) of this section to clarify that the cleanup has been completed in accordance with the requirements of this section. The notification shall include:

(A) Site identification information, including the site address and the name, phone number, and email address of the site contact;

(B) Disposal facility and shipment information, including the disposal facility's name and address, the manifest tracking number(s), and the quantity of waste shipped;

(C) A summary of all applicable components of the records in § 761.125(c)(5); and

(D) A certification using the language in § 761.3.

(2) *Performance-based disposal.* (i) Any person disposing of liquid PCB remediation waste under this subsection shall do so according to §§ 761.60(a) or (e) or decontaminate it in accordance with § 761.79.

(ii) Any person disposing of non-liquid PCB remediation waste under this subsection shall do so by one of the following methods:

(A) Dispose of it in a high temperature incinerator approved under § 761.70(b), an alternate disposal method approved under § 761.60(e), a chemical waste landfill approved under § 761.75, a facility with a coordinated approval issued under § 761.77, or a hazardous waste landfill permitted by EPA under section 3005 of RCRA, or by a State or territory authorized under section 3006 of RCRA.

(B) Decontaminate it in accordance with § 761.79.

(iii) Any person may manage or dispose of material containing <50 ppm PCBs that has been dredged or excavated from waters of the United States:

(A) In accordance with a permit that has been issued under section 404 of the Clean Water Act, or the equivalent of such a permit as provided for in regulations of the U.S. Army Corps of Engineers at 33 CFR part 320.

(B) In accordance with a permit issued by the U.S. Army Corps of Engineers under section 103 of the Marine Protection, Research, and Sanctuaries Act, or the equivalent of such a permit as provided for in regulations of the U.S. Army Corps of Engineers at 33 CFR part 320.

(c) *Risk-based cleanup and disposal approval.* (1) Any person wishing to sample, extract, analyze, cleanup, or dispose of PCB remediation waste in a manner other than prescribed in paragraphs (a) or (b) of this section, or store PCB remediation waste in a manner other than prescribed in § 761.65, must apply in writing to the Regional Administrator in the Region

where the sampling, extraction, analysis, cleanup, disposal, or storage site is located, for sampling, extraction, analysis, cleanup, disposal, or storage occurring in a single EPA Region; or to the Director, Office of Resource Conservation and Recovery, for sampling, extraction, analysis, cleanup, disposal, or storage occurring in more than one EPA Region. Each application must include information described in the notification required by paragraph (a)(3) of this section. EPA may request other information that it believes necessary to evaluate the application. No person may conduct cleanup activities under this paragraph prior to obtaining written approval by EPA.

\*    \*    \*    \*    \*

■ 10. Amend § 761.62 by revising paragraphs (c)(1) and (d) to read as follows:

### § 761.62   Disposal of PCB bulk product waste.

\*    \*    \*    \*    \*

(c) \* \* \*

(1) Any person wishing to sample, extract, analyze, or dispose of PCB bulk product waste in a manner other than prescribed in paragraphs (a) or (b) of this section, or store PCB bulk product waste in a manner other than prescribed in § 761.65, must apply in writing to the Regional Administrator in the Region where the sampling, extraction, analysis, disposal, or storage site is located, for sampling, extraction, analysis, disposal, or storage occurring in a single EPA Region; or to the Director, Office of Resource Conservation and Recovery, for sampling, extraction, analysis, disposal, or storage occurring in more than one EPA Region. Each application must contain information indicating that, based on technical, environmental, or waste-specific characteristics or considerations, the proposed sampling, extraction, analysis, disposal, or storage methods or locations will not pose an unreasonable risk of injury to health or the environment. EPA may request other information that it believes necessary to evaluate the application. No person may conduct sampling, extraction, analysis, disposal, or storage activities under this paragraph prior to obtaining written approval by EPA.

\*    \*    \*    \*    \*

(d) *Disposal as daily landfill cover.* Bulk product waste described in paragraph (b)(1) of this section may be disposed of as daily landfill cover, as long as the daily cover remains in the landfill and is not released or dispersed by wind or other action.

■ 11. Amend § 761.65 by revising paragraphs (c)(9)(i) and (iii), (g) introductory text, (g)(1) introductory text, (g)(1)(iv), (g)(2), (g)(3)(i), (g)(4)(i), (g)(5), (6), (7) and (h) to read as follows:

### § 761.65   Storage for disposal.

\*    \*    \*    \*    \*

(c) \* \* \*

(9) \* \* \*

(i) The waste is placed in a pile or non-leaking, covered container designed and operated to control dispersal of the waste by wind, where necessary, by means other than wetting.

\*    \*    \*    \*    \*

(iii) The storage site must have:

(A) A liner or container that is designed, constructed, and installed to prevent any migration of wastes off or through the liner or container into the adjacent subsurface soil, ground water or surface water at any time during the active life (including the closure period) of the storage site. The liner or container may be constructed of materials that may allow waste to migrate into the liner or container. The liner or container must be:

(*1*) Constructed of materials that have appropriate chemical properties and sufficient strength and thickness to prevent failure due to pressure gradients (including static head and external hydrogeologic forces), physical contact with the waste or leachate to which they are exposed, climatic conditions, the stress of installation, and the stress of daily operation.

(*2*) Placed upon a foundation or base capable of providing support to the liner or container and resistance to pressure gradients above and below the liner or container to prevent failure of the liner or container due to settlement, compression, or uplift.

(*3*) In the case of liners, installed to cover all surrounding earth likely to be in contact with the waste.

(B) A cover that meets the requirements of paragraph (c)(9)(iii)(A) of this section, is installed to cover all of the stored waste likely to be in contact with precipitation, and is secured so as not to be functionally disabled by winds expected under normal seasonal meteorological conditions at the storage site.

\*    \*    \*    \*    \*

(g) *Financial assurance for closure.* A commercial storer of PCB waste shall establish financial assurance for closure of each PCB storage facility that they own or operate. In establishing financial assurance for closure, the commercial storer of PCB waste may choose from the following financial assurance mechanisms or any combination of mechanisms:

(1) The ''closure trust fund,'' as specified in § 264.143(a) of this chapter, except for paragraph (a)(3) of § 264.143 and except when the Regional Administrator specifies modifications for the purposes of implementation under TSCA. For purposes of this paragraph, the following provisions also apply:

\*    \*    \*    \*    \*

(iv) The submission of a trust agreement with the wording specified in § 264.151(a)(1) of this chapter, including any reference to hazardous waste management facilities, shall be deemed to be in compliance with the requirement to submit a trust agreement under this subpart except when the Regional Administrator specifies modifications for the purposes of implementation under TSCA.

(2) The ''surety bond guaranteeing payment into a closure trust fund,'' as specified in § 264.143(b) of this chapter, including the use of the surety bond instrument specified at § 264.151(b) of this chapter and the standby trust specified at § 264.143(b)(3) of this chapter except when the Regional Administrator specifies modifications for the purposes of implementation under TSCA. The use of the surety bonds, surety bond instruments, and standby trust agreements specified in §§ 264.143(b) and 264.151(b) of this chapter, with any modifications specified by the Regional Administrator, shall be deemed to be in compliance with this subpart.

(3)(i) The ''surety bond guaranteeing performance of closure,'' as specified at § 264.143(c) of this chapter, except for § 264.143(c)(5) of this chapter and except when the Regional Administrator specifies modifications for the purposes of implementation under TSCA. The submission and use of the surety bond instrument specified at § 264.151(c) of this chapter and the standby trust specified at § 264.143(c)(3) of this chapter, with any modifications specified by the Regional Administrator, shall be deemed to be in compliance with the requirements under this subpart relating to the use of surety bonds and standby trust funds.

\*    \*    \*    \*    \*

(4)(i) The ''closure letter of credit'' specified in § 264.143(d) of this chapter, except for paragraph (d)(8) and except when the Regional Administrator specifies modifications for the purposes of implementation under TSCA. The submission and use of the irrevocable letter of credit instrument specified in § 264.151(d) of this chapter and the standby trust specified in § 264.143(d)(3) of this chapter, with any

modifications specified by the Regional Administrator, shall be deemed to be in compliance with the requirements of this subpart relating to the use of letters of credit and standby trust funds.

\*    \*    \*    \*    \*

(5) "Closure insurance," as specified in § 264.143(e) of this chapter, utilizing the certificate of insurance for closure specified at § 264.151(e) of this chapter except when the Regional Administrator specifies modifications for the purposes of implementation under TSCA. The use of closure insurance as specified in § 264.143(e) of this chapter and the submission and use of the certificate of insurance specified in § 264.151(e) of this chapter, with any modifications specified by the Regional Administrator, shall be deemed to be in compliance with the requirements of this subpart relating to the use of closure insurance.

(6) The "financial test and corporate guarantee for closure," as described in § 264.143(f) of this chapter except when the Regional Administrator specifies modifications for the purposes of implementation under TSCA, including a letter signed by the owner's or operator's chief financial officer as specified at § 264.151(f) of this chapter and, if applicable, the written corporate guarantee specified at § 264.151(h) of this chapter. The use of the financial test and corporate guarantee specified in § 264.143(f) of this chapter, the submission and use of the letter specified in § 264.151(f) of this chapter, and the submission and use of the written corporate guarantee specified at § 264.151(h) of this chapter, with any modifications specified by the Regional Administrator, shall be deemed to be in compliance with the requirements of this subpart relating to the use of financial tests and corporate guarantees.

(7) The corporate guarantee as specified in § 264.143(f)(10) of this chapter except when the Regional Administrator specifies modifications for the purposes of implementation under TSCA.

\*    \*    \*    \*    \*

(h) *Release of owner or operator.* Within 60 days after receiving certifications from the owner or operator and an independent registered professional engineer that final closure has been completed in accordance with the approved closure plan, EPA will notify the owner or operator in writing that the owner or operator is no longer required by this section to maintain financial assurance for final closure of the facility, unless EPA has reason to believe that final closure has not been completed in accordance with the approved closure plan. EPA shall

provide the owner or operator with a detailed written statement stating the reasons why EPA believed closure was not conducted in accordance with the approved closure plan.

\*    \*    \*    \*    \*

■ 12. Add § 761.66 to subpart D to read as follows:

**§ 761.66  Emergency situations.**

This section establishes procedures that may be used for purposes of the cleanup and/or disposal of PCB releases caused by an emergency situation as defined in § 761.3. This section allows the request of a waiver of any of the requirements in §§ 761.60, 761.61, 761.62, or 761.65. Any person conducting activities under these emergency provisions is also responsible for determining and complying with all other applicable Federal, State, and local laws and regulations. This section does not prohibit any person from implementing temporary emergency measures to prevent, treat, or contain further releases or mitigate migration to the environment of PCBs or PCB remediation waste.

(a) *Applicability.* This section may only be applied to the cleanup and/or disposal of PCB releases caused by an emergency situation as defined in § 761.3.

(b) *Waiver Request.* Any person intending or planning to sample, extract, analyze, clean up, store, and/or dispose of PCBs under this section shall submit a waiver request to the Regional Administrator in the EPA Region where the sampling, extraction, analysis, cleanup, storage, and/or disposal would occur, in writing and/or by email no later than seven (7) days after discovery of the release or implementation of any temporary emergency measures, as applicable. The requestor must also send a copy of the waiver request to the Director of the State or Tribal environmental agency where the sampling, extraction, analysis, cleanup, storage, and/or disposal would occur. If the sampling, extraction, analysis, cleanup, storage, and/or disposal activities in the waiver request would be conducted in more than one Region, then the waiver request must be submitted, in its entirety, to the Regional Administrators for all affected Regions.

(1) This request shall include:

(i) The contact information for the person requesting the waiver.

(ii) Location(s) of the release(s).

(iii) A description of the emergency situation, including information about adverse conditions and the incident(s) that caused them.

(iv) The type(s) of material(s) that are contaminated and the source of the release, if known.

(v) The as-found PCB concentrations in the PCB waste, unless the materials are being managed as if they contain ≥500 ppm PCBs. If actual PCB concentrations have not yet been determined, then estimated concentrations may be provided in the request. Actual PCB concentrations shall be determined before disposal activities commence, unless the waste is being managed as if it contains ≥500 ppm PCBs.

(vi) The provisions of §§ 761.60, 761.61, 761.62, or 761.65 that the person requests to waive or modify (or to use alternative procedures for) and an explanation of why compliance with the existing provisions would be impracticable as a result of the emergency situation.

(vii) The plan for how sampling, extraction, analysis, storage, cleanup, and/or disposal of the PCB waste would be conducted if the waiver were granted. The plan shall provide information to support how the actions described in the plan do not pose an unreasonable risk of injury to health or the environment. This plan shall be based on the as-found PCB concentrations in the materials unless waste is being managed as if it contains PCBs ≥500 ppm.

(viii) Whether or not the PCB waste is near, or likely to impact, surface waters, ground waters, drinking water sources or distribution systems, wells, sediments, sewers or sewage treatment systems, grazing lands, vegetable gardens, residential dwellings, hospitals, schools, nursing homes, playgrounds, parks, day care centers, endangered species habitats, estuaries, wetlands, national parks, national wildlife refuges, commercial fisheries, or sport fisheries and how those areas and potential impacts will be addressed.

(2) To make changes to submitted information described in paragraph (b)(1) of this section, the requestor shall submit the new information to the EPA Regional Administrator(s) in writing and/or by email. Changes must also be sent to the Director of the State or Tribal environmental agency or agencies where the request is applicable.

(c) *Approval of waiver requests.* The EPA Regional Administrator may approve the waiver request, request additional information, approve the waiver request with specified changes or additional conditions, or deny the waiver request, in writing, by telephone, or by email. An approval, with or without changes or conditions, shall be based on the Regional Administrator's

finding that compliance with the regulatory requirements from which a waiver is sought is impracticable and that the action approved under the waiver will not pose an unreasonable risk of injury to health or the environment. At any point, EPA may impose additional sampling, extraction, analysis, cleanup, storage, and/or disposal requirements, or require the requestor to delay acting on their proposed plan, in order to ensure the actions will not pose an unreasonable risk of injury to health or the environment.

(d) *Steps after approval of waiver request.* Sampling, extraction, analysis, cleanup, storage, and disposal activities as described in the waiver request may begin after the EPA Regional Administrator responds with approval of the waiver request. All sampling, extraction, analysis, cleanup, storage, and disposal activities shall be conducted in compliance with the terms of the approval and all applicable provisions of §§ 761.60, 761.61, 761.62, and 761.65 not expressly waived by the approval.

(e) *As-found concentration.* Sampling, extraction, analysis, cleanup, storage, and disposal activities conducted under this section shall be based on the as-found concentration of the PCB waste unless the materials are being managed as if they contain ≥500 ppm PCBs.

(f) *Records, manifests, and certification.* Recordkeeping and certification are required in accordance with § 761.125(c)(5). The manifesting and reporting requirements in Subpart K apply to waste disposed of under this section. However, if the person requesting a waiver has not previously submitted a notification of PCB activity as described in § 761.205 and the requirements of § 761.205 specify that such notification is required for the cleanup, storage, and/or disposal activity, the requestor shall submit the notification within ten (10) business days of their waiver request. The requestor does not have to wait to obtain their EPA identification number before initiating cleanup and/or disposal activities described in their approved waiver request. While waiting for their identification number, the requestor may use the generic identification ''40 CFR PART 761'' in lieu of an EPA identification number on manifests for PCB waste. The requestor may alternatively use an EPA identification number they previously obtained from EPA under RCRA or a State or territory under an authorized RCRA program, if they have one. Once the requestor receives an EPA identification number,

they shall use it on manifests for PCB waste.

■ 13. Amend § 761.70 by revising paragraph (d)(4)(i) to read as follows:

**§ 761.70   Incineration.**

*   *   *   *   *
(d) *   *   *
(4) *   *   *
(i) Except as provided in paragraph (d)(5) of this section, the Regional Administrator or the appropriate official at EPA Headquarters may not approve an incinerator for the disposal of PCBs and PCB Items unless they find that the incinerator meets all of the requirements of paragraphs (a) and/or (b) of this section.

*   *   *   *   *

■ 14. Amend § 761.71 by revising paragraphs (b)(2)(iv) and (vi) to read as follows:

**§ 761.71   High efficiency boilers.**

*   *   *   *   *
(b) *   *   *
(2) *   *   *
(iv) The type of equipment, apparatus, and procedures to be used to control the feed of PCB liquids to the boiler and to monitor and record the carbon monoxide concentration and excess oxygen percentage in the stack.

*   *   *   *   *

(vi) The concentration of PCBs and of any other chlorinated hydrocarbon in the waste and the results of analyses using ASTM methods as follows: Carbon and hydrogen content using ASTM D5373–16, nitrogen content using ASTM E258–67 (Reapproved 1987) or ASTM D5373–16, sulfur content using ASTM D1266–87, or ASTM D129–64 (Reapproved 1968), chlorine content using ASTM D808–87, water and sediment content using either ASTM D2709–88 or ASTM D1796–83 (Reapproved 1990), ash content using ASTM D482–13, calorific value using ASTM D240–87, carbon residue using either ASTM D2158–89 or ASTM D524–88, and flash point using ASTM D93–09, ASTM D8174–18, or ASTM D8175–18 (all standards incorporated by reference, see § 761.19).

*   *   *   *   *

■ 15. Amend § 761.75 by revising paragraphs (b)(8)(iii) and (c)(3)(i) and (c)(4) to read as follows:

**§ 761.75   Chemical waste landfills.**

*   *   *   *   *
(b) *   *   *
(8) *   *   *
(iii) Ignitable wastes shall not be disposed of in chemical waste landfills. Liquid ignitable wastes are wastes that have a flash point less than 60 degrees

C (140 degrees F) as determined by the following method or an equivalent method: Flash point of liquids shall be determined by a Pensky-Martens Closed Cup Tester, using the protocol specified in ASTM D93–09 or ASTM D8175–18, a Small Scale Closed Cup Tester, using the protocol specified in ASTM D8174–18, or the Setaflash Closed Tester using the protocol specified in ASTM D3278–96 (Reapproved 2011) (all standards incorporated by reference, see § 761.19).

*   *   *   *   *
(c) *   *   *
(3) *   *   *
(i) Except as provided in paragraph (c)(4) of this section, the Regional Administrator may not approve a chemical waste landfill for the disposal of PCBs and PCB Items, unless they find that the landfill meets all of the requirements of paragraph (b) of this section.

*   *   *   *   *

(4) *Waivers.* An owner or operator of a chemical waste landfill may submit evidence to the Regional Administrator that operation of the landfill will not present an unreasonable risk of injury to health or the environment from PCBs when one or more of the requirements of paragraph (b) of this section are not met. On the basis of such evidence and any other available information, the Regional Administrator may in their discretion find that one or more of the requirements of paragraph (b) of this section is not necessary to protect against such a risk and may waive the requirements in any approval for that landfill. Any finding and waiver under this paragraph will be stated in writing and included as part of the approval.

*   *   *   *   *

■ 16. Amend § 761.77 by revising paragraphs (a)(1)(ii)(B), (a)(2), and (b) introductory text to read as follows:

**§ 761.77   Coordinated approval.**

(a) *   *   *
(1) *   *   *
(ii) *   *   *
(B) Issue a letter granting or denying the TSCA PCB Coordinated Approval. If the EPA Regional Administrator grants the TSCA PCB Coordinated Approval, they may acknowledge the non-TSCA approval meets the regulatory requirements under TSCA as written, or require additional conditions the EPA Regional Administrator has determined are necessary to prevent unreasonable risk of injury to health or the environment.

*   *   *   *   *

(2) The EPA Regional Administrator may issue a notice of deficiency, revoke

the TSCA PCB Coordinated Approval, require the person to whom the TSCA PCB Coordinated Approval was issued to submit an application for a TSCA PCB approval, or bring an enforcement action under TSCA if they determine that:

* * * * *

(b) Any person who owns or operates a facility that they intend to use to landfill PCB wastes; incinerate PCB wastes; dispose of PCB wastes using an alternative disposal method that is equivalent to disposal in an incinerator approved under § 761.70 or a high efficiency boiler operating in compliance with § 761.71; or store PCB wastes may apply for a TSCA PCB Coordinated Approval. The EPA Regional Administrator may approve the request if the EPA Regional Administrator determines that the activity will not pose an unreasonable risk of injury to health or the environment and the person:

* * * * *

■ 17. Amend § 761.79 by revising paragraph (h)(3) to read as follows:

### § 761.79 Decontamination standards and procedures.

* * * * *

(h) * * *

(3) Any person wishing to sample, extract, or analyze decontaminated material in a manner other than prescribed in paragraph (f) of this section must apply in writing to the Regional Administrator in the Region where the activity would take place, for decontamination activity occurring in a single EPA Region; or to the Director, Office of Resource Conservation and Recovery, for decontamination activity occurring in more than one EPA Region. Each application must contain a description of the material to be decontaminated, the nature and PCB concentration of the contaminating material (if known), the decontamination method, the proposed extraction, analysis, and/or sampling procedure, and a justification for how the proposed extraction, analysis, and/or sampling procedure is equivalent to or more comprehensive than the extraction, analysis, and/or sampling procedure required under paragraph (f) of this section.

* * * * *

## Subpart G—PCB Spill Cleanup Policy

■ 18. Amend § 761.120 by revising paragraphs (b)(2) and (c) to read as follows:

### § 761.120 Scope.

* * * * *

(b) * * *

(2) In those situations, the Regional Administrator may require cleanup in addition to that required under § 761.125(b) and (c). However, the Regional Administrator must first make a finding, based on the specific facts of a spill, that additional cleanup is necessary to prevent unreasonable risk. In addition, before making a final decision on additional cleanup, the Regional Administrator must notify the Director, Office of Resource Conservation and Recovery of their finding and the basis for the finding.

(c) *Flexibility to allow less stringent or alternative requirements.* (1) EPA retains the flexibility to allow less stringent or alternative decontamination measures based upon site-specific considerations. EPA will exercise this flexibility if the responsible party demonstrates that cleanup to the numerical decontamination levels is clearly unwarranted because of risk-mitigating factors, that compliance with the procedural requirements or numerical standards in the policy is impracticable at a particular site, or that site-specific characteristics make the costs of cleanup prohibitive. The Regional Administrator will notify the Director, Office of Resource Conservation and Recovery of any decision and the basis for the decision to allow less stringent cleanup. The purpose of this notification is to enable the Director, Office of Resource Conservation and Recovery to ensure consistency of spill cleanup standards under special circumstances across the regions.

(2) In emergency situations, as defined in § 761.123, the following provisions of this Policy are hereby modified as follows:

(i) For actions taken directly in response to spills caused by emergency situations, responsible parties may use the as-found concentrations in the spill materials when determining whether to manage the spill under §§ 761.125(b) or (c) of this Policy when it is not possible to readily determine the spill source concentration at a site.

(ii) For spills caused by emergency situations, the applicable notifications in § 761.125(a)(1) must be submitted as soon as possible, but no later than 48 hours after the adverse conditions that prevented communication have ended.

* * * * *

■ 19. Amend § 761.123, by:
■ a. Adding the definition in alphabetical order for "Emergency situation"; and
■ b. Revising the definitions for "Other restricted access (nonsubstation) locations" and "Spill".

The addition and revisions read as follows:

### § 761.123    Definitions.

* * * * *

*Emergency situation* means adverse conditions caused by manmade or natural incidents that threaten lives, property, or public health and safety; require prompt responsive action from the local, State, Tribal, territorial, or Federal government; and result in or are reasonably expected to result in: (1) A declaration by either the President of the United States or Governor of the affected State of a natural disaster or emergency; or, (2) an incident funded under FEMA via a Stafford Act disaster declaration or emergency declaration. Examples of emergency situations may include civil emergencies or adverse natural conditions, such as hurricanes, earthquakes, or tornados.

* * * * *

*Other restricted access (nonsubstation) locations* means areas other than electrical substations that are at least 0.1 kilometer (km) from a residential/commercial area and limited by man-made barriers (*e.g.,* fences and walls) or substantially limited by naturally occurring barriers such as mountains, cliffs, or rough terrain. These areas generally include industrial facilities and extremely remote rural locations. (Areas where access is restricted but are less than 0.1 km from a residential/commercial area are considered to be residential/commercial areas.)

* * * * *

*Spill* means both intentional and unintentional spills, leaks, and other uncontrolled discharges where the release results in any quantity of PCBs running off or about to run off the external surface of the equipment or other PCB source, as well as the contamination resulting from those releases. This policy applies to spills of 50 ppm or greater PCBs. The concentration of PCBs spilled is determined by the PCB concentration in the material spilled as opposed to the concentration of PCBs in the material onto which the PCBs were spilled, except where authorized in § 761.120(c). Where a spill of untested mineral oil occurs, the oil is presumed to contain greater than or equal to 50 ppm, but less than 500 ppm PCBs and is subject to the relevant requirements of this policy.

* * * * *

■ 20. Amend § 761.125 by revising paragraphs (a)(2), (c)(3)(iii), and (c)(4)(iv) to read as follows:

**§ 761.125  Requirements for PCB spill cleanup.**

(a) * * *

(2) *Disposal of cleanup debris and materials.* All concentrated soils, solvents, rags, and other materials resulting from the cleanup of PCBs under this policy shall be properly stored, labeled, and disposed of in accordance with the provisions of Subpart D of this part, except that such materials shall not be disposed of in a hazardous waste landfill permitted by EPA under section 3005 of RCRA or by a State or territory authorized under section 3006 of RCRA pursuant to § 761.61(b)(2)(ii)(A).

*     *     *     *     *

(c) * * *
(3) * * *
(iii) At the option of the responsible party, low-contact, indoor, nonimpervious surfaces will be cleaned either to 10 µg/100 cm² or to 100 µg/100 cm² and encapsulated. The Regional Administrator, however, retains the authority to disallow the encapsulation option for a particular spill situation upon finding that the uncertainties associated with that option pose special concerns at that site. That is, the Regional Administrator would not permit encapsulation if they determine that if the encapsulation failed the failure would create an imminent hazard at the site.

*     *     *     *     *

(4) * * *
(iv) At the option of the responsible party, low-contact, outdoor, nonimpervious solid surfaces shall be either cleaned to 10 µg/100 cm² or cleaned to 100 µg/100 cm² and encapsulated. The Regional Administrator, however, retains the authority to disallow the encapsulation option for a particular spill situation upon finding that the uncertainties associated with that option pose special concerns at that site. That is, the Regional Administrator would not permit encapsulation if they determine that if the encapsulation failed the failure would create an imminent hazard at the site.

*     *     *     *     *

■ 21. Amend § 761.130 by revising paragraph (e) to read as follows:

**§ 761.130  Sampling requirements.**

*     *     *     *     *

(e) EPA recommends the use of a sampling scheme developed by the Midwest Research Institute (MRI) for use in enforcement inspections: "Verification of PCB Spill Cleanup by Sampling and Analysis." Guidance for the use of this sampling scheme is available in the MRI report "Field Manual for Grid Sampling of PCB Spill Sites to Verify Cleanup." Both the MRI sampling scheme and the guidance document are available on EPA's website at *https://www.epa.gov/pcbs,* or from the Program Implementation and Information Division, Office of Resource Conservation and Recovery (5303T), 1200 Pennsylvania Ave. NW, Washington, DC 20460–0001. The major advantage of this sampling scheme is that it is designed to characterize the degree of contamination within the entire sampling area with a high degree of confidence while using fewer samples than any other grid or random sampling scheme. This sampling scheme also allows some sites to be characterized on the basis of composite samples.

*     *     *     *     *

## Subpart J—General Records and Reports

■ 22. Amend § 761.180 by revising paragraphs (b)(3) introductory text, removing and reserving paragraph (b)(3)(ii), revising paragraphs (b)(3)(iii) and (v), and (b)(4).

The revisions read as follows:

**§ 761.180  Records and monitoring.**

*     *     *     *     *

(b) * * *
(3) The owner or operator of a PCB disposal facility (including an owner or operator who disposes of their own waste and does not receive or generate manifests) or a commercial storage facility shall submit an annual report using EPA Form 6200–025, which briefly summarizes the records and annual document log required to be maintained and prepared under paragraphs (b)(1) and (b)(2) of this section to the Director, Office Resource Conservation and Recovery at the address listed on the form, by July 15 of each year, beginning with July 15, 1991. The first annual report submitted on July 15, 1991, shall be for the period starting February 5, 1990, and ending December 31, 1990. The annual report shall contain no confidential business information. The annual report shall consist of the information listed in paragraphs (b)(3)(i) through (vi) of this section.

*     *     *     *     *

(iii) The total weight in kilograms of PCB waste in PCB Large High or Low Voltage Capacitors, PCB waste in PCB Article Containers, PCB waste in PCB Transformers, bulk PCB waste, PCB waste in PCB Containers, and other PCB waste in storage at the facility at the beginning of the calendar year, received or generated at the facility, transferred to another facility, or disposed of at the facility during the calendar year. The information must be provided for each of these categories, as appropriate.

*     *     *     *     *

(v) The total weight in kilograms of each of the following PCB categories: PCB waste in PCB Large High or Low Voltage Capacitors, PCB waste in PCB Article Containers, PCB waste in PCB Transformers, bulk PCB waste, PCB waste in PCB Containers, and other PCB waste remaining in storage for disposal at the facility at the end of the calendar year

*     *     *     *     *

(4) Whenever a commercial storer of PCB waste accepts PCBs or PCB Items at their storage facility and transfers the PCB waste off-site to another facility for storage or disposal, the commercial storer of PCB waste shall initiate a manifest under subpart K of this part for the transfer of PCBs or PCB Items to the next storage or disposal facility.

**Note 1 to paragraph (b)(4):** Any requirements for weights in kilograms of PCBs may be calculated values if the internal volume of PCBs in containers and transformers is known and included in the reports, together with any assumptions on the density of the PCBs contained in the containers or transformers. If the internal volume of PCBs is not known, a best estimate may be used.

*     *     *     *     *

## Subpart K—PCB Waste Disposal Records and Reports

■ 23. Amend § 761.205 by revising paragraphs (a)(3), (a)(4)(v), and (d) to read as follows:

**§ 761.205  Notification of PCB waste activity (EPA Form 7710–53).**

(a) * * *
(3) Any person required to notify EPA under this section shall file with EPA Form 7710–53. A copy of EPA Form 7710–53 is available on EPA's website at *https://www.epa.gov/pcbs,* or from the Program Implementation and Information Division, Office of Resource Conservation and Recovery (5303T), Environmental Protection Agency, 1200 Pennsylvania Ave. NW, Washington, DC 20460–0001 ATTN: PCB Notification. Descriptive information and instructions for filling in the form are included in paragraphs (a)(4)(i) through (vii) of this section.

(4) * * *
(v) The facility's installation contact, telephone number, and email address.

*     *     *     *     *

(d) Persons required to notify under this section shall file EPA Form 7710–

USCA Case #23-1300    Document #2024503    Filed: 10/30/2023    Page 39 of 41

53 with EPA by mailing the form to the address listed on the form.

\* \* \* \* \*

■ 24. Amend § 761.207 by revising paragraph (a), and paragraph (c) and to read as follows:

### § 761.207 The manifest—general requirements.

(a) A generator who transports, or offers for transport, PCB waste for commercial off-site storage or off-site disposal, and a commercial storage or disposal facility who offers for transport a rejected load of PCB waste, must prepare a manifest on EPA Form 8700–22 and, if necessary, a continuation sheet. The generator shall specify:

(1) For each bulk load of PCBs, the identity of the PCB waste, the earliest date of removal from service for disposal, and the weight in kilograms of the PCB waste. (Item 14—Special Handling Instructions box)

(2) For each PCB transformer, the serial number if available, or other identification if there is no serial number; the date of removal from service for disposal; and weight in kilograms of the PCB waste in each PCB transformer. (Item 14—Special Handling Instructions box)

(3) For each PCB Large High or Low Voltage Capacitor, the serial number if available, or other identification if there is no serial number; the date of removal from service for disposal; and weight in kilograms of the PCB waste in each PCB Large High or Low Voltage Capacitor. (Item 14—Special Handling Instructions box)

(4) For each PCB Article Container, the unique identifying number, type of PCB waste (*e.g.,* small capacitors), earliest date of removal from service for disposal, and weight in kilograms of the PCB waste contained therein. (Item 14—Special Handling Instructions box)

(5) For each PCB Container, the unique identifying number, type of PCB waste (*e.g.,* soil, debris, small capacitors), earliest date of removal from service for disposal, and weight in kilograms of the PCB waste contained therein. (Item 14—Special Handling Instructions box)

(6) For each Other item, the type of PCB waste (*e.g.,* small capacitors, circuit breakers, PCB-Contaminated transformers, pipeline), earliest date of removal from service for disposal, and weight in kilograms of the PCB waste.

**Note 1 to paragraph (a):** EPA Form 8700–22A is not required as the PCB manifest continuation sheet. In practice, form 8700–22A does not have adequate space to list required PCB-specific information for several PCB articles. However, if form 8700–22A fits

the needs of the user community, the form is permissible.

**Note 2 to paragraph (a):** PCB waste handlers should use the EPA Form 8700–22 instructions as a guide, but should defer to the Part 761 manifest regulations whenever there is any difference between the Part 761 requirements and the instructions. The differences should be minimal.

**Note 3 to paragraph (a):** PCBs are not regulated under RCRA, thus do not have a RCRA waste code. EPA does not require boxes 13 and 31 on forms 8700–22 and 8700–22A (if used), respectively, to be completed for shipments only containing PCB waste. However, some States track PCB wastes as State-regulated hazardous wastes, and assign State hazardous waste codes to these wastes. In such a case, the user should follow the State instructions for completing the waste code fields.

\* \* \* \* \*

(c) A generator may also designate on the manifest one alternate facility which is approved to handle their PCB waste in the event an emergency prevents delivery of the waste to the primary designated facility.

\* \* \* \* \*

■ 25. Amend § 761.212 by revising paragraph (a) introductory text to read as follows:

### § 761.212 Transporter compliance with the manifest.

(a) The transporter must deliver the entire quantity of PCB waste which they have accepted from a generator or a transporter to:

\* \* \* \* \*

■ 26. Amend § 761.213 by revising paragraphs (a)(2) introductory text and (b) introductory text to read as follows:

### § 761.213 Use of manifest—Commercial storage and disposal facility requirements.

(a) \* \* \*

(2) If a commercial storage or disposal facility receives an off-site shipment of PCB waste accompanied by a manifest, the owner or operator, or their agent, shall:

\* \* \* \* \*

(b) If a commercial storage or disposal facility receives, from a rail or water (bulk shipment) transporter, PCB waste which is accompanied by a shipping paper containing all the information required on the manifest (excluding the EPA identification numbers, generator's certification, and signatures), the owner or operator, or their agent, must:

\* \* \* \* \*

■ 27. Amend § 761.214 by revising paragraph (a)(1) to read as follows:

### § 761.214 Retention of manifest records.

(a)(1) A generator must keep a copy of each manifest signed in accordance with

§ 761.210(a) for three years or until they receive a signed copy from the designated facility which received the PCB waste. This signed copy must be retained as a record for at least three years from the date the waste was accepted by the initial transporter. A generator subject to annual document requirements under § 761.180 shall retain copies of each manifest for the period required by § 761.180(a).

\* \* \* \* \*

■ 28. Amend § 761.216 by revising paragraphs (a) introductory text and (a)(6) to read as follows:

### § 761.216 Unmanifested waste report.

(a) If a facility accepts for storage or disposal any PCB waste from an offsite source without an accompanying manifest, or without an accompanying shipping paper as described by § 761.211(e), and the owner or operator of the commercial storage or disposal facility cannot contact the generator of the PCB waste, then they shall notify the Regional Administrator of the EPA region in which their facility is located of the unmanifested PCB waste so that the Regional Administrator can determine whether further actions are required before the owner or operator may store or dispose of the unmanifested PCB waste, and additionally the owner or operator must prepare and submit a letter to the Regional Administrator within 15 days after receiving the waste. The unmanifested waste report must contain the following information:

\* \* \* \* \*

(6) Signature of the owner or operator of the facility or their authorized representative; and

\* \* \* \* \*

■ 29. Amend § 761.217 by revising paragraph (a)(2)(ii) to read as follows:

### § 761.217 Exception reporting.

(a) \* \* \*

(2) \* \* \*

(ii) A cover letter signed by the generator or their authorized representative explaining the efforts taken to locate the PCB waste and the results of those efforts.

\* \* \* \* \*

### Subpart M—Determining a PCB Concentration for Purposes of Abandonment or Disposal of Natural Gas Pipeline: Selecting Sample Sites, Collecting Surface Samples, and Analyzing Standard PCB Wipe Samples

■ 30. Amend § 761.243 by revising paragraph (a) to read as follows:

## § 761.243   Standard wipe sample method and size.

(a) Collect a surface sample from a natural gas pipe segment or pipeline section using a standard wipe test as defined in § 761.123. Detailed guidance for the entire wipe sampling process appears in the document entitled, ''Wipe Sampling and Double Wash/ Rinse Cleanup as Recommended by the Environmental Protection Agency PCB Spill Cleanup Policy,'' dated June 23, 1987, and revised on April 18, 1991. This document is available on EPA's website at *https://www.epa.gov/pcbs,* or from the Program Implementation and Information Division, Office of Resource Conservation and Recovery (5303T), Environmental Protection Agency, 1200 Pennsylvania Ave. NW, Washington, DC 20460–0001.

\*    \*    \*    \*    \*

■ 31. Amend § 761.247 by revising paragraph (b)(2)(ii)(B)*(2)* to read as follows:

## § 761.247   Sample site selection for pipe segment removal.

\*    \*    \*    \*    \*

(b) \*  \*  \*
(2) \*  \*  \*
(ii) \*  \*  \*
(B) \*  \*  \*

*(2)* Divide the total number of segments, save one, by six. The resulting number is the interval between the segments you will sample. Do not round this interval. For example, cut a 2.9-mile length of pipe into segments of no more than 40 feet by first, dividing 2.9 miles (15,312 feet) by 40 feet per segment, resulting in 382.8 total segments. Do not round this result. Subtract 1 from the total number of segments and then divide the remaining number of segments, 381.8, by six. The resulting number in this example is 63.6. Do not round. Add 63.6 to the first segment (number 1) to select segment 64.6. Next, add 63.6 to 64.6 to select segment 128.3. Continue in this fashion to select all seven segments: 1, 64.6, 128.3, 191.9, 255.5, 319.2, and 382.8. Now round these numbers to the nearest whole number to determine which segment to sample: 1, 65, 128, 192, 256, 319, and 383.

\*    \*    \*    \*    \*

■ 32. Amend § 761.253 by revising paragraph (a) to read as follows:

## § 761.253   Chemical Analysis.

(a) Select applicable method(s) from the following list to extract PCBs and determine the PCB concentration from the standard wipe sample collection medium: SW–846 Method 3540C, Method 3550C, Method 3541, Method 3545A, Method 3546, or Method 8082A (all standards incorporated by reference in § 761.19). Modifications to the methods listed in this paragraph or alternative methods not listed may be used if validated under Subpart Q of this part or authorized in a § 761.61(c) approval.

\*    \*    \*    \*    \*

## Subpart N—Cleanup Site Characterization Sampling for PCB Remediation Waste in Accordance With § 761.61(a)(2)

■ 33. Amend § 761.267 by revising paragraph (a) to read as follows:

## § 761.267   Sampling non-porous surfaces.

(a) Sample large, nearly flat, non-porous surfaces by dividing the surface into roughly square portions approximately 2 meters on each side. Follow the procedures in § 761.302(a) with the exception of the sampling grid size.

\*    \*    \*    \*    \*

■ 34. Revise § 761.272 to read as follows:

## § 761.272   Chemical extraction and analysis of samples.

Select applicable method(s) from the following list to extract PCBs and determine the PCB concentration from individual and composite samples of PCB remediation waste: SW–846 Method 3510C, Method 3520C, Method 3535A, Method 3540C, Method 3541, Method 3545A, Method 3546, or Method 8082A (all standards incorporated by reference in § 761.19). Modifications to the methods listed in this paragraph or alternative methods not listed may be used if validated under Subpart Q of this part or authorized in a § 761.61(c) approval.

## Subpart O—Sampling To Verify Completion of Self-Implementing Cleanup and On-Site Disposal of Bulk PCB Remediation Waste and Porous Surfaces in Accordance With § 761.61(a)(6)

■ 35. Revise § 761.292 to read as follows:

## § 761.292   Chemical extraction and analysis of individual samples and composite samples.

Select applicable method(s) from the following list to extract PCBs and determine the PCB concentration from individual and composite samples of PCB remediation waste: SW–846 Method 3510C, Method 3520C, Method 3535A, Method 3540C, Method 3541, Method 3545A, Method 3546, or Method 8082A (all standards incorporated by reference in § 761.19). Modifications to the methods listed in this paragraph or alternative methods not listed may be used if validated under Subpart Q of this part or authorized in a § 761.61(c) approval.

## Subpart P—Sampling Non-Porous Surfaces for Measurement-Based Use, Reuse, and On-Site or Off-Site Disposal Under § 761.61(a)(6) and Determination Under § 761.79(b)(3)

■ 36. Revise § 761.314 to read as follows:

## § 761.314   Chemical analysis of standard wipe test samples.

Perform the chemical analysis of standard wipe test samples in accordance with § 761.253. Report sample results in micrograms per 100 cm$^2$.

## Subpart R—Sampling Non-Liquid, Non-Metal PCB Bulk Product Waste for Purposes of Characterization for PCB Disposal in Accordance With § 761.62, and Sampling PCB Remediation Waste Destined for Off-Site Disposal, in Accordance With § 761.61

■ 38. Revise § 761.358 to read as follows:

## § 761.358   Determining the PCB concentration of samples of waste.

Select applicable method(s) from the following list to extract PCBs and determine the PCB concentration from individual and composite samples of PCB remediation waste or PCB bulk product waste: SW–846 Method 3540C, Method 3541, Method 3545A, Method 3546, or Method 8082A (all standards incorporated by reference in § 761.19). Modifications to the methods listed in this paragraph or alternative methods not listed may be used if validated under subpart Q of this part or authorized in a §§ 761.61(c) or 761.62(c) approval.

## Subpart T—Comparison Study for Validating a New Performance-Based Decontamination Solvent Under § 761.79(d)(4)

■ 39. Amend § 761.386 by revising paragraph (e) to read as follows:

## § 761.386   Required experimental conditions for the validation study and subsequent use during decontamination.

\*    \*    \*    \*    \*

(e) *Confirmatory sampling for the validation study.* Select surface sample locations using representative sampling or a census. Sample a minimum area of 100 cm$^2$ on each individual surface in the validation study. Measure surface

concentrations using the standard wipe test, as defined in § 761.123, from which a standard wipe sample is generated for chemical analysis. Guidance for wipe sampling appears in the document entitled ''Wipe Sampling and Double Wash/Rinse Cleanup as Recommended by the Environmental Protection Agency PCB Spill Cleanup Policy,'' available on EPA's website at *https://www.epa.gov/ pcbs,* or from the Program Implementation and Information Division, Office of Resource Conservation and Recovery (5303T), Environmental Protection Agency, 1200 Pennsylvania Ave. NW, Washington, DC 20460–0001.

\*    \*    \*    \*    \*

■ 40. Amend § 761.395 by revising paragraph (b)(1) to read as follows:

### § 761.395    A validation study.

\*    \*    \*    \*    \*

(b)(1) Select applicable method(s) from the following list to extract PCBs and determine the PCB concentration from the standard wipe sample collection medium: SW–846 Method 3540C, Method 3550C, Method 3541, Method 3545A, Method 3546, or Method 8082A (all standards incorporated by reference in § 761.19). Modifications to the methods listed in this paragraph or alternative methods not listed may be used if validated under subpart Q of this part.

[FR Doc. 2023–17708 Filed 8–28–23; 8:45 am]

**BILLING CODE 6560–50–P**

\*    \*    \*    \*    \*